**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

| | |
|---|---|
| PLANT OIL POWERED DIESEL FUEL SYSTEMS, INC., | |
| Plaintiff, | **VERIFIED COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| EXXONMOBIL CORPORATION; ROYAL DUTCH SHELL, PLC; BP, PLC; CHEVRON CORPORATION; CONOCOPHILLIPS, and ASTM INTERNATIONAL, f/k/a AMERICAN SOCIETY FOR TESTING AND MATERIALS, | CASE NO.: JUDGE: |
| Defendants. | |

Plaintiff Plant Oil Powered Diesel Fuel Systems, Inc. ("POP Diesel™"), a manufacturer

and seller of triglyceride diesel fuel (fuel consisting of vegetable oil and animal fat) and related

equipment, brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26,

and 28 U.S.C. §§ 1331, 1337, to redress violations of Sections 1 and 2 of the Sherman Antitrust

Act, 15 U.S.C. §§ 1 and 2; New Mexico Statutes Annotated Sections 57-1-1 and 57-1-2; and

New Mexico common law, in order to obtain damages and to enjoin defendants above named

from agreeing, combining, and conspiring to bring about the adoption of an industry standard

and guidelines for triglyceride diesel fuel, the purpose and effect of which will be to exclude

POP Diesel™ from diesel fuel markets in the United States. For its complaint, POP Diesel™

demands trial by jury of all issues properly triable thereby, and complains and alleges as follows:

## NATURE OF ACTION

1.     By means of the conduct described hereinafter, defendants above named have agreed, combined, and conspired to cause defendant ASTM International to adopt a standard and guidelines for triglyceride diesel fuel (fuel consisting of vegetable oil and animal fat and alternately referred to as "vegetable oil diesel fuel") that will exclude POP Diesel™ from diesel fuel markets in the United States, and have undertaken a group boycott and concerted refusal to deal to exclude POP Diesel™ from diesel fuel markets in the United States, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  Through the adoption of said standard and guidelines, defendants have also conspired to monopolize diesel fuel markets in the United States in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.  Defendants' actions further violate New Mexico Statutes Annotated §§ 57-1-1 and 57-1-2 and the common law of the State of New Mexico.  POP Diesel™ is threatened with loss or damage by the triglyceride diesel fuel standard and Fit-for-purpose Guidelines drafted and proposed for adoption by defendants, and, accordingly, it brings this action for preliminary and permanent injunctive relief, such damages as it shows itself to have sustained, trebled, and its cost of suit, including a reasonable attorney's fee, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26; and New Mexico Statutes Annotated §§ 57-1-1 and 57-1-2, as well as for relief under common law.

## JURISDICTION

2.     This action is brought pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, for redress from violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, as well as under  New Mexico Statutes Annotated §§ 57-1-1 and 57-1-2.  This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action pursuant to 15 U.S.C. §§15 and 26 and 28 U.S.C. §§ 1331 and 1337.  This Court has subject matter jurisdiction of

the state law claims asserted in this action, pursuant to 28 U.S.C. §§ 1332 and 1367, in that the plaintiff and the defendants are citizens of different states and the matter in controversy exceeds the value of $75,000, exclusive of interest and costs, and the state law claims form part of the same case or controversy with the federal antitrust claims.

## THE PARTIES

3.     POP Diesel™ is a New Mexico corporation, with its principal place of business located within Bernalillo County, New Mexico.

4.     POP Diesel™ develops, manufactures, and sells triglyceride diesel fuel and related equipment that permits and manages the use of triglyceride diesel fuel in residential, commercial and industrial burners and in compression ignition (diesel) engines.  POP Diesel™ also owns and operates a state-licensed triglyceride diesel fuel processing and filling station in New Mexico, which it opened as the first such station in the entire United States, in 2006.

5.     The cities of Albuquerque, Las Cruces, and Santa Fe and the Town of Taos have all pledged to assist POP Diesel™ in establishing the first state-wide network of triglyceride fuel filling stations in the country.

6.     POP Diesel™'s feedstock for making triglyceride diesel fuel at this time consists primarily of waste vegetable oils and greases obtained from restaurants and industrial and agricultural operations, of which there is a virtually unlimited supply.

7.     Defendant ExxonMobil Corporation ("ExxonMobil"), the world's largest publicly traded international oil and gas company, is a New Jersey corporation with its principal place of business located at 5959 Las Colinas Boulevard, Irving, Texas.  ExxonMobil is directly or indirectly a manufacturer and seller of petroleum-based diesel fuel, which, as described more fully

hereafter, is different from and inferior to triglyceride diesel fuel for use in residential, commercial and industrial burners and in compression ignition (diesel) engines.

8.     ExxonMobil is a member of defendant ASTM International, f/k/a American Society for Testing and Materials ("ASTM"), as well as a voting member of ASTM's Committee D02, Subcommittee P on Recycled Petroleum Products, and has participated in the unlawful activities set forth hereafter as a member of ASTM.

9.     Royal Dutch Shell, plc ("Shell"), a global group of energy and petrochemical companies, is an English and Welsh public company with its principal place of business located at Carel van Bylandtlaan 16, 2596 HR The Hague, The Netherlands.  Shell is directly or indirectly a manufacturer and seller of petroleum-based diesel fuel.

10.     Shell is a member of ASTM, as well as a voting member of ASTM's Committee D02, Subcommittee P on Recycled Petroleum Products, and has participated in the unlawful activities set forth hereafter as a member of ASTM.

11.     BP, plc ("BP"), one of the world's leading international oil and gas companies, is an English public company with its principal place of business located at 1 St. James's Square, London, SW1Y 4PD, England.  BP is directly or indirectly a manufacturer and seller of petroleum-based diesel fuel.

12.     BP is a member of ASTM, as well as a voting member of ASTM's Committee D02, Subcommittee P on Recycled Petroleum Products, and has participated in the unlawful activities set forth hereafter as a member of ASTM.

13.     Chevron Corporation ("Chevron"), the second-largest integrated energy company in the United States, is a Delaware corporation with its principal place of business located at 6001

Bollinger Canyon Road V2322/A, San Ramon, California. Chevron is directly or indirectly a manufacturer and seller of petroleum-based diesel fuel.

14.    Chevron is a member of ASTM, as well as a voting member of ASTM's Committee D02, Subcommittee P on Recycled Petroleum Products, and has participated in the unlawful activities set forth hereafter as a member of ASTM.

15.    ConocoPhillips, the third-largest integrated energy company in the United States, based on market capitalization, oil and natural gas reserves, is a Delaware corporation with its principal place of business located at 600 North Dairy Ashford, Houston, TX 77079. ConocoPhillips is directly or indirectly a manufacturer and seller of petroleum-based diesel fuel.

16.    ConocoPhillips is a member of ASTM, as well as a member of ASTM's Committee D02, Subcommittee P on Recycled Petroleum Products and is one of the principal authors of the guidelines for triglyceride diesel fuel, and has participated in the unlawful activities set forth hereafter as a member of ASTM.

17.    Defendants ExxonMobil, Shell, BP, Chevron, and ConocoPhillips will be referred to collectively hereinafter as "the Defendant Oil Companies."

18.    Defendant ASTM International, f/k/a American Society for Testing and Materials ("ASTM"), is a Pennsylvania non-profit organization, with its principal place of business located at 100 Bar Harbor Drive, West Conshohoken, Pennsylvania.

19.    ASTM is one of the largest standards development and delivery systems in the world. ASTM promulgates voluntary quality standards for many products in commerce, which standards have been adopted by reference in federal and state law. For example, New Mexico Statutes Annotated 57-19-29(A) (1978) provides, in pertinent part, that "[u]nless modified by regulation of the board, the quality standards, tests and methods of conducting analyses on

petroleum products manufactured, kept, stored, sold or offered for sale in New Mexico shall be those last adopted and published by the American society for testing and materials ..."

20.     ASTM has over 30,000 members and 141 technical standard writing committees. Many, if not all, of ASTM's officers, as well as the chairs and co-chairs of its committees, subcommittees, and working groups are associated with the industries for which ASTM standards are promulgated.

21.     ASTM's standard setting power is wide-ranging and extends to more than 100 industrial and management sectors, including petroleum, consumer products, construction materials, environmental assessment, medical devices, and property management systems. Over 130 nations are represented in the membership of ASTM. More than 12,000 ASTM standards are in use around the world, including, by way of example, Standard Specification for Fuel Oils (D396) (burner fuel) and Standard Specification for Diesel Fuel Oils (D-975) (compression ignition (diesel) engines). ASTM's largest committee, titled D02, Petroleum Products and Lubricants, has within its scope the charge of promulgating standard specifications, classifications, test methods, and guides for liquid fuels in the diesel fuel industry.

## NATURE OF TRADE AND COMMERCE

22.     The relevant product and geographic markets for purposes of this action are the diesel fuel market for residential, commercial and industrial burners in the United States, and the diesel fuel market for compression ignition (diesel) engines in the United States ("the Relevant Markets").

23.     A burner combusts fuel to heat a fluid for one of three purposes: (a) the fluid is part of an industrial process, such as in the manufacture of asphalt or cement; (b) the fluid transfers

heat to the interior space of a building via a boiler and distribution pipes; or (c) the fluid stores potential energy, as in a hot water tank.

24.     The compression ignition engine, also referred to as a diesel engine, is named after its inventor, Rudolf Diesel, who originally intended that it run on peanut oil, a form of vegetable oil or triglyceride diesel fuel.

25.     POP Diesel™ competes in the Relevant Markets against the Defendant Oil Companies, as well as other producers and sellers of diesel fuel.

26.     The Relevant Markets are in and part of interstate commerce, make extensive use of the instrumentalities of interstate commerce, and substantially affect interstate commerce.

27.     Vehicles that utilize diesel fuel and related equipment travel in a continuous and uninterrupted flow of interstate commerce.

28.     Materials used in the production of diesel fuel and related equipment are purchased and shipped in a continuous and uninterrupted flow of interstate commerce.

29.     Any restraint of trade in the Relevant Markets, including the restraints specifically alleged in this complaint, directly and substantially restrain and affect interstate commerce.

## CONDUCT GIVING RISE TO VIOLATIONS OF LAW

30.     Diesel fuel is any fuel intended for use in a compression ignition (diesel) engine or a residential, commercial or industrial burner. The most common type of diesel fuel currently in use is petroleum-based diesel fuel, which derives primarily, *i.e.*, approximately 95 percent or more, from fossil hydrocarbons and is produced from (a) the fractional distillation (boiling) of crude oil and (b) the residual material of such distillation.

31.     ASTM's Standard Specification for Fuel Oils (D396) (burner fuel) and Standard Specification for Diesel Fuel Oils (D-975) (diesel engine fuel), adopted by its Committee D02,

Petroleum Products and Lubricants, set forth the physical and chemical properties of petroleum-based diesel fuels that are commonly sold in the United States.

32.     Until recently, petroleum-based diesel fuel meeting ASTM Standard Specifications D396 and D975 have been almost exclusively the diesel fuel available in the Relevant Markets.

33.     Triglyceride diesel fuel is an alternative to petroleum-based diesel fuel. Triglyceride diesel fuel consists of naturally occurring vegetable oils and animal fats. If properly managed, it can be an effective substitute for petroleum-based diesel fuel. Triglyceride diesel fuel has substantial advantages over petroleum-based diesel fuel. In supplanting the use of petroleum, triglyceride diesel fuel drastically reduces net greenhouse gas emissions. It does so by replacing petroleum feedstock containing fossilized carbon with plant matter that, instead of adding fossilized carbon to the atmosphere, extracts carbon from the atmosphere as it grows from the Earth. Triglyceride diesel fuel may derive from recycling previously used substances. It is potentially plentiful and readily available within the borders of the United States in virtually unlimited supply. Because triglyceride diesel fuel is not a hazardous substance, it is far safer and less costly to manufacture, handle, transport, store, and dispense than petroleum-based diesel fuel. POP Diesel™'s burner equipment permits a burner to operate on any blend of triglyceride and petroleum-based diesel fuels from zero to 100 percent of either fuel. POP Diesel™'s diesel engine equipment permits a diesel engine to operate on 100 percent triglyceride diesel fuel drawn from an auxiliary fuel tank.

34.     To date, ASTM Committee D02, Petroleum Products and Lubricants, has approved for mixing with petroleum-based diesel fuel a non-petroleum blend stock, commonly known as "biodiesel," that meets the strictures of Standard Specification for Biodiesel Fuel Blend Stock (B100) for Middle Distillate Fuels (D-6751). ASTM Standard Specification for Fuel Oils (D396)

and ASTM Standard Specification for Diesel Fuel Oils (D975) approve of up to a five percent blend of biodiesel (B5) to be included in petroleum-based diesel fuel used in burners and diesel engines, respectively.

35.    Biodiesel starts as triglycerides (vegetable oils and animal fats), but then it undergoes a complicated, hazardous, energy-intensive, and costly physical and chemical transformation of the molecules, most often by a process of transesterification, to become a new substance, biodiesel. Due to their common origins in plant matter, biodiesel offers the promise of net greenhouse gas reductions comparable to those achieved with triglyceride diesel fuel, but because of the high energy input and cost of its manufacture, this benefit ends up being far less than it is with triglyceride diesel fuel.

36.    Because of the five percent cap on biodiesel content in petroleum-based diesel fuel imposed by ASTM Committee D02 in ASTM Standard Specifications D396 and D975, as compared to the near 100 percent use of triglyceride diesel fuel possible with POP Diesel™'s equipment, biodiesel represents only an incremental step in reducing net greenhouse gas emissions. Defendant Oil Companies, corporate agricultural interests, and the few companies that dominate the waste triglyceride collection business have invested heavily in biodiesel facilities, in part because federal tax policy favored such investments before 2010. Support for the five percent cap on biodiesel in ASTM Standard Specifications D396 and D975 allows Defendant Oil Companies to portray themselves as favoring renewable energy.

37.    Without the costly federal tax incentives that expired at the end of 2009, the manufacture of biodiesel is largely not cost-effective or economically or commercially feasible in today's market for diesel fuel. Many biodiesel facilities today are sitting idle.

38.     Several years ago, ASTM's Committee D02 on Petroleum Products and Lubricants was asked to develop a standard for triglyceride diesel fuel for use in burners. The request emanated from burner manufacturers seeking insurance coverage for the use of their burners with triglyceride diesel fuel. Underwriters Laboratories, an insurance actuarial firm, would not rate these burners, and some insurers therefore would not offer coverage, unless and until ASTM first adopted a standard specification for triglyceride diesel fuel for burners.

39.     Subcommittee E of ASTM Committee D02 covers Burner, Diesel, Non-Aviation Gas Turbine, and Marine Fuels. Subcommittee D02.E0.01, Burner Fuels, was the logical body to address the request for a standard specification for triglyceride diesel fuel for burners. Both Subcommittee E and its Subcommittee D02.E0.01 refused, however, to take on this responsibility. Upon information and belief, they refused because they are dominated by petroleum-based diesel fuel interests, including the Defendant Oil Companies, which oppose any standard for triglyceride diesel fuel that may lead to triglyceride diesel fuel's supplanting petroleum-based diesel fuel. For the same reason, other subcommittees of ASTM Committee D02 were unwilling to take on this responsibility.

40.     Finally, the request to develop a standard specification for triglyceride diesel fuel for burners was referred to ASTM Committee D02's Subcommittee P, Recycled Petroleum Products. Subcommittee P established a Triglyceride Burner Fuel Working Group.

41.     The ASTM members who comprise the D.02 Committee, its Subcommittee P ("the Subcommittee"), and the Triglyceride Burner Fuel Working Group ("the Working Group") are primarily affiliated with and representatives of petroleum companies, including the Defendant Oil Companies, corporate agricultural interests that favor the use of biodiesel, and biodiesel

manufacturers, all of which have an interest in preserving the status quo embodied in ASTM
Standard Specifications D396 and D975 and their five percent biodiesel blend stock cap.

42.    The Defendant Oil Companies, either directly or indirectly, are all members of or
active participants in the D02 Committee, the Subcommittee, and the Working Group. They have
used their membership and participation to promote and promulgate an ASTM standard
specification for triglyceride diesel fuel for burners and additional guidelines that will have the
purpose and effect of facilitating the use of petroleum-based diesel fuel, including biodiesel as
approved in Standard Specifications D396 and D975, in residential, commercial and industrial
burners and compression ignition (diesel) engines, while precluding and excluding triglyceride
diesel fuel.

43.    The Subcommittee and the Working Group have created and approved a draft
Standard Specification for Triglyceride Burner Fuel for use of triglyceride diesel fuel in larger-
sized commercial and industrial burners, numbered WK 21463 (the "Draft ASTM Triglyceride
Standard").

44.    Failing to abide by its regular procedures, as set forth below, and as decided at a
meeting of its Committee D02 on Petroleum Products and Lubricants on December 9, 2010 in
Jacksonville, Florida dominated by Defendant Oil Companies, ASTM imminently will present the
Draft ASTM Triglyceride Standard to the full membership of Committee D02 for a vote with
regard to the Draft ASTM Triglyceride Standard's adoption and subsequent publication by ASTM.
POP Diesel™ has been advised by ASTM that the vote could occur within days.

45.    The Draft ASTM Triglyceride Standard contains the following material
misstatements of fact, made with the purpose and effect of excluding triglyceride diesel fuel and

related products, including the triglyceride diesel fuel and related products of POP Diesel™, from
the Relevant Markets:

    a.    The Draft ASTM Triglyceride Standard and Table 1 thereof, in its reference to
"Detailed Requirements for Triglyceride Burner Fuels," cites and refers to 38
ASTM-approved test methods for measuring the various physical or chemical
properties of petroleum-based diesel fuel as applicable to triglyceride diesel fuel.
These references are false and unsupported in fact. In breach of normal ASTM
policy and practice, not one of these petroleum test methods has ever been
validated as having applicability to triglyceride diesel fuel. According to normal
ASTM practice, applying a test method for petroleum-based diesel fuel to
triglyceride diesel fuel would require a major inter-laboratory study. Six to nine
laboratories would have to duplicate each test for petroleum-based diesel fuel on
triglyceride diesel fuel. Then ASTM, by its Committee D02, would have to
evaluate the results statistically to determine if each test applied to triglyceride
diesel fuel were equivalent or superior to the test as previously validated on
petroleum-based diesel fuel. Only then could ASTM truthfully and correctly
import a petroleum-based diesel fuel test method to triglyceride diesel fuel. Such
a major inter-laboratory study has not been performed on a single one of the 38
test methods enumerated in the Draft ASTM Triglyceride Standard for
triglyceride diesel fuel.

    b.    Section 1.2 of the Draft Standard states that "[t]he fuels specified herein are not
intended for blending with conventional [petroleum] fuel oils for this purpose."
This statement is false and unsupported in fact because:

1.  Triglyceride diesel fuel and petroleum-based diesel fuel used in burners are miscible, meaning that, when stored in a heated tank prior to combustion, they blend in a homogeneous mixture.

2.  There is no evidence that burners cannot operate on a blend of triglyceride diesel fuel and petroleum-based diesel fuel.

3.  POP Diesel™'s burner equipment functions without mishap, harm, disability, increased cost, or diminished performance on any blend of triglyceride diesel fuel and petroleum-based diesel fuel and on any continually varying blend of these two different fuels.  Thus, the above-quoted language serves to disfavor and exclude POP Diesel™'s burner equipment from the Relevant Markets.

4.  The above-quoted language will further disadvantage and exclude POP Diesel™ from the market for diesel fuel in diesel engines, because it is likely that ASTM will rely on this misstatement as precedent and use the same or similar language when it develops a standard specification for use of triglyceride diesel fuel in compression ignition (diesel) engines.

c.  Section 1.2 of the Draft ASTM Triglyceride Standard also states that "[t]hey [the fuels specified herein] are not intended for use in burners <0.32 GJ/h (0.3 × 10$^6$ BTU/h) such as residential burners or small pressure atomization burners nor are they intended for use in internal combustion engines or marine applications." This statement is false and unsupported because triglyceride diesel fuel, properly managed, operates without mishap, harm, disability, increased overall cost, or

diminished performance in burners with output of less than 0.32 GJ/h and diesel internal combustion engines.

d.     Sections 5.3.1 and 5.3.2 of the Draft ASTM Triglyceride Standard, in relevant part, define triglyceride burner fuel as "burner fuel comprised of commercial recycled and unused cooking oils, greases and rendered animal fats * * * intended for use in industrial burners and commercial boilers equipped with devices that use steam or compressed air to atomize fuel oil of higher viscosity." This description is false and unsupported because:

1.     Waste vegetable oil feedstock for triglyceride diesel fuel is not limited only to "commercial" sources, but may also originate from household sources, as some municipalities around the country, notably the City of San Francisco, are now officially promoting; and

2.     There is no reason why triglyceride diesel fuel should be restricted to use in "industrial burners and commercial boilers" only. This fuel functions just as well with residential burners and boilers.

e.     Section 5.3.2 of the Draft ASTM Triglyceride Standard, in relevant part, states that "[t]he extra equipment and maintenance required to handle this fuel [] may preclude its use in small and/or unattended installations." This statement is false and unsupported in fact. POP Diesel™'s burners do not require extra equipment or maintenance or an attendant. This statement serves to discourage and exclude POP Diesel™'s products from use in the Relevant Markets.

f.     The Draft ASTM Triglyceride Standard limits to 30 the total acid number for triglyceride diesel fuel, as set forth in Table 1 and Sections X1.2 and X1.5.1.

This limitation is false and unsupported in fact because, when used with POP Diesel™'s related equipment, triglyceride diesel fuel may have an acid number in excess of 30, and is safe and appropriate for use in residential, commercial, and industrial burners. By limiting the acid number to 30, the Draft ASTM Triglyceride Standard discourages and excludes POP Diesel™'s triglyceride diesel fuel and related equipment from the Relevant Markets.

g.  Section X1.4.4.2 of the Draft Standard states, in pertinent part, that "[t]he viscosity of [triglyceride diesel fuel] can change significantly with relatively small temperature differences in the range of temperatures at which the burner operates. For this reason, burner manufacturers and triglyceride fuel users should consider the viscosity characteristics of the range of potential triglyceride burner fuels very carefully." This cautionary statement about the viscosity of triglyceride diesel fuel is false and unsupported in fact because:

1.  Higher viscosity is not a problem for POP Diesel™'s burner and diesel engine equipment, which pre-heats triglyceride diesel fuel to lower its viscosity;

2.  POP Diesel™'s burner and diesel engine equipment eliminates temperature-variable viscosity of any sample of triglyceride diesel fuel by pre-heating it;

3.  The language quoted above restricts and precludes the use of higher viscosity triglyceride diesel fuels, which POP Diesel™'s equipment handles without difficulty, harm, diminished performance, or other problem.

h.      Section X1.4.1 of the Draft ASTM Triglyceride Standard states with regards to
the temperature at which a substance turns from solid to liquid state: "An
increase in pour point can occur when triglyceride burner fuel is subjected to
cyclic temperature variations that can occur in the course of storage." This
statement is false and unsupported in fact. Although cyclic temperature
variations can occur in the course of storage and use of triglyceride diesel fuel, as
they do in the storage and use of most fuels, such temperature variations do not
lead to a significant change in the pour point of triglyceride diesel fuel. The
inclusion of this false statement in the Draft ASTM Triglyceride Standard
propagates misinformation and generates misperceptions about triglyceride diesel
fuel, thereby causing immense damage to POP Diesel™ in the Relevant Markets.

i.      Section 1.4 of the Draft ASTM Triglyceride Standard states: "Nothing in this
specification shall preclude observance of national or local regulations, which
can be more restrictive." Given the unreasonable restrictions on triglyceride
diesel fuels set forth in subparagraphs 45(a) through (h) hereinabove and the
misperceptions these restrictions propagate, there is no factual basis to suggest
that governments may have cause to adopt even more restrictive standards.

46.     In or about the Spring of 2010, POP Diesel™'s President and General Counsel,
Claude D. Convisser ("Convisser"), learned that the Subcommittee was considering the Draft
ASTM Triglyceride Standard.

47.     Convisser attended the semi-annual meetings of the D02 Committee and its various
subcommittees in Kansas City, Missouri, in late June 2010, during which the Subcommittee and
the Working Group met to discuss the Draft ASTM Triglyceride Standard.

48.     Representatives of the Defendant Oil Companies were also in attendance.

49.     Convisser voiced objections to the Draft ASTM Triglyceride Standard at the meetings of, first, the Working Group and, then, the Subcommittee.  Convisser subsequently provided the Working Group and Subcommittee with written objections to the Draft ASTM Triglyceride Standard.  Convisser's oral and written objections specifically described the misrepresentations set forth in paragraph 45, *supra*.

50.     During Convisser's comments about the Draft ASTM Triglyceride Standard at the Working Group's meeting, a representative of ExxonMobil sitting as a member of the Subcommittee stated that ExxonMobil would vote against the Draft ASTM Triglyceride Standard if ASTM deleted the misrepresentations in Section 1.2 restricting the uses and purposes of triglyceride diesel fuel, to which Convisser had objected, as set forth in paragraph 45(b) *supra*.

51.     As the world's largest publicly traded international oil and gas company, ExxonMobil has the market power to ensure that ASTM adopts the Draft ASTM Triglyceride Standard in its current form, without any of the changes proposed by POP Diesel™.

52.     ExxonMobil and the other Defendant Oil Companies have an interest in excluding POP Diesel™'s products from the Relevant Markets because the Defendant Oil Companies produce and sell petroleum-based diesel fuel, and they wish to promote and preserve the status quo in the Relevant Markets, in which the Defendant Oil Companies collectively and individually have market power.

53.     The other Defendant Oil Companies have concurred with and acquiesced in ExxonMobil's position with respect to the Draft ASTM Triglyceride Standard, because they share the same goal of barring the introduction of significant, new triglyceride diesel fuel supplies to the Relevant Markets.  In concert, the Defendant Oil Companies and ASTM have approved the Draft

ASTM Triglyceride Standard with the purpose and effect of unreasonably excluding triglyceride diesel fuel and POP Diesel™'s products from the Relevant Markets. The Defendants intend imminently to present the Draft ASTM Triglyceride Standard to the membership of ASTM for a vote on its adoption. Once it is adopted and published, numerous states will incorporate it by reference into law pursuant to existing statutes, similar to New Mexico Statutes Annotated 57-19-29(A) (1978).

54.     Approval of the Draft ASTM Triglyceride Standard by ASTM's Committee D02, the Subcommittee, and the Working Group was also marked by the following irregularities and breaches of ASTM's own policies and procedures:

a       ASTM's Regulations Governing [Its] Technical Committees ("ASTM's Regulations") state in relevant part at section 19.2.2.4:  "Accurate minutes should be kept of all ASTM-sponsored meetings."  In fact, in breach of this regulation, minutes were not taken at the ASTM-sponsored meeting of the Working Group in Kansas City in late June 2010, during which ExxonMobil stated that it would vote against the Draft ASTM Triglyceride Standard if the Working Group or Subcommittee deleted language that had the purpose and effect of restricting and excluding triglyceride diesel fuels and POP Diesel™'s products from the Relevant Markets.

b.      The Bylaws of Committee D02 state at section 9.3.2: "Minutes shall be circulated within 60 days following a meeting."  Since no minutes were taken, there were no minutes of the Working Group meeting referenced in the preceding subparagraph circulated to Working Group members within 60 days following the meeting in late June 2010.

c.    ASTM's Regulations state in further relevant part at section 19.2.2.4: "The minutes of the preceding meeting should be approved before the start of the following meeting." Without prior approval by the Working Group or the Subcommittee at their meetings on December 8, 2010, the Chair of the Subcommittee attempted to append a set of alleged minutes of the Working Group meeting of late June 2010 to the Subcommittee report to the D.02 Committee on December 9, 2010 in Jacksonville. The draft of the alleged Working Group minutes that were *ex post facto* appended to the report did not make mention of the statement by ExxonMobil referenced above.

d.    The agenda published for the Committee D02 meeting on December 9, 2010 in Jacksonville stated, as it does for every semi-annual meeting of this Committee, that the meeting "will continue until all business is completed." In contravention of the agenda, the Committee did not vote on the Draft ASTM Triglyceride Standard at the December 9, 2010 meeting. This Committee, over POP Diesel™'s objection, voted to submit Convisser's comments accompanying his negative vote on the Draft ASTM Triglyceride Standard to electronic balloting, rather than allow for discussion and debate at the meeting. In contrast, Committee D02 permitted unlimited discussion and debate on all of the other twenty or so ASTM Standards on the agenda.

e.    Prior to drafting his written comments that would accompany his negative vote on the Draft ASTM Triglyceride Standard, in September 2010, Convisser asked ASTM for access to the data and reports on triglyceride diesel fuel that the Subcommittee and Working Group had considered in formulating the Draft

ASTM Triglyceride Standard. No such material has ever been provided. Upon information and belief, there are no data or reports to support the provisions of the Draft ASTM Triglyceride Standard to which Convisser has objected. In fact, the only report to which ASTM referred Convisser, which came from the University of Georgia, supported Convisser's point that triglyceride diesel fuel and petroleum-based diesel fuel are miscible.

f.   During the December 8, 2010 Subcommittee meeting, Convisser repeatedly requested to see and know of data and reports justifying the statements in the Draft ASTM Triglyceride Standard to which he objected. No such data or reports were furnished at this meeting or thereafter.

g.   Contrary to the usual and customary ASTM practice of trying to work through differences prior to an actual committee meeting, the Working Group and Subcommittee did not contact Convisser following his submission in September of written comments accompanying his negative vote and prior to the December meetings. Instead, the Subcommittee contacted Convisser the week before and simply asked him to withdraw his negative comments, which Convisser declined to do.

h.   At the December, 2010, Subcommittee meeting on the Draft ASTM Triglyceride Standard in Jacksonville, Florida, the Subcommittee presented on a large display screen written responses to each of Convisser's objections to the Draft Standard, which responses had not been previously provided to Convisser, contrary to the usual and customary practice of ASTM . No hard copies of the Subcommittee's responses were made available at the meeting.

i.    During the December, 2010, Subcommittee meeting on the Draft ASTM Triglyceride Standard, members of the Subcommittee not affiliated with the Defendant Oil Companies repeatedly stated that many of Convisser's objections had substantive merit. These members of the Subcommittee refused to adopt and approve any of Convisser's proposed changes because such adoption and approval would antagonize the Defendant Oil Companies.

j.    During the December, 2010, Subcommittee meeting on the Draft ASTM Triglyceride Standard, Convisser repeatedly stated that the Subcommittee's handling of Convisser's objections to the Draft ASTM Triglyceride Standard was tantamount to an unreasonable restraint on trade and in breach of ASTM's own Antitrust Policy.

55.    At the December, 2010, meeting, the Subcommittee voted 12-1, over Convisser's objections, to adopt the Draft ASTM Triglyceride Standard and forward it to the main Committee D02 for approval at its meeting on the following day, December 9. In doing so, Committee D02 treated the negative comments on the Draft ASTM Triglyceride Standard uniquely and differently from all other negative comments submitted during the meeting by preventing discussion and debate and submitting them for post-meeting electronic balloting.

56.    When ASTM makes the negative comments of Convisser and other negative voters on the Draft ASTM Triglyceride Standard available for voting by electronic ballot, ASTM regulations provide that the ballot will remain open for 30 days. Given the denial of discussion and debate afforded Convisser's negative comments at the Committee D02 meeting in Jacksonville, voters, if permitted to vote, will in all likelihood override his negative vote and approve the Draft ASTM Triglyceride Standard.

57.     As a result of Convisser's objections stated to ASTM's development of standards for triglyceride diesel fuel for burners, the Defendant Oil Companies have also moved aggressively to have ASTM unreasonably restrict future approval of triglyceride diesel fuels for diesel engines. They have caused Committee D02 to begin the promulgation of so-called "Fit-for-Purpose" Guidelines that expressly limit standards for future diesel engine fuels to petroleum-based diesel fuel or biodiesel, as currently described in ASTM Standard Specification D975.

58.     These Fit-for-Purpose Guidelines are anticipatory standards governing research and development of future products. These Fit-for-Purpose Guidelines specify how a new and potentially as yet undeveloped product must function and how it must fit with existing products and processes in order to meet ASTM standards. Fit-for-Purpose Guidelines not only are uncommon in ASTM, but also, in this context and for the reasons stated below, are detrimental to innovation and research and development, in that Fit-for-Purpose Guidelines tend to limit and channel innovation towards existing products and processes and protect existing products and processes from future competition.

59.     Two Fit-for-Purpose Guidelines for diesel fuels under development at ASTM would modify ASTM Standard Specification for Diesel Fuel Oils (D975), ASTM's basic standard for diesel engine fuel.

60.     Defendant ConocoPhillips has a key role in the development of the Fit-for-Purpose Guidelines. The other Defendant Oil Companies have known of and concurred and participated in the development of the Fit-for-Purpose Guidelines.

61.     The purpose and effect of the Fit-for-Purpose Guidelines are to stifle innovation of new diesel fuels, including specifically triglyceride diesel fuel, in the Relevant Markets, as follows:

a.      ASTM Work Item 30622, for which ConocoPhillips is the technical contact,

defines "hydrocarbon oil" as "a homogeneous mixture or solution with elemental

composition primarily of carbon and hydrogen and also containing sulfur

consistent with [D975] Table 1 requirements, elements other than carbon,

hydrogen, sulfur, oxygen and nitrogen at total concentration less than 10 mass

[parts per million ("ppm")] and oxygen and nitrogen consistent with the use of

diesel additives."   This definition will exclude triglyceride diesel fuel and any

other diesel fuel apart from refined petroleum-based diesel fuel and biodiesel.

1.      Triglyceride diesel fuel made from waste vegetable oil would be excluded

from the proposed definition of "hydrocarbon oil" because triglyceride

diesel fuel made from waste vegetable oil naturally contains more than 10

mass ppm of oxygen, even though triglyceride diesel fuel, if cleaned and

managed properly, does not harm a diesel engine and indeed, has

properties that make it perform better in a diesel engine than petroleum-

based diesel fuel or biodiesel.

2.      Triglyceride diesel fuel would also be excluded from the proposed

definition of "hydrocarbon oil" by allowance for the presence of higher

levels of oxygen only "consistent with the use of use of diesel additives,"

but not due to other causes, such as the natural occurrence of oxygen in the

triglyceride molecule.

b.      ASTM Work Item 5 that accompanies ASTM Work Item 30622, for which

ConocoPhillips is also the technical contact, is entitled the "Proposed Revision of

D975 -- Adding an Appendix Guidance on Evaluation of New, Unusual Non-conventional Materials for #1D and #2D Grades of Diesel Fuels."

1. Work Item 5 states that "[w]here sufficient performance data does not exist to validate [a new fuel's] fitness, the manufacturer or other stakeholder promoting the fuel will be expected to obtain such data as may reasonably be needed." This expectation or requirement prejudices small, independent, innovating producers like POP Diesel™, that do not have large research and development budgets, and favors large corporate producers like the Defendant Oil Companies.

2. Work Item 5's placing, in essence, a burden of production and proof on the advocate for a new fuel is contrary to ASTM's stated policy and practice of setting standards through a collegial and collective process involving multiple parties, and is an abdication of ASTM's purpose and responsibilities in establishing standards.

c. ASTM Work Item 30088, in the drafting of which a former employee of ExxonMobil is actively participating, entitled "Standard Guide for Fit-for-purpose Considerations for Compression Ignition Distillate Fuel (Diesel Fuel)" purports to "provide[] an analytic framework to aid the evaluation of new fuels and new fuel additives for use in compression ignition (diesel) engines." The purpose and effect of this Work Item are to exclude triglyceride diesel fuel from the relevant markets in the future.

1. Work Item 30088 references a long list of ASTM standards, none of which have been validated for triglyceride diesel fuel.

2.    Section 5.3.1 of Work Item 30088 falsely states that "[t]his guide gives
properties that have been found to have an effect on performance during
use." In fact, the "properties that have been found" are necessarily limited
to petroleum-based diesel fuels. The intent and effect of Section 5.3.1 are
thus to exclude any new fuel that falls outside the petroleum-based diesel
"properties that have been found to have an effect on performance during
use."

3.    Work Item 30088 purports to set forth physical and chemical properties
for new fuels not currently in ASTM Standard Specification D975.
Because the Work Item places these physical and chemical properties in
an appendix to D975, rather than the definition section or properties table
of D975, the limits on these physical and chemical properties would apply
only to new fuels, such as triglyceride diesel fuel, and not to petroleum-
based diesel fuel.

4.    Section 5.1 of Work Item 30088 falsely states: "Specification D975
adequately describes/specifies an acceptable fuel for a diesel engine,
providing the fuel was refined from petroleum crude oil using current
refining techniques. Fuels made from other raw materials or by other
manufacturing processes but that also meet the requirements of D975 may
also provide acceptable performance." In fact, triglyceride diesel fuel,
properly managed, "also provide[s] acceptable performance" in a diesel
engine, even though it may not satisfy all the requisites of D975. ASTM's
adoption of Work Item 30088 will unnecessarily and unreasonably restrict

future research and development of promising diesel fuel alternatives to petroleum-based diesel fuel that may or may not fall squarely within the requirements of D975.

d.   A biofuel is a combustible fuel that derives from biological or plant material, rather than fossilized carbon material. Triglyceride diesel fuel is a biofuel. The only biofuels used in burners and internal combustion engines for which ASTM has validated any test methods are biodiesel and ethanol. Ethanol is a gasoline, rather than diesel, fuel blend stock, for use in a spark ignition (gasoline) internal combustion engine. ASTM Work Item WK27610, entitled "Standard Guide to Elemental and Related Analysis of Oxygenated Fuels and Blendstocks Including Biofuels," purports to "provide[] an analytic framework to aid the evaluation of new fuels and new fuel additives for use in compression ignition (diesel) engines." This ASTM Standard, if adopted, will guide federal agencies, such as the Internal Revenue Service and the Department of Commerce, in assessing penalties and fines for fuel shipments that the manufacturer certifies meet this Standard's criteria but in actuality, do not.

1.   Some ASTM test methods have been validated for biodiesel and some for ethanol. Although it purports to apply to "biofuels" generally, ASTM Work Item WK27610, as is the case with ASTM Work Item 30088, references a long list of ASTM standards, 42 in all, that have never been validated for triglyceride diesel fuel. The use in ASTM Work Item WK27610 of the generic term "biofuels," rather than the specific naming of only biodiesel and ethanol, implies that conclusions may be drawn

about the validation of ASTM test methods for other biofuels, such as triglyceride diesel fuel, when in fact, no conclusions may be drawn unless and until a particular ASTM test method is specifically validated for triglyceride diesel fuel via a comprehensive inter-laboratory study. ASTM Work Item WK27610 will mislead government regulators into basing decisions on purported non-compliance with such ASTM standards and test methods, when these test methods have never been validated to be precise for triglyceride diesel fuel or other non-biodiesel, non-ethanol biofuels.

2.    For example, Table 11 of Work Item WK27610, entitled "Precision of Test Methods for Determination of Sulfur," denotes by asterisk those test methods where "[p]recision for biofuels is not available." Because the only biofuels on which ASTM has done inter-laboratory studies and thereby validated any of its test methods are biodiesel and ethanol, the only biofuels that Table 11 can truthfully describe are biodiesel and ethanol. The use of the generic term "biofuels" is misleading, since it may be interpreted to mean that biofuels other than ethanol and biodiesel, such as triglyceride diesel fuel, have been validated for the ASTM test methods that are listed without an asterisk in Table 11, even though the ASTM test methods have not been validated for such fuel.

62.    Upon information and belief, the Defendant Oil Companies may have other Fit-for-Purpose Guidelines in some stage of ASTM development unknown to POP Diesel™ that have the same unlawful purpose and effect as the ones described above.

## INJURY TO COMPETITION AND ANTICOMPETITIVE EFFECTS

63.     Upon approval of the Draft ASTM Triglyceride Standard and/or the Fit-for-Purpose Guidelines, POP Diesel™ will be irreparably harmed because it will be wrongfully excluded from the Relevant Markets.

64.     ASTM's adoption of the Draft ASTM Triglyceride Standard and/or the Fit-for-Purpose Guidelines will harm competition in the Relevant Markets in that POP Diesel™ and other existing and potential suppliers of triglyceride diesel fuel will be hindered and excluded from participation in the Relevant Markets.

65.     ASTM's adoption of the Draft ASTM Triglyceride Standard and/or the Fit-for-Purpose Guidelines will harm competition in the Relevant Markets in that consumers will be harmed because they will be deprived of the choice of triglyceride diesel fuel, a product that is less expensive and hazardous and more environmentally friendly than petroleum-based diesel fuel.

66.     Competition will be harmed in the Relevant Markets in that innovation in the Relevant Markets will be curtailed and discouraged because the Draft ASTM Triglyceride Standard and the Fit-for-Purpose Guidelines will impede and prevent introduction of triglyceride diesel fuel and other new, non-petroleum-derived products.

67.     Competition will be harmed in the Relevant Markets in that if the Draft ASTM Triglyceride Standard and/or the Fit-for-Purpose Guidelines are adopted, the industry will continue to be dominated by the Defendant Oil Companies, which have an interest in preserving a fossil fuel-based economy.

68.     Defendants' actions with respect to promulgation of the Draft ASTM Triglyceride Standard and the Fit-for-Purpose Guidelines, as described in this Complaint, in addition to harming competition in violation of federal and state antitrust laws, also violate Section 19.2.5 of

ASTM's own Antitrust Policy, which provides, in pertinent part that "[n]either ASTM nor any committee, subcommittee or task group thereof shall make any effort to bring about the standardization of any product or service for the purpose or with the effect of (a) preventing the manufacture or sale of any product or service not conforming to a specified standard ... ."

## VIOLATIONS ALLEGED

### SHERMAN ACT, SECTION 1

69.     Paragraphs 1 through 68 above are incorporated herein by reference as if the same had been set forth in full.

70.     The conduct of defendants described above, specifically their agreement to promulgate the Draft ASTM Triglyceride Standard and the Fit-for-Purpose Guidelines, constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, in that the effect of the Draft ASTM Triglyceride Standard and the Fit-for-Purpose Guidelines is a group boycott and concerted refusal to deal by defendants directed against POP Diesel™ and other existing and potential suppliers of triglyceride diesel fuel, by reason of which violation POP Diesel™ is threatened with loss or damage in the form of lost sales, profits, and investment, and with the complete destruction of its business, irreparable harm for which damages will be inadequate to compensate POP Diesel™, by reason of which POP Diesel™ is authorized to bring suit under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to obtain preliminary and permanent injunctive relief enjoining defendants from adopting and publishing the Draft ASTM Triglyceride Standard and the Fit-for-Purpose Guidelines, and to recover its cost of suit, including a reasonable attorney's fee.

71.     The conduct of defendants described hereinabove, specifically their agreement to promulgate the Draft ASTM Triglyceride Standard and the Fit-for-Purpose Guidelines, also constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the quick look rule of

reason, in that the Draft ASTM Triglyceride Standard and the Fit-for-Purpose Guidelines are naked restraints on output with no procompetitive benefits or good faith business justifications.

72.    The conduct of defendants described hereinabove, specifically their agreement to promulgate the Draft ASTM Triglyceride Standard and the Fit-for-Purpose Guidelines, also constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the full rule of reason, in that the Defendant Oil Companies have market power in the Relevant Markets; their conduct creates unjustifiable barriers to entry and innovation and restricts consumer choice in the Relevant Markets; and their agreement to promulgate the Draft ASTM Triglyceride Standard and the Fit-for-Purpose Guidelines unreasonably restrains trade and competition in the Relevant Markets by excluding therefrom a more efficient, safer, and less expensive product, triglyceride diesel fuel, and its suppliers, by denying consumers access to triglyceride diesel fuel, and by causing consumers to pay higher prices for petroleum-based diesel fuel.

73.    To the extent that POP Diesel™ is unable to obtain preliminary and permanent injunctive relief against the defendants' agreement to promulgate the Draft ASTM Triglyceride Standard and the Fit-for-Purpose Guidelines, POP Diesel™ reserves the right under Section 4 of the Clayton Act, 15 U.S.C. § 15, to seek and recover such damages as it proves itself to have sustained and a jury shall award, trebled, together with its cost of suit, including a reasonable attorney's fee.

## SHERMAN ACT, SECTION II

74.    Paragraphs 1 through 68 above are incorporated herein by reference as if the same had been set forth in full.

75.    The conduct of defendants described above, specifically their agreement to promulgate the Draft ASTM Triglyceride Standard and the Fit-for-Purpose Guidelines, also

constitutes a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, in that defendants, through

their agreement to promulgate the Draft ASTM Triglyceride Standard and the Fit-for-Purpose

Guidelines, have conspired to monopolize the Relevant Markets, with the specific intent to do so,

by reason of which violation POP Diesel™ is threatened with loss or damage in the form of lost

sales, profits, and investment, and with the complete destruction of its business, irreparable harm

for which damages will be inadequate to compensate POP Diesel™, by reason of which POP

Diesel™ is authorized to bring suit under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26,

to obtain preliminary and permanent injunctive relief enjoining defendants from adopting and

publishing the Draft ASTM Triglyceride Standard and the Fit-for-Purpose Guidelines, and to

recover its cost of suit, including a reasonable attorney's fee.

76.     To the extent that POP Diesel™ is unable to obtain preliminary and permanent

injunctive relief against the defendants' agreement to promulgate the Draft ASTM Triglyceride

Standard and the Fit-for-Purpose Guidelines, POP Diesel™ reserves the right under Section 4 of

the Clayton Act, 15 U.S.C. § 15, to seek and recover such damages as it proves itself to have

sustained and a jury shall award, trebled, together with its cost of suit, including a reasonable

attorney's fee.

## NEW MEXICO STATUTES ANNOTATED SECTIONS 57-1-1 AND 57-1-2

77.     Paragraphs 1 through 68 above are incorporated herein by reference as if the same

had been set forth in full.

78.     The conduct of defendants described above, specifically their agreement to

promulgate the Draft ASTM Triglyceride Standard and the Fit-for-Purpose Guidelines, also

violates New Mexico Statutes Annotated Sections 57-1-1 and 57-2-2, such that POP Diesel™ is

D.    Permanently enjoining defendants from agreeing to promulgate, or taking any other action to promulgate or adopt, the Draft ASTM Triglyceride Standard and the Fit-for-Purpose Guidelines.

E.    Awarding to POP Diesel™ such actual damages, trebled, as it proves itself to have sustained and the jury shall find.

F.    Awarding to POP Diesel™ such punitive or exemplary damages as the jury shall find to be appropriate for defendants' interference with POP Diesel™'s prospective business advantage.

G.    Awarding to POP Diesel™ its cost of suit, including a reasonable attorney's fee, as provided by Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26, and New Mexico Annotated Statutes Section 57-1-3.

H.    Granting to POP Diesel™ such other and further relief to which it may be entitled and which the Court finds to be just and appropriate.


Dated: February 1, 2011.

> Respectfully submitted by,
>
> GADDY♦JARAMILLO
>
>
> By: ___/s/ Maria E. Touchet_____
>      David J. Jaramillo
>      Maria E. Touchet
> Gaddy ♦ Jaramillo
> 2025 San Pedro Drive, N.E.
> Albuquerque, New Mexico 87110
> Telephone: (505) 254-9090
> Fax: (505) 254-9366
> Email: david@gaddyfirm.com
> Email: mia@gaddyfirm.com

GRAY, PLANT, MOOTY, MOOTY &
BENNETT, P.A.


By:_____
      Daniel R. Shulman (MN SBN 100651)
      Julie L. Boehmke (MN SBN 317330)
      Jeremy L. Johnson (MN SBN 0328558)
500 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Telephone:  612-632-3000
Facsimile:  612-632-4444
Email:  daniel.shulman@gpmlaw.com
Email:  julie.boehmke@gpmlaw.com
Email:  jeremy.johnson@gpmlaw.com

ATTORNEYS FOR PLANT OIL POWERED
DIESEL FUEL SYSTEMS, INC.

GP:2906283 v3

34

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | |
|---|---|
| PLANT OIL POWERED DIESEL FUEL SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> EXXONMOBIL CORPORATION; ROYAL DUTCH SHELL, PLC; BP, PLC; CHEVRON CORPORATION; CONOCOPHILLIPS, and ASTM INTERNATIONAL, f/k/a AMERICAN SOCIETY FOR TESTING AND MATERIALS, <br><br> Defendants. | **VERIFICATION** |

STATE OF NEW MEXICO   )
                        ) ss
COUNTY OF BERNALILLO )

Being first duly sworn, Claude D. Convisser states that he is the President and General

Counsel of plaintiff Plant Oil Powered Diesel Fuel Systems, Inc., and has read the foregoing

Verified Complaint, and knows the contents thereof and that the facts stated therein are true to

the best of his knowledge.

_____
Claude D. Convisser
President and General Counsel
Plant Oil Powered Diesel Fuel Systems, Inc.

Subscribed and sworn to before
me this 31st day of January, 2011.

_____
Notary Public

OFFICIAL SEAL
Diana Lueras
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires: 12.20.2011