IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PLANT OIL POWERED DIESEL FUEL SYSTEMS, INC.,

      Plaintiff,

vs.                                                                              No. CIV 11-0103 JB/WPL

EXXONMOBIL CORPORATION; ROYAL DUTCH
SHELL, PLC; BP, PLC; CHEVRON CORPORATION;
CONOCOPHILLIPS; ASTM INTERNATIONAL f/k/a
AMERICAN SOCIETY FOR TESTING AND
MATERIALS; BP PRODUCTS NORTH AMERICA, INC.;
and CHEVRON USA, INC.

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Defendant Conocophillips' Motion to

Dismiss, filed April 1, 2011 (Doc. 64); (ii) Defendant Exxonmobil Corporation's Motion to Dismiss

Plaintiff's Second Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6), filed April 1, 2011 (Doc. 66); and (iii) Defendant ASTM International's Motion to Dismiss

Plaintiff's Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), or in the

Alternative, to Strike Certain Allegations Pursuant to Fed. R. Civ. P. 12(f), filed April 1, 2011 (Doc.

67).  The primary issues are: (i) whether the claims asserted by Plaintiff Plant Oil Powered Diesel

Fuel Systems, Inc. ("POP Diesel") are ripe; (ii) whether POP Diesel adequately pled allegations

plausibly showing that the Defendants engaged in an conspiracy in violation of § 1 of the Sherman

Act, 15 U.S.C. § 1; and (iii) whether POP Diesel has adequately pled a claim for tortious

interference with business contracts under New Mexico law.  The Court dismisses without prejudice

POP Diesel's claims that are based on the Fit-for-Purpose Guidelines as unripe.  The Court

dismisses POP Diesel's antitrust claims over which it has subject-matter jurisdiction, because POP Diesel fails to allege a plausible conspiracy.  Because POP Diesel's state law claims are predicated on its antitrust claims and because POP Diesel does not allege contractual relations with which the Draft Standard Specification for Triglyceride Burner Fuel for use of triglyceride diesel fuel in larger-sized commercial and industrial burners, numbered WK 21463 (the "Draft ASTM Triglyceride Standard") would interfere, the Court also dismisses POP Diesel's claim for interference with prospective business advantage.

## FACTUAL BACKGROUND

POP Diesel develops, manufactures, and sells triglyceride diesel fuel -- fuel consisting of vegetable oil and animal fat -- and related equipment that permits and manages the use of triglyceride diesel fuel in residential, commercial, and industrial burners and in diesel engines.  See Second Amended Complaint Jury Demand ¶ 1, at 2, filed April 1, 2011 (Doc. 1)("SAC").  POP Diesel also owns and operates a state-licensed triglyceride diesel fuel processing and filling station in state of New Mexico, which it opened in 2006 as the first such station in the United States of America.  See SAC ¶ 4, at 3.  The cities of Albuquerque, Las Cruces, and Santa Fe and the town of Taos in New Mexico have all pledged to assist POP Diesel in establishing the first state-wide network of triglyceride fuel filling stations in the country.  See SAC ¶ 5, at 3.  POP Diesel's feedstock for making triglyceride diesel fuel at this time consists primarily of waste vegetable oils and greases obtained from restaurants and from industrial and agricultural operations, of which there is a virtually unlimited supply.  See SAC ¶ 6, at 3.

Defendants ExxonMobil Corporation and ConocoPhillips Company (together "the Defendant Oil Companies"), are two of the world's largest producers and sellers of petroleum-based diesel fuel, which competes with triglyceride diesel fuel, but which POP Diesel alleges is inferior to triglyceride

diesel fuel for use in burners and diesel engines, for reasons of cost, performance, product safety, and environmental impact. SAC ¶¶ 7-9, at 3-4. Each of the Defendant Oil Companies is a member of Defendant ASTM International, one of the largest standard-setting organizations in the world. See SAC ¶¶ 8, 11-15, at 4-5. ASTM promulgates quality standards for many products, including fuel oils, which have been adopted by reference in federal and state statutes throughout the United States, including New Mexico. See SAC ¶ 13, at 4. ASTM's "membership is composed of three categories: producers, consumers, and general interest (academic, etc.) . . . [and] [i]ts specifications are written by technically qualified committees composed of members from the three categories." Application of Am. Soc'y for Testing & Materials, 231 F. Supp. 686, 688 (E.D. Pa. 1964).

This case involves ASTM's pending promulgation, with the Defendant Oil Companies' alleged involvement, of a proposed new standard and guidelines for biofuels that would limit the use of triglyceride diesel fuel and related products, including those of POP Diesel. POP Diesel alleges that the Defendants conspired with numerous other entities. See SAC ¶¶ 17-19, at 5-6. POP Diesel asserts that the co-conspirators of which it knows include certain members of ASTM's Triglyceride Burner Fuel Working Group and Subcommittee P of ASTM Committee D02, including: (i) the National Biodiesel Board and Ralph F. Turner, Chair of the Triglyceride Burner Fuel Working Group, acting on behalf of biodiesel interests; (ii) Barbara Parry and Steve Spence of Newalta, acting on behalf of interests connected with recycled engine oil for burners; (iii) Marie F. Calhoon of Transmontaigne Inc., acting on behalf of interests connected with the petroleum industry; and (iv) other members of the Triglyceride Burner Fuel Working Group and Subcommittee P of ASTM Committee D02. See SAC ¶ 18, at 6. POP Diesel contends that the co-conspirators and the Defendant Oil Companies all have an economic interest in the exclusion of triglyceride diesel fuel from the relevant markets, because

-3-

triglyceride diesel fuel may tend to displace competing products manufactured, marketed, or promoted by the co-conspirators, including petroleum-based diesel fuel, recycled engine oil, and so-called biodiesel, a blend of 95 percent petroleum-based diesel fuel and 5 percent of a substance that starts out as triglycerides, but the molecules of which end up being physically and chemically transformed into a different substance . . . .  Specifically, the co-conspirators are primarily affiliated with and representatives of petroleum companies, including, but not limited to, the Defendant Oil Companies; corporate agricultural interests that have invested heavily in biodiesel production facilities; companies that collect and render waste triglycerides, which have also invested heavily in biodiesel production facilities; sellers of petroleum fuel oil and recycled engine oil for use in burners; manufacturers and sellers of biodiesel; and related interests that service petroleum and biodiesel producers.

SAC ¶ 17, at 5-6.

### 1.    The Relevant Markets.

The relevant product and geographic markets for purposes of this action are: (i) the diesel fuel market for residential, commercial, and industrial burners in the United States, and (ii) the diesel fuel market for diesel engines in the United States ("the Relevant Markets").  SAC ¶ 21, at 7.  POP Diesel competes in the Relevant Markets against the Defendant Oil Companies, as well as against other producers and sellers of diesel fuel.  See SAC ¶ 24, at 7.

### 2.    The Draft ASTM Triglyceride Standard.

ASTM's largest committee, titled D02, Petroleum Products and Lubricants ("Committee D02"), of which the Defendant Oil Companies are members, promulgates standards, specifications, classifications, test methods, and guidelines for liquid fuels in the diesel fuel industry.  SAC ¶¶ 8, 10, 15, at 4, 5.  To date, Committee D02 has approved for mixing with petroleum-based diesel fuel a non-petroleum blend stock, commonly known as "biodiesel," that meets ASTM Standard Specifications Biodiesel Fuel Blend Stock B100 for Middle Distillate Fuels D6751.  SAC ¶ 33, at 9.  ASTM Standard Specifications D396 and D975 approve up to five percent biodiesel blended with petroleum-based diesel fuel for use in burners and diesel engines, respectively.  See SAC ¶ 33, at 9.

-4-

POP Diesel alleges that, because of the five-percent cap, biodiesel represents only an incremental step in reducing net greenhouse gas emissions as compared with the near one-hundred percent use of triglyceride diesel fuel POP Diesel's equipment permits.  See SAC ¶ 35, at 10.  The Defendant Oil Companies do not oppose biodiesel, which poses no threat to petroleum-based diesel fuel because of the five-percent cap.  See SAC ¶ 35, at 10.  POP Diesel contends that supporting the five-percent cap on biodiesel in ASTM Standard Specifications D396 and D975 allows the Defendant Oil Companies to portray themselves as favoring renewable energy.  See SAC ¶ 35, at 10.  POP Diesel further contends that biodiesel blended with petroleum fuels makes use of existing pipeline, rail, road and other infrastructure, whereas "triglyceride diesel fuel is handled, transported, and stored in equipment that is apart and segregated from the infrastructure supporting petroleum."  SAC ¶ 35, at 10.  Without federal tax incentives, which expired at the end of 2009, the manufacture of biodiesel is largely not cost-effective or economically or commercially feasible, and many biodiesel facilities today are sitting idle.  See SAC ¶ 36, at 10.

Several years ago, burner manufacturers seeking insurance coverage for the use of triglyceride diesel fuel asked ASTM Committee D02 to develop a standard for triglyceride diesel fuel to be used in burners.  See SAC ¶ 37, at 10.  Underwriters Laboratories, an insurance actuarial firm, would not rate burners using triglyceride diesel fuel, and some insurers therefore would not offer coverage, unless and until ASTM first adopted a standard specification for triglyceride diesel fuel for burners.  See SAC ¶ 37, at 10-11.  Various subcommittees of Committee D02 refused to adopt a specification for triglyceride diesel fuel burners.  See SAC ¶ 39, at 10.  POP Diesel alleges that this refusal is the result of the petroleum-based diesel fuel interests that dominate these subcommittees and that these interests "oppose any standard for triglyceride diesel fuel that may lead to triglyceride diesel fuel's supplanting petroleum-based diesel fuel."  SAC ¶ 38, at 11.  The

request was then referred to Committee D02's Subcommittee P, Recycled Petroleum Products (the "Subcommittee"). SAC ¶ 40, at 11. The Subcommittee established a Triglyceride Burner Fuel Working Group (the "Working Group"). SAC ¶ 40, at 11. "The Defendant Oil Companies, either directly or indirectly, are all members of or active participants in the D02 Committee, the Subcommittee, and the Working Group," and, POP Diesel alleges, each has an interest in preserving the status quo embodied in ASTM Standard Specifications D396 -- for burners -- and D975 -- for diesel engines -- with the five-percent biodiesel cap. See SAC ¶ 41, at 11-12.

The Subcommittee and the Working Group have created and approved the Draft ASTM Triglyceride Standard. SAC ¶ 42, at 12. POP Diesel asserts that the Draft ASTM Triglyceride Standard contains numerous, material misstatements of fact made with the purpose and effect of excluding sellers of triglyceride diesel fuel and related products, including POP Diesel, from the Relevant Markets. See SAC ¶ 44, at 12-17. During the June 2010, ASTM semi-annual meeting, POP Diesel's President, Claude Convisser, voiced objections to the Draft ASTM Triglyceride Standard at the meetings of both the Working Group and the Subcommittee. See SAC ¶¶ 45-47, at 17. During Convisser's comments at the Working Group meeting, ExxonMobil stated that it would vote against the Draft ASTM Triglyceride Standard if ASTM deleted the alleged misrepresentation in Section 1.2 -- that "[t]h[e fuels specified herein] are not intended for use" in residential and smaller burners, diesel internal combustion engines, and marine applications -- to which Convisser had objected. SAC ¶ 48, at 18. Convisser subsequently provided the Working Group and Subcommittee with written objections to the Draft ASTM Triglyceride Standard. See Complaint ¶ 47, at 17. Convisser's oral and written objections described, among other things, the following alleged material misrepresentations in the Draft ASTM Triglyceride Standard:

(i)     Table 1 of the Draft ASTM Triglyceride Standard contains "Detailed Requirements for

Triglyceride Burner Fuels," which refers to thirty-eight ASTM-approved test methods allegedly applicable to triglyceride diesel fuel. Complaint ¶ 44(a), at 12. These test methods, however, all involve tests for the properties of petroleum-based diesel fuel and have never been validated as having applicability to triglyceride diesel fuel. These test methods thus provide invalid criteria for disqualifying triglyceride diesel fuel from fitness for use in burners. See SAC ¶ 44(a), at 12-13.

(ii)  Section 1.2 of the Draft ASTM Triglyceride Standard states that "[t]he fuels specified herein are not intended for blending with conventional [petroleum] fuel oils for this purpose." SAC ¶ 44(b), at 13. POP Diesel contends this statement is false because triglyceride diesel fuel and petroleum-based diesel fuel used in burners are miscible, meaning that, when stored in a heated tank before combustion, they blend in a homogeneous mixture. POP Diesel further asserts that there is no evidence that burners cannot operate on a blend of triglyceride diesel fuel and petroleum-based diesel fuel, and that such use is common without harm to burner equipment. POP Diesel's burner equipment functions, POP Diesel contends, with any blend of triglyceride diesel fuel and petroleum-based diesel fuel. POP Diesel further contends that ASTM will likely rely on this language when it develops future specifications for diesel engines. See SAC ¶ 44(b), at 13-14.

(iii)  Section 1.2 of the Draft ASTM Triglyceride Standard also states that "[the fuels specified herein] are not intended for use in . . . [certain specified burners], such as residential burners or small pressure atomization burners nor are they intended for use in internal combustion engines." SAC ¶ 44(c), at 14. POP Diesel asserts, on the contrary, that triglyceride diesel fuel, properly managed, operates in all such burners and diesel internal combustion engines. See SAC ¶ 44(c), at 14.

(iv)     Sections 5.3.1 and 5.3.2 of the Draft ASTM Triglyceride Standard define triglyceride burner fuel so as to exclude triglyceride diesel fuel that originates from household, non-commercial sources, so as to exclude its use from residential burners.  POP Diesel asserts, on the contrary, that triglyceride diesel fuel can originate from household, non-commercial sources, and, properly managed, is suitable for use in residential burners.  See SAC ¶ 44(d), at 14-15.

(v)      Section 5.3.2 of the Draft ASTM Triglyceride Standard also, according to POP Diesel, falsely states that "[t]he extra equipment and maintenance required to handle this fuel . . . may preclude its use in small and/or unattended installations."  SAC ¶ 44(e), at 14. POP Diesel asserts, on the contrary, that its burners do not require extra equipment or maintenance or an attendant.  See SAC ¶ 44(e), at 14.

(vi)     The Draft ASTM Triglyceride Standard limits to thirty the total acid number for triglyceride diesel fuel, as set forth in Table 1, and in Sections X1.2 and X1.5.1.  POP Diesel asserts, on the contrary, that when used with its equipment, triglyceride diesel fuel may have an acid number in excess of thirty, and is safe and appropriate for use in residential, commercial, and industrial burners.  See SAC ¶ 44(f), at 15.

(vii)    Section X1.4.4.2 of the Draft Standard states that, because "[t]he viscosity of [triglyceride diesel fuel] can change significantly with relatively small temperature differences in the range of temperatures at which the burner operates, . . . burner manufacturers and triglyceride fuel users should consider the viscosity characteristics of the range of potential triglyceride burner fuels very carefully."  SAC ¶ 44(g), at 15.  POP Diesel asserts, on the contrary, that higher viscosity is not a problem for burner and diesel engine equipment that pre-heats triglyceride diesel fuel to lower its viscosity, as does POP Diesel's equipment.  See SAC ¶ 44(g), at 15.

-8-

(viii)   Section X1.4.1 of the Draft ASTM Triglyceride Standard states with regards to the temperature at which a substance turns from solid to liquid state: "An increase in pour point can occur when triglyceride burner fuel is subjected to cyclic temperature variations that can occur in the course of storage."  SAC ¶ 44(h), at 16.  POP Diesel asserts, on the contrary, that there is no evidence that such temperature variations lead to a significant change in the pour point of triglyceride diesel fuel.  See SAC ¶ 44(h), at 16-17.

(xi)   Section 1.4 of the Draft ASTM Triglyceride Standard states: "Nothing in this specification shall preclude observance of national or local regulations, which can be more restrictive." SAC ¶ 44(i), at 17.  POP Diesel contends that there is "no factual basis to suggest that governments may have cause to adopt even more restrictive standards."  SAC ¶ 44(i), at 17.

POP Diesel further asserts that numerous irregularities, and breaches of ASTM's own policies and procedures, have marked the ASTM's Committee D02's, the Subcommittee's, and the Working Group's approval process for the Draft ASTM Triglyceride Standard.  See SAC ¶ 52, at 18-22.  POP Diesel alleges the following irregularities:

(i)   ASTM's Regulations Governing Technical Committees ("ASTM's Regulations") state in the relevant part of § 19.2.2.4: "Accurate minutes should be kept of all ASTM-sponsored meetings."  SAC ¶ 52(a), at 19.  The Bylaws of Committee D02 state at § 9.3.2: "Minutes shall be circulated within 60 days following a meeting."  SAC ¶ 52(b), at 19.  POP Diesel alleges that no minutes were taken or circulated for an ASTM-sponsored meeting of the Working Group in Kansas City, Missouri, in late June 2010, during which ExxonMobil stated that it would vote against the Draft ASTM Triglyceride Standard if the Working Group or Subcommittee deleted language stating triglyceride diesel fuel is not appropriate for residential and smaller burners, diesel internal combustion engines, and marine

-9-

applications.  See SAC ¶ 52(a), at 19.

(ii)      ASTM's Regulations further states in § 19.2.2.4 that "[t]he minutes of the preceding meeting

should be approved before the start of the following meeting."  SAC ¶ 52(c), at 19.  Without

the Working Group's or the Subcommittee's prior approval, at their meeting on December

8, 2010, the Chair of the Subcommittee appended a set of purported minutes for the June

2010 Working Group meeting to the Subcommittee report to the D02 Committee on the

December 9, 2010 Working Group meeting.  The draft of the purported Working Group

minutes made no mention of ExxonMobil's statement that it would vote against the Draft

ASTM Triglyceride Standard if limiting language was deleted.  See SAC ¶ 52(c), at 19.

(iii)     At the December 9, 2010 meeting, the Working Group's agenda said that the meeting "will

continue until all business is completed."  SAC ¶ 52(d), at 20.  While "Committee D02

permitted unlimited discussion and debate on all of the other twenty or so ASTM Standards

on the agenda," over POP Diesel's objection, the Committee "voted to submit Convisser's

comments accompanying his negative vote on the Draft ASTM Triglyceride Standard to

electronic balloting, rather than allow for discussion and debate at the meeting."  SAC

¶ 52(d), at 20.

(iv)     ASTM has not provided material to POP Diesel in response to Convisser's request for access

to the data and reports on triglyceride diesel fuel that the Subcommittee and Working Group

had considered in formulating the Draft ASTM Triglyceride Standard.  See SAC ¶ 52(e), (f),

at 20-21.

(v)      Contrary to the "usual and customary ASTM practice of trying to work through differences

prior to an actual committee meeting," the Working Group and Subcommittee did not

contact Convisser following his submission in September of written comments

-10-

accompanying his negative vote and before the December meeting.  SAC ¶ 52(g), at 21.

Instead, the Subcommittee contacted Convisser the week before the December meeting and

asked him to withdraw his negative comments, which Convisser declined to do.  See SAC

¶ 52(g), at 21.  At the December meeting, the Committee D02 "presented on a large display

screen" its responses to Convisser's objections to the Draft ASTM Triglyceride Standard,

but provided no hard copies.  See SAC ¶ 52(h), at 21.

POP Diesel asserts that, "[a]s the world's largest publicly traded international oil and gas

company, ExxonMobil has the influence and market power to ensure that ASTM adopts the Draft

ASTM Triglyceride Standard in its current form."  SAC ¶ 49, at 18.  POP Diesel alleges that

members of the Subcommittee not affiliated with the Defendant Oil Companies "repeatedly stated

that many of Convisser's objections had substantive merit," but nonetheless "refused to adopt and

approve any of Convisser's proposed changes because such adoption and approval would antagonize

the Defendant Oil Companies."  SAC ¶ 52(i), at 21-22.  The Subcommittee voted twelve-to-one in

favor of adopting the Draft ASTM Triglyceride Standard and forwarding it to Committee D02.  See

SAC ¶ 53, at 22.  POP Diesel asserts:

> When ASTM makes the negative comments of Convisser and other negative voters
> on the Draft ASTM Triglyceride Standard available for voting by electronic ballot,
> ASTM regulations provide that the ballot will remain open for 30 days.  Given the
> denial of discussion and debate afforded Convisser's negative comments at the
> Committee D02 meeting in Jacksonville, voters, if permitted to vote, will in all
> likelihood override his negative vote and approve the Draft ASTM Triglyceride
> Standard.

SAC ¶ 54, at 22.

### 3.    The Fit-For-Purpose Guidelines.

POP Diesel also asserts that, in response to its objections, the Defendant Oil Companies have

also moved aggressively to have ASTM restrict future approval of triglyceride diesel fuels for diesel

engines.  See SAC ¶ 55, at 23.  POP Diesel alleges that the Defendants have caused Committee D02 to begin the promulgation of "Fit-for-Purpose" Guidelines that limit standards for future diesel engine fuels to petroleum-based diesel fuel or biodiesel, as currently described in ASTM Standard Specification D975.  SAC ¶ 55, at 23.  These Fit-for-Purpose Guidelines are anticipatory standards governing research and development of future products, in that they specify how a new and potentially as yet undeveloped product must function, and how it must fit with existing products and processes to meet ASTM standards.  See SAC ¶ 56, at 23.  POP Diesel argues that these Fit-for-Purpose Guidelines are detrimental to innovation, research, and development, in that they tend to limit and channel innovation towards existing products and processes, and protect existing products and processes from future competition.  See SAC ¶ 56, at 23.

POP Diesel contends that, like the Draft ASTM Triglyceride Standard, the purpose and effect of the Fit-for-Purpose Guidelines will be to stifle innovation, and to exclude Pop Diesel and other sellers of alternative diesel fuels from the Relevant Markets.  See SAC ¶ 59, at 23.  For example, the Fit-For-Purpose Guidelines' definition of "hydrocarbon oil," a key term, will favor biodiesel, while excluding triglyceride diesel fuel.  SAC ¶ 59, at 23 (a), at 23.  The Fit-For-Purpose Guidelines shift the future burden of validating triglyceride diesel fuel to its producers, small firms that cannot afford the testing that it is the function of ASTM to provide.  See SAC ¶ 59, at 23, at 24-25.  Like the Draft ASTM Triglyceride Standard, the Fit-For-Purpose Guidelines rely on standards and tests applicable to petroleum-based diesel fuel, with no proven applicability to triglyceride diesel fuel. See Complaint ¶¶ 59(c)-(d), at 26-28.  POP Diesel alleges that ConocoPhillips is the technical contact for parts of the Fit-for-Purpose Guidelines, see SAC ¶ 59 (a), (b), at 24, and that a "former employee of ExxonMobil is actively participating in the drafting" a related guideline, see SAC ¶ 59(c), at 25.  POP Diesel contends, upon information and belief, that the Defendant Oil Companies

may have other Fit-for-Purpose Guidelines in some stage of ASTM development unknown to POP Diesel that have the same purpose and effect as they attribute to the Guidelines.  See Complaint ¶ 62, at 27.

In sum, POP Diesel alleges that, in concert, the Defendant Oil Companies and ASTM are in the process of promulgating the Draft ASTM Triglyceride Standard and the Fit-for-Purpose Guidelines with the purpose and effect of excluding triglyceride diesel fuel and POP Diesel's products from the Relevant Markets.  See SAC ¶¶ 63-64, at 30.  The Defendants intend imminently to present the Draft ASTM Triglyceride Standard to the Committee D02 membership for a vote on its adoption.  See SAC ¶ 43, at 12.  Once the Draft ASTM Triglyceride Standard is adopted and published, numerous states will incorporate it by reference into law pursuant to existing statutes, such as N.M.S.A. 1978, § 57-19-29.  See SAC ¶ 13, at 4.

## PROCEDURAL BACKGROUND

POP Diesel brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337, to redress the alleged violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1; its state counterpart, N.M.S.A. 1978, § 57-1-1; and New Mexico common law against intentional interference with prospective business advantage, for damages and to enjoin the Defendants from agreeing, combining, and conspiring to bring about the adoption of an industry standard and guidelines for triglyceride diesel fuel, the purpose and effect of which POP Diesel alleges will be to exclude it and other sellers of triglyceride diesel fuel from diesel fuel markets in the United States.

On February 1, 2011, POP Diesel filed its Motion and Application for Temporary Restraining Order and Order to Show Cause, requesting a temporary restraining order and preliminary injunction.  See Doc. 5 ("TRO Motion").  The Court held a hearing on the TRO on

March 1, 2011.  At the hearing, POP Diesel stated that its most imminent harm was that ASTM would submit the Draft ASTM Triglyceride Standard to an electronic ballot, because, if approved, the standard would automatically become the law by reference in over thirty states, including New Mexico.  See Transcript of Hearing at 7:2-10 (taken March 1, 2011), filed April 10, 2011 (Doc. 69)("Tr.")(Shulman).  POP Diesel contended that it had not had adequate opportunity to makes its views known in ASTM and that the Draft ASTM Triglyceride Standard is inaccurate.  See Tr. at 7:11-19 (Court, Shulman).  POP Diesel acknowledged that "once the standards is enacted it's not written in stone," "[i]t can be changed," and "[t]he change will go into law."  Tr. at 18:13-15 (Schulman).  POP Diesel also conceded that, while it hopes to expand, it is currently doing business only in New Mexico, with approximately thirty trucks using its fuel.  See Tr. at 19:3-21 (Court, Schulman).  POP Diesel also stated that it was "not sure" if adoption of the Draft ASTM Triglyceride Standard would "shut down the vehicles" in New Mexico.  Tr. at 20:24-21:2 (Court, Schulman).  POP Diesel then clarified that "[t]his standard deals with burner fuel, which is not vehicle fuel," and that it is "not currently marketing oil for burners," but asserted that it is "preparing to market burners."  Tr. at 22:4-17 (Court, Schulman).  POP Diesel also represented that it sought injunctive relief for only the Draft ASTM Triglyceride Standard, because the Fit-For-Purpose Guidelines are "sufficiently far from the voting stage."  Tr. at 26:21-27:2 (Schulman).

ASTM stated that it was ready to issue the ballot on the Draft ASTM Triglyceride Standard. See Tr. at 29:1-5 (Court, Edward).  ASTM represented that the ballot would be open for thirty days, after which time the ASTM Committee on Standards would have sixty days in which to review the process to make certain that there were no procedural irregularities.  See Tr. at 29:5-13 (Edward). POP Diesel's criticisms and the Working Group's response would accompany the ballots.  See Tr. at 30:5-11 (Edward).  Additionally, if one-third of the votes oppose the Draft ASTM Triglyceride

Standard, the standard is returned to committee for redrafting.  See Tr. at 30:20-23 (Edward).  POP Diesel would have the right to take an appeal of the Committee D02's decision to the Committee on Standards, which could not be heard before October 2011, and, failing there, to the ASTM Board of Directors, which could not be heard before April 2012.  See Tr. at 32:3-18 (Edward).  The Draft ASTM Triglyceride Standard would not become law while the appeal was pending, giving POP Diesel the ability to forestall the Draft ASTM Triglyceride Standard from becoming law for at least thirteen months.  See Tr. at 32:19-21, 34:1 (Court, Edward).  In light of ASTM's representations, POP Diesel acknowledged that it did not face imminent injury.  See Tr. at 42:4-10 ("Court: I guess the sense I get is that we're not in . . . an imminent situation . . . .  Do you get the same impression? MR. SHULMAN: Yes, Your Honor, I do.").  On April 18, 2011, the Court issued its Memorandum Opinion and Order, denying POP Diesel preliminary injunctive relief without prejudice to POP Diesel renewing its request in the future, because POP Diesel had not shown imminent harm would result if the Court did not issue a preliminary injunction.

The Defendants now move the Court to dismiss the SAC.  The Defendants contend that POP Diesel lacks Article III standing, because it has not suffered an injury, and that its claims are not ripe, because any future injury is speculative and contingent on uncertain events.  The Defendants further contend that POP Diesel has not suffered an antitrust injury, because, as POP Diesel represented at the March 1, 2011 TRO hearing, POP Diesel is not in the burner market, which the Draft ASTM Triglyceride Standard will affect, and that the Fit-for-Purpose Guidelines, which affect the diesel engine market -- in which POP Diesel is active -- are in their early stages.  The Defendants assert that POP Diesel fails to set forth allegations that make its conspiracy claims plausible and that

the Noerr-Pennington doctrine[1] bars POP Diesel's claims.  The Defendants also assert that POP Diesel has not alleged business relationships with which the Defendants have interfered.  The Defendants further contend that POP Diesel has conceded that its claims are subject to full-rule-of-reason review, and that if the Court does not dismiss POP Diesel's claims, it should strike POP Diesel's allegations purporting to assert a per se or "quick look" claim and seeking treble damages.

On April 22, 2011, POP Diesel filed its Combined Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Second Amended Complaint and in Opposition to Defendant ASTM International's Alternative Motion to Strike Certain Allegations in the Second Amended Complaint.  See Doc. 74 ("Response").  POP Diesel responds that, because it seeks injunctive relief, the harm it seeks to avoid is adequately imminent and its claims are ripe.  POP Diesel asserts that the Court should not consider its statements at the March 1, 2011 when determining whether it has suffered an antitrust injury without converting the motions into motions for summary judgment and giving POP Diesel an opportunity to brief accordingly after discovery.  POP Diesel further asserts that it adequately pled plausible allegations of a conspiracy and that the Noerr-Pennington doctrine does not remove standard-setting organizations from antitrust liability.  POP Diesel also asserts that it alleged sufficient facts showing intentional interference with prospective advantage.

On May 6, 2011, ASTM filed its Reply in Support of its Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), or in the Alternative, to Strike Certain Allegations Pursuant to Fed. R. Civ. P. 12(f).  See Doc. 76 ("Reply").  ASTM reasserted the Defendants' arguments from their motions, and contend that POP Diesel concedes

---

[1] See United Mine Workers v. Pennington, 381 U.S. 657 (1965)(holding that petitioning government to adopt policies -- even those that would harm competitors or competition -- is immune from antitrust challenge); E.R.R. Presidents Conference v. Noerr Motor Freight, 365 U.S. 127 (1961)(same).

in its Response that it has suffered no Article III or antitrust injury.  ASTM asserts that the Court should consider POP Diesel's concession without converting the motions to dismiss into motions for summary judgment.

## LEGAL STANDARD FOR MOTIONS TO DISMISS UNDER RULE 12(b)(1)

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress."  Henry v. Office of Thrift Supervision, 43 F.3d 507, 511 (10th Cir. 1994)(citations omitted).  A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence.").  Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to raise the defense of the court's "lack of jurisdiction over the subject matter" by motion.  Fed. R. Civ. P. 12(b)(1).  The United States Court of Appeals for the Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject-matter jurisdiction is based."  Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002).

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true.  See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981).  But when the attack is aimed at the jurisdictional facts themselves, a district court may not presume the truthfulness of those allegations.  A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).  In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 [summary-judgment] motion.

Alto Eldorado Partners v. City of Santa Fe, No. CIV 08-0175 JB/ACT, 2009 WL 1312856, at *8-9

(D.N.M. Mar.11, 2009)(Browning, J.)(citations omitted).  As the United States Court of Appeals for

the Fifth Circuit has stated:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56.
> Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very
> power to hear the case -- there is substantial authority that the trial court is free to
> weigh the evidence and satisfy itself as to the existence of its power to hear the case.
> In short, no presumptive truthfulness attaches to plaintiff's allegations, and the
> existence of disputed material facts will not preclude the trial court from evaluating
> for itself the merits of jurisdictional claims.

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortenson v. First Fed. Sav.

& Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the allegations in the complaint

to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or

other evidence properly before the court.  See New Mexicans for Bill Richardson v. Gonzales, 64

F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995).  In

those instances, a court's reference to evidence outside the pleadings does not necessarily convert

the motion to a rule 56 motion for summary judgment.  See Holt v. United States, 46 F.3d at 1003

(citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)).  Where, however, the court

determines that jurisdictional issues raised in rule 12(b)(1) motion are intertwined with the case's

merits, the court should resolve the motion either under rule 12(b)(6) or under rule 56.  See Franklin

Sav. Corp. v. United States, 180 F.3d 1124, 1129 (10th Cir. 1999); Tippet v. United States, 108 F.3d

1194, 1196 (10th Cir. 1997).  "When deciding whether jurisdiction is intertwined with the merits

of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question

requires resolution of an aspect of the substantive claim.'"  Davis ex rel. Davis v. United States, 343

F.3d 1282, 1296 (10th Cir. 2003)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320,

1324 (10th Cir. 2002)).

## LAW REGARDING RULE 12(b)(6)

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(citation omitted). The sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Smith v. United States, 561 F.3d 1090, 1097 (10th Cir. 2009); Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of Ponca City, 952 F.2d 1183, 1187 (10th Cir. 1991). A complaint challenged by a rule 12(b)(6) motion to dismiss does not need to set forth detailed factual allegations, but a plaintiff's burden to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)(stating that a plaintiff's complaint must set forth more than a threadbare recital "of the elements of a cause of action, supported by mere conclusory statements"). To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. at 1940.

## ANALYSIS

The Court has subject-matter jurisdiction over POP Diesel's claims that are founded on the passage of the Draft ASTM Triglyceride Standard, because POP Diesel has alleged a harm and the potential harm is adequately imminent.  POP Diesel's claims that are founded on the Fit-For-Purpose Guidelines, however, are not ripe, because the standards are at their early stages, and whether and in what form the Fit-For-Purpose Guidelines will be enacted is uncertain.  The Court dismisses POP Diesel's antitrust claims over which it has subject-matter jurisdiction, because POP Diesel fails to allege a plausible conspiracy.  Because POP Diesel's state law claims are predicated on its antitrust claims and because POP Diesel does not allege contractual relations with which the Draft ASTM Triglyceride Standard would interfere, the Court also dismisses POP Diesel's claim for interference with prospective business advantage.

## I.   THE COURT HAS SUBJECT-MATTER JURISDICTION OVER POP DIESEL'S DRAFT ASTM TRIGLYCERIDE STANDARD CLAIMS, BUT NOT OVER ITS FIT-FOR-PURPOSE GUIDELINES CLAIMS.

The Defendants contend that the Court lacks subject-matter jurisdiction over this case.  They contend that POP Diesel lacks standing and its claims are not ripe, because it has not suffered an Article III or antitrust injury, and faces only a speculative future injury that may not come to pass.  They assert that, because the harm POP Diesel seeks to avoid in the diesel burner market, in which POP Diesel does not currently participate, will not come to pass unless members of Committee D02 vote to adopt the Draft ASTM Triglyceride Standard, and even then it is subject to appellate review within ASTM, including review of procedural irregularities, POP Diesel's claims are not ripe.  The Defendants further assert that the harm POP Diesel seeks to avoid from the Fit-For-Purpose Guidelines is more attenuated than the harm it alleges may flow from the Draft ASTM Triglyceride Standard, because, as POP Diesel conceded, the Fit-For-Purpose Guidelines are at an early stage of

development.  See, e.g., ConocoPhillips' Memorandum at 10-11 ("[POP Diesel] apparently relies

on threatened harm, but it makes no showing as required to establish standing under Article III that

any potential harm is anything 'more than a possibility,' or that 'the threat of injury [is] both real

and immediate' and 'certainly impending.' (citations omitted)); ASTM's Memorandum at 9 ("[T]he

Draft TG Standard remains subject to an uncertain outcome in the main committee vote and possible

appeals, and . . . the Fit-For-Purpose Guides remain in the early drafting stages and are not alleged

to be voted upon imminently.").

POP Diesel responds that it has sufficiently alleged Article III harm and that its claims are

ripe.  POP Diesel contends:

> Once the Draft ASTM Triglyceride Standard is put to a vote of the ASTM
> membership, the ballot will remain open for just 30 days.  Given the market power
> and influence of the Oil Company Defendants and the reticence of other ASTM
> members to oppose the Oil Company Defendants, the Draft ASTM Triglyceride
> Standard will likely be adopted, rendering POP Diesel[ ]'s claims for injunctive
> relief ripe for adjudication now.  Likewise, POP Diesel[ ] has alleged that defendants
> and the Co-conspirators "have . . . moved aggressively" to promulgate the
> Fit-for-Purpose Guides.  The "mere proposal" of the Fit-for-Purpose Guides, coupled
> with the Draft ASTM Triglyceride Standard, unreasonably restrains competition in
> the Relevant Markets to develop new and innovative fuels (that is, non-petroleum
> based fuels), including triglyceride fuels, because the Fit-for-Purpose Guides will
> unreasonably restrict approval of such new fuels.  Producers of innovative fuels will
> be less likely to undertake to develop new fuels because, following adoption of the
> Fit-for-Purpose Guides, the fuels will be less likely to be approved by ASTM.

Response at 17-18 (citations to the record omitted).  The parties elaborated on the approval process

at the preliminary injunction hearing.  ASTM stated that it was ready to issue the ballot on the Draft

ASTM Triglyceride Standard.  See Tr. at 29:1-5 (Court, Edward).  ASTM represented that the ballot

would be open for thirty days, after which time the ASTM Committee on Standards would have

sixty days in which to review the process to make certain that there were no procedural

irregularities.  See Tr. at 29:5-13 (Edward).  POP Diesel's criticisms and the Working Group's

-21-

response would attend the ballots.  See Tr. at 30:5-11 (Edward).  Additionally, if one-third of the votes oppose the Draft ASTM Triglyceride Standard, the standard is returned to committee for redrafting.  See Tr. at 30:20-23 (Edward).  POP Diesel would have the right to take an appeal of the Committee D02's decision to the Committee on Standards, which could not be heard before October 2011, and, failing there, to the ASTM Board of Directors, which could not be heard before April 2012.  See Tr. at 32:3-18 (Edward).  The Draft ASTM Triglyceride Standard would not become law while the appeal was pending, giving POP Diesel the ability to forestall the Draft ASTM Triglyceride Standard from becoming law for at least thirteen months.  See Tr. at 32:19-21, 34:1 (Court, Edward).  The Court agrees that POP Diesel's Draft ASTM Triglyceride Standard claims adequately allege an Article III injury and are ripe.  POP Diesel's Fit-for-Purpose Guidelines claims, however, are not ripe.

### A.  POP DIESEL'S DRAFT ASTM TRIGLYCERIDE STANDARD CLAIMS ARE RIPE, BUT ITS FIT-FOR-PURPOSE GUIDELINES CLAIMS ARE NOT.

Article III of the United States Constitution requires that a live case or controversy for a federal court to have jurisdiction over a dispute.  See U.S. Const. art. III, § 2.  "The existence of a case and controversy is a prerequisite to all federal actions, including those for . . . injunctive relief." Presbytery of N.J. of Orthodox Presbt. Church v. Florio, 40 F.3d 1454, 1462 (3d Cir. 1994).  The limitation on federal subject-matter jurisdiction to "cases or controversies" has both a standing and a ripeness component, which are two sides of the same coin.  Armstrong World Indus., Inc. v. Adams, 961 F.2d 405, 411 & nn. 12-13 (3d Cir. 1992).  "[R]ipeness tells us when a Case proper party may bring an action and . . . standing tells us who may bring the action."  Presbytery of N.J. of Orthodox Presbt. Church v. Florio, 40 F.3d at 1462.  To demonstrate Article III standing, "a plaintiff must have suffered an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly

traceable to the challenged action; and the injury must be likely redressable by a favorable decision."

Hinds County v. Wachovia Bank N.A., 700 F. Supp. 2d 378, 392 (S.D.N.Y. 2010)(quoting Lujan

v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)(other citations omitted).  Any potential harm

must be "more than a possibility," and a plaintiff must show that "the threat of injury [is] both real

and immediate" and "certainly impending."  Essence, Inc. v. City of Fed. Heights, 285 F.3d 1272,

1282 (10th Cir. 2002)(internal quotation marks omitted).  The United States Court of Appeals for

the Second Circuit stated in Ross v. Bank of America, 524 F.3d 217 (2nd Cir. 2008):

> Injury in fact is a low threshold, which we have held "need not be capable of
> sustaining a valid cause of action," but "may simply be the fear or anxiety of future
> harm."  [Denney v. Deutsche Bank AG, 443 F.3d 253, 264 (2d Cir. 2006)].
> "Moreover, the fact that an injury may be outweighed by other benefits, while often
> sufficient to defeat a claim for damages, does not negate standing."  Id. at 265.  The
> burden rests on the party asserting jurisdiction to clearly allege facts demonstrating
> standing.  FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 . . . (1990).

524 F.3d at 222.  The determination whether a claimant has suffered injury-in-fact is assessed "at

of the time the action is brought."  Smith v. U.S. Court of Appeals for the Tenth Circuit, 484 F.3d

1281, 1285 (10th Cir. 2007)(quotations and citations omitted).

A federal court's jurisdiction also requires a dispute to be ripe.  See New Mexicans for

Richardson v. Gonzales, 64 F.3d 1495, 1498-99 (10th Cir. 1995)(stating that the ripeness inquiry

"bears on the court's subject matter jurisdiction under the case or controversy clause of Article III").

The ripeness inquiry is concerned with the "timing" of the dispute, unlike standing which is

concerned with whether a proper party is raising the dispute.  Regional Rail Reorg. Act Cases, 419

U.S. 102, 140 (1975).  "As a general rule, determinations of ripeness are guided by a two-factor test,

'requiring [a court] to evaluate both the fitness of the issue for judicial resolution and the hardship

to the parties of withholding judicial consideration.'"  Sierra Club v. Yeutter, 911 F.2d 1405, 1415

(10th Cir. 1990)(quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)).  The "central focus"

of the fitness aspect of the ripeness inquiry is "whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." New Mexicans for Richardson v. Gonzales, 64 F.3d at 1499 (citations omitted). The hardship aspect "typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties." New Mexicans for Richardson v. Gonzales, 64 F.3d at 1499 (internal citations and quotation marks omitted). "[R]ipeness overlaps in some respects with standing, most notably in the shared requirement that the [plaintiff's] injury be imminent rather than conjectural or hypothetical." Ross v. Bank of America, 524 F.3d at 226.

The Court concludes that POP Diesel's claims that are based on the Draft ASTM Triglyceride Standard are up to constitutional muster, but that POP Diesel's claims that are based on the Fit-For-Purpose Guidelines are not ripe. In Volvo North America Corp. v. Men's International Professional Tennis Council, 857 F.2d 55 (2d Cir. 1988), the Second Circuit addressed whether members of an alleged tennis cartel had standing to bring claims based on the cartel's proposed rules, and whether the claims were ripe. The plaintiffs alleged that the defendants had "conspired in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1982), to monopolize and restrain trade in the markets for the production of men's professional tennis events, the tennis-playing services of men's professional tennis players, and the rights to broadcast men's professional tennis events" 857 F.2d at 57. The plaintiffs also brought pendant state law claims for tortious interference with prospective business relations and unfair competition. The plaintiffs complained of the cartel's four proposed rules:

> [The plaintiffs] claim that certain proposed restrictions would further limit their ability to compete in the market for men's professional tennis events. Among these proposed rules is a "Special Event" Rule, which would require all owners, agents, consultants, and associates of a sanctioned event to agree not to "promote" any Special Event during the week of any Grand Prix tournament. Since Grand Prix

> tournaments occupy forty-eight weeks of the year, this rule allegedly would preclude any person associated with an existing sanctioned event from producing any Special Events at all. There is also a proposed rule, known as the "Best Interest" Rule, which would give MIPTC the right to refuse to sanction any event whenever "in the sole judgment of the MIPTC" sanctioning that event would not serve "the best interest of the sport." Another proposal, the "Conflicts of Interest" Rule, would allow MIPTC to prohibit owners and producers from inviting certain players to participate in their tournaments as "wild cards." And last, there is a proposed rule that would permit MIPTC to serve as the exclusive representative and agent for the pooled sale of television broadcasting rights to sanctioned events.

857 F.2d at 61 (footnotes omitted). The defendants sought to dismiss the plaintiffs' challenge to the proposed rules pursuant to rule 12(b)(1) on the ground that this challenge was not ripe. The district court did not address the ripeness challenge, dismissing the antitrust claims on other grounds, and "the tortious interference claim . . . was dismissed on the ground that appellants had not alleged any business relations between themselves and a third party that were harmed by appellees' behavior." 857 F.2d at 62.

The Second Circuit vacated the district court's dismissal and remanded. The Second Circuit first considered the defendants' ripeness argument. The Second Circuit held that the challenge to the proposed "Special Events Rule" was ripe, because it was having a present anti-competitive effect and its future application was straight forward, making it unnecessary to await future developments. The Second Circuit further held, however, that the challenges to the other three rules were not yet ripe, because future events would clarify how they would be enacted and applied:

> Appellees moved to dismiss appellants' challenge to MIPTC's four proposed rules on the ground that this challenge was not ripe for adjudication. The district court did not address this argument, and appellees have not raised it on appeal. Nevertheless, to the extent that "issues of ripeness involve, at least in part, the existence of a live 'Case or Controversy,'" Regional Rail Reorg. Act Cases, 419 U.S. 102, 138 . . . (1974) (footnote omitted), we should consider such issues sua sponte. See, e.g., Suburban Trails, Inc. v. New Jersey Transit Corp., 800 F.2d 361, 365 (3d Cir. 1986); American Trucking Ass'ns v. I.C.C., 747 F.2d 787, 790 (D.C. Cir. 1984); Johnson v. Sikes, 730 F.2d 644, 647-48 (11th Cir. 1984); 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3532.1, at 135 (2d ed. 1984)

("Wright, Miller & Cooper").

        As the Supreme Court has noted, the purpose of the ripeness doctrine "'is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements.'" Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580 . . . (1985) (quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 148 . . . (1967)). Ripeness therefore "'is peculiarly a question of timing,'" id. (quoting Regional Rail Reorg. Act Cases, 419 U.S. at 140 . . . .), and it cautions courts against adjudicating "'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" id. at 580-81 . . . (quoting Wright, Miller & Cooper § 3532). Two additional factors, "'the fitness of the issues for judicial decision'" and "'the hardship to the parties of withholding court consideration,'" also inform any analysis of ripeness. Id. at 581 . . . (quoting Abbott Laboratories, 387 U.S. at 149 . . . .). The fitness of an issue for judicial decision depends at least in part on the extent to which the issue is "purely legal, and will not be clarified by further factual development." Id.; see also Abbott Laboratories, 387 U.S. at 149 . . . . In considering the hardship to the parties of withholding consideration, a court must be mindful that "'[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.'" Regional Rail Reorg. Act Cases, 419 U.S. at 143 . . . (quoting Pennsylvania v. West Virginia, 262 U.S. 553, 593 . . . (1923), re aff'd, 263 U.S. 350 . . . (1923)).

        As appellees argued before the district court, the fact that the proposed rules "may never be enacted, or alternatively, may be enacted in a form which completely alleviates plaintiffs' concerns," seems to suggest that any challenge to the proposals is premature. "The difference between an abstract question and a 'case or controversy' is one of degree, [however], and is not discernible by any precise test." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 297 . . . (1979). In some instances, "the prospect or fear of future events may have a real impact on present affairs," Wright, Miller & Cooper § 3532.2, at 143, such that a preemptive challenge is ripe. See, e.g., Bowsher v. Synar, 478 U.S. 714, 727 n. 5 . . . (1986); Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 201 . . . (1983); Pierce v. Society of Sisters, 268 U.S. 510, 534 . . . (1925); Pennsylvania v. West Virginia, 262 U.S. at 593. . . . In the antitrust context in particular, a rule that has yet to be enacted or enforced may be ripe for review if its mere proposal is likely to inhibit competition. See, e.g., North Am. Soccer League v. National Football League, 465 F. Supp. 665 (S.D.N.Y.1979) ("NASL v. NFL") (district court entertained an antitrust challenge to a proposed amendment to the constitution and bylaws of the National Football League that would have prevented NFL owners from acquiring any interest in another major team sport), complaint dismissed, 505 F.Supp. 659 (S.D.N.Y.1980), aff'd in part, rev'd in part, and remanded, 670 F.2d 1249 (2d Cir.), cert. denied, 459 U.S. 1074 . . . (1982).

        Applying the foregoing principles to the facts as alleged in the amended

complaint, we conclude that appellants' challenge to the Special Events Rule is ripe for consideration.  Appellants claim that this rule is having a present anti-competitive effect because "persons or entities involved with Special Events and . . . persons involved with MIPTC-sanctioned events are inhibited and deterred from entering into contracts with ProServ and IMC that extend into the future . . . because they fear that ProServ and IMC will be compelled by the new rule to break either their agreements involving Special Events or their agreements involving MIPTC-sanctioned events."  Likewise, appellants allege that "owners and producers of MIPTC-sanctioned events, including Volvo, are afraid to enter into long-term agreements with ProServ or IMC for fear that the defendants will force them to choose between breaching their contract with the player-agent and losing their MIPTC sanction."  In our view, these allegations plausibly suggest how the proposed rule may have "a real impact on present affairs"; and under these circumstances, to withhold consideration until the rule is actually adopted might work considerable hardship on appellants.  We note also that the proposal, as alleged, appears to be straightforward: it threatens to prohibit persons associated with sanctioned events from producing any Special Events.  Thus, its effect is unlikely to be clarified substantially by whatever "further factual development" would accompany its enactment.  For these reasons, we conclude that appellants' challenge to the Special Event Rule is ripe for consideration.

We believe, however, that any challenge to the three remaining proposals would be premature, even though appellants have suggested various ways in which these rules might have an impact on present affairs.  The amended complaint states that the Best Interest Rule, which would give MIPTC the power to refuse to sanction any event that would not serve "the best interest of the sport," is having a present anticompetitive effect because owners and producers of sanctioned events "must exercise extreme care . . . to comply with all demands of [MIPTC] because of fear that [MIPTC] will otherwise utilize the new rule to refuse to sanction or withdraw the sanction of" a given event.  Likewise, appellants claim that the Conflicts of Interest Rule -- which would allow MIPTC to prohibit certain players from participating in sanctioned events as wild cards -- is having a present anticompetitive effect because "owners and producers of MIPTC-sanctioned events are being deterred from entering into any contractual relationships with player-agents . . . for fear that . . . the ongoing business relationship with the player-agent will cost that event its sanction or its cont[r]ol over its Wild Cards."  Finally, appellants claim that the rule relating to pooled television broadcasting rights is having a present anticompetitive effect because "it deters television companies from entering into long-term television contracts . . .because of concerns about (1) the competition with an MIPTC contract with a television company for a substantial package of television broadcast rights to MIPTC-sanctioned events, and (2) the legal effects of [the] rule."  These alleged present effects are all more attenuated, however, than the alleged present effect of the Special Events Rule.  It is also much more difficult to predict how appellees will choose to employ the three remaining rules should they be enacted; thus, unlike the effect of the Special Events Rule, the effect of the other

proposed rules may be clarified by the further factual development that would accompany their adoption.

> We therefore hold that appellants' challenges to the proposed Best Interest Rule, the Conflicts of Interest Rule, and the rule relating to the pooling of television broadcasting rights are not ripe for review.  In the event that these rules are adopted, appellants, of course, are free to reinstitute their challenges.  See Wright, Miller & Cooper § 3532.1, at 137 (dismissal for lack of ripeness is not a decision on the merits for purposes of preclusion by judgment).  We therefore vacate so much of the district court's order as dismissed with prejudice appellants' claims relating to the Best Interest Rule, the Conflicts of Interest Rule, and the rule relating to pooled broadcasting rights, and we direct the court to dismiss the claims relating to these rules without prejudice.

857 F.2d at 63-65 (emphasis added).

Similar to the challenge to the proposed rules in Volvo North America Corp. v. Men's International Professional Tennis Council, some of POP Diesel's claims are ripe, and others are not. Because the Draft ASTM Triglyceride Standard is nearing implementation, the Court concludes that POP Diesel's challenge to it is ripe and POP Diesel has adequately alleged an Article III injury.  The Draft ASTM Triglyceride Standard discourages POP Diesel's pending attempts to enter the burner market.  See Ross v. Bank of America, 524 F.3d at 222 ("Injury in fact is a low threshold, which we have held 'need not be capable of sustaining a valid cause of action,' but 'may simply be the fear or anxiety of future harm.'"  (citations omitted)).  Additionally, the Draft ASTM Triglyceride Standard is ripe for adjudication, because it has been finalized and submitted for ballot.  POP Diesel has also shown adequate hardship, because passage of the Draft ASTM Triglyceride Standard is imminent.  In the SAC, POP Diesel alleges that "[t]he Defendants intend imminently to present the Draft ASTM Triglyceride Standard to the membership of ASTM for a vote on its adoption," and that "[o]nce it is adopted and published, numerous states will incorporate it by reference into law pursuant to existing statutes."  SAC ¶ 51, at 18.  At the preliminary injunction hearing, ASTM stated that it was prepared to distribute the ballots.  POP Diesel "does not have to await the consummation

of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.'"

Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,  857 F.2d at 63 (quoting Regional Rail

Reorg. Act Cases, 419 U.S. at 143).  "In the antitrust context in particular, a rule that has yet to be

enacted or enforced may be ripe for review if its mere proposal is likely to inhibit competition."

Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,  857 F.2d at 64 (citing North Am. Soccer

League v. National Football League, 465 F. Supp. 665 (S.D.N.Y. 1979)).  The language of the Draft

ASTM Triglyceride Standard has been finalized for approval in technical and specific language.

"Thus, its effect is unlikely to be clarified substantially by whatever 'further factual development'

would accompany its enactment."  Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council, 857

F.2d at 64.

POP Diesel's challenge to the Fit-for-Purpose Guidelines, however, is not ripe.  First, POP

Diesel has not shown a hardship.  POP Diesel attempts to make out a present injury, arguing:

> The "mere proposal" of the Fit-for-Purpose Guides, coupled with the Draft ASTM
> Triglyceride Standard, unreasonably restrains competition in the Relevant Markets
> to develop new and innovative fuels (that is, non-petroleum based fuels), including
> triglyceride fuels, because the Fit-for-Purpose Guides will unreasonably restrict
> approval of such new fuels.  Producers of innovative fuels will be less likely to
> undertake to develop new fuels because, following adoption of the Fit-for-Purpose
> Guides, the fuels will be less likely to be approved by ASTM.

Response at 17-18.  While "[i]n some instances, the prospect or fear of future events may have a real

impact on present affairs, such that a preemptive challenge is ripe," Volvo N. Am. Corp. v. Men's

Int'l Prof'l Tennis Council, 857 F.2d at 64 (citations omitted), POP Diesel Fit-for-Purpose

Guidelines claims are based on "uncertain or contingent future events that may not occur as

anticipated, or indeed may not occur at all," New Mexicans for Richardson v. Gonzales, 64 F.3d at

1499 (citations omitted).  POP Diesel's alleged present effects are "more attenuated . . . than the

alleged present effect of the [Draft ASTM Triglyceride Standard]."  Volvo N. Am. Corp. v. Men's

Int'l Prof'l Tennis Council, 857 F.2d at 65.  POP Diesel's argument is of the same nature of the one

the Second Circuit rejected in Volvo North America Corp. v. Men's International Professional

Tennis Council,

> that the Conflicts of Interest Rule -- which would allow MIPTC to prohibit certain
> players from participating in sanctioned events as wild cards -- is having a present
> anticompetitive effect because "owners and producers of MIPTC-sanctioned events
> are being deterred from entering into any contractual relationships with
> player-agents . . . for fear that . . . the ongoing business relationship with the
> player-agent will cost that event its sanction or its cont[r]ol over its Wild Cards."

Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council, 857 F.2d at 64.

POP Diesel's challenge also fails the fitness prong, because the Fit-For-Purpose Guidelines

are in their early stages of development.  It is uncertain whether and in what form they will be voted

upon or enacted.  POP Diesel acknowledges in its SAC that the Fit-for-Purpose Guidelines are in

their initial stages of development:

> [T]he defendants and their co-conspirators have also moved aggressively to have
> ASTM unreasonably restrict future approval of triglyceride diesel fuels for diesel
> engines.  They have caused Committee D02 to begin the promulgation of so-called
> "Fit-for-Purpose" Guides that expressly limit standards for future diesel engine fuels
> to petroleum-based diesel fuel or biodiesel, as currently described in ASTM Standard
> Specification D975.

SAC ¶ 55, at 23.  See Response at 6 ("[D]efendants and the Co-conspirators have already also

caused Committee D02 to begin the promulgation of so-called 'Fit-for-Purpose'

Guides . . . .")(emphasis added).  At the preliminary injunction hearing, POP Diesel further

acknowledged that the Fit-for-Purpose Guidelines were in a nascent stage, stating that it did not seek

a preliminary injunction for the Fit-For-Purpose Guidelines because they are "sufficiently far from

the voting stage."  Tr. at 26:21-27:2 (Schulman).  In addition to being in their early stages, POP

Diesel also acknowledges that, in contrast to the alleged procedural irregularities surrounding

promulgation of the Draft ASTM Triglyceride Standard, the Defendants have acted on POP Diesel's

objections to the Fit-for-Purpose Guidelines:

> Convisser had previously orally addressed the full Committee D02 with regard to one of the Fit-For-Purpose Guides described hereafter and had succeeded in persuading the Committee to return the Guide to one of its subcommittees for further work on the basis of his objections.  The decision to refer the Draft ASTM Triglyceride Standard to electronic balloting improperly and unfairly deprived POP Diesel[ ] of that crucial right and opportunity.

SAC ¶ 52(d), at 20.

The Court concludes that POP Diesel's claims based on the Fit-for-Purpose Guidelines are not ripe.  The issues of ripeness "typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties."  New Mexicans for Richardson v. Gonzalez, 64 F.3d at 1498-99.  Because the Fit-for-Purpose Guidelines are both in their early stages and because their development is on-going, creating uncertainty what form they will ultimately take if and when they are submitted for approval, the Court concludes that POP Diesel's claims based on the Fit-for-Purpose Guidelines are premature.  The form and "effect of the [Fit-for-Purpose Guidelines] may be clarified by the further factual development that would accompany their adoption."  Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council, 857 F.2d at 65.  Consequently, the Court lacks subject-matter jurisdiction over those claims, and dismisses them without prejudice.[2]

---

[2] In a footnote, POP Diesel asserts:

> ConocoPhillips asserts only that POP Diesel[ ] cannot establish Article III injury in fact and ripeness.  It takes no position as to antitrust injury, aside from a footnote that generally asserts that it incorporates the arguments of other defendants "to the extent applicable."  ExxonMobil for its part argues only that POP Diesel[ ] has not alleged antitrust injury and makes no assertions about Article III injury or ripeness.  To the extent that a defendant has not made an argument, the argument is waived.

Response at 12.  A litigant cannot waive a court's subject-matter jurisdiction.

### B.   ANTITRUST STANDING IS NOT JURISDICTIONAL.

The Defendants also assert that POP Diesel has conceded that it has not suffered an antitrust injury, and therefore POP Diesel lacks antitrust standing.  An antitrust injury, however, is not a jurisdictional requirement, and, because the Court dismisses POP Diesel's remaining claims for failing to plausibly allege an antitrust conspiracy, the Court declines to consider matters outside the four corners of the SAC to determine whether to dismiss POP Diesel's remaining causes of action. Besides demonstrating Article III standing, an antitrust plaintiff must also establish antitrust standing.  See Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc., 467 F.3d 283, 290-92 (2d Cir. 2006).  "An antitrust injury is an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." Reazin v. Blue Cross & Blue Shield of Kan., Inc., 899 F.2d 951, 962 n.15 (10th Cir. 1990)(citation and quotation omitted).  To plead an antitrust injury, a plaintiff "must allege a business or property injury . . . as defined by the Sherman Act." Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc., 131 F.3d 874, 882 (10th Cir. 1997)(citation and quotation omitted).  Where injunctive relief is sought pursuant to Section 16 of the Clayton Act, the same standard for antitrust injury applies, except that the harm alleged is "threatened loss or damage." Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 112 (1986) (citation omitted).  A court must also consider other factors relevant to standing (sometimes called the "efficient enforcer" factors), including: (i) "the directness or indirectness of the asserted injury"; (ii) "the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement"; (iii) "the speculativeness of the alleged injury"; and (iv) "the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries." Ross v. Bank of Am., 524 F.3d at 222 n.1.  "A court proceeds to an antitrust standing analysis only after Article III standing has been

established." Ross v. Bank of Am., 524 F.3d at 222 n.1 (citing Kochert v. Greater Lafayette Health

Servs., Inc., 463 F.3d 710, 714-16 (7th Cir. 2006)). Unlike Article III standing, however, antitrust

standing is not jurisdictional. In Gerlinger v. Amazon.com Inc., Borders Group, Inc., 526 F.3d 1253

(9th Cir. 2008), the United States Court of Appeals for the Ninth Circuit stated:

> Antitrust standing is distinct from Article III standing. Am. Ad Mgmt., Inc. v. Gen.
> Tel. Co. of Cal., 190 F.3d 1051, 1054 (9th Cir.1999). Article III standing is required
> to establish a justiciable case or controversy within the jurisdiction of the federal
> courts. Antitrust standing is a requirement for treble damages under Section 4 of the
> Clayton Act, 15 U.S.C. § 15. See Associated Gen. Contractors [of Cal., Inc. v. Cal.
> State Council of Carpenters, 459 U.S. 519, 535 & n. 31 (1983)]. Lack of antitrust
> standing affects a plaintiff's ability to recover, but does not implicate the subject
> matter jurisdiction of the court. Datagate, Inc. [v. Hewlett-Packard Co., 60 F.3d
> 1421, 1425 n.1 (9th Cir. 1995)].

526 F.3d at 1254. Challenges to antitrust standing are properly brought under rule 12(b)(6) of the

Federal Rules of Civil Procedure. See NicSand, Inc. v. 3M Co., 507 F.3d 442 (6th Cir.

2007)("[A]ntitrust standing and Article III standing are not one and the same, and we not only may

-- but we must -- reject claims under Rule 12(b)(6) when antitrust standing is missing.").

The Defendants contend that the Court should dismiss POP Diesel's SAC, because POP

Diesel conceded in admissions and sworn declarations in support of its TRO Motion and in its

representations at the preliminary injunction hearing that it has not suffered an antitrust injury. See

Bailey v. Shell Western E&P, Inc., 609 F.3d 710 (5th Cir. 2010)("[The plaintiff] fails to meet even

the most basic of antitrust requirements -- he has suffered no antitrust injury and, accordingly, lacks

antitrust standing." (citing Norris v. Hearst Trust, 500 F.3d 454, 465 (5th Cir.2007)). Specifically,

POP Diesel acknowledged that it has not suffered an antitrust injury because (i) the Draft TG

Standard does not affect the market for diesel fuel in compression engines, and (ii) POP Diesel is

neither a customer nor competitor in the market for diesel fuel used in burners.

POP Diesel does not dispute that it has not suffered an antitrust injury. Instead, it responds

that it artfully pled around its substantive difficulties in the SAC, and that the Court must ignore

POP Diesel's real world shortcomings and limit its review to only the artificial image of the case

POP Diesel projects in the SAC:

> Defendants' remaining arguments about antitrust injury are also readily disposed of. Assertions that the Draft ASTM Triglyceride Standard applies only to burners and not to diesel compression ignition engines; and that POP Diesel[ ] does not compete in the relevant market for triglyceride diesel fuel for use in burners are based on declarations in support of POP Diesel[ ]'s motion for preliminary injunction and counsel's statements at the preliminary injunction hearing, respectively, which are obviously outside the four corners of the Complaint.  Because defendants quite clearly rely on these matters for their truth, they may not be considered without converting the instant motions to summary judgment motions . . . .

Response at 14 n.5.  Because the Court concludes that POP Diesel's remaining claims fail on the

four corners of the SAC, the Court need not consider whether it should dismiss POP Diesel's claims

for lack of an antitrust injury based on its concessions in support of a preliminary injunction.  The

Court notes, however, other courts have refused to "pretend . . .[a plaintiff's admissions] do not

exist." Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc., No. 08-4548, 2010 WL 145098, at *4

(N.D. Cal. Jan. 6, 2010)(holding, on a rule 12(b)(6) motion that "[t]he court will take judicial notice

of admissions and concessions already made in this action; no rule of procedure requires a court to

pretend these do not exist."); Ventre v. Datronic Rental Corp., No. 92-3289, 1995 U.S. Dist. LEXIS

20323, at *18-19 (N.D. Ill. Dec. 5, 1995)("Price Waterhouse . . . relies upon . . . admissions by

plaintiffs' counsel contained within the record of this case . . . .  Since this court may properly

consider . . . items appearing in the record of the case . . . it declines to convert the motion to dismiss

into a motion for summary judgment.").

## II.   POP DIESEL DOES NOT SET FORTH ALLEGATIONS SHOWING A PLAUSIBLE ANTITRUST CONSPIRACY OR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE.

The Defendants allege that POP Diesel has not plausibly alleged an antitrust conspiracy or

a violation of the New Mexico law against tortious interference with prospective business advantage.

POP Diesel responds that it has alleged that the Defendant Oil Companies used their influence to

promulgate anti-competitive standard through ASTM, plausibly showing a violation of the antitrust

laws, and that the same allegations support a claim for tortious interference with prospective

business advantage.  The Court concludes that POP Diesel has not set forth adequate factual

allegations in support of its antitrust claims or, thereby, a claim of tortious interference with

prospective advantage.  The Court therefore dismisses the remaining claims in POP Diesel's SAC.

Because POP Diesel has twice amended the SAC and has not plausibly alleged an antitrust claim,

the Court dismisses the claims over which it has subject-matter jurisdiction with prejudice.

### A.   STANDARD-SETTING ORGANIZATIONS ARE NOT IMMUNE FROM ANTITRUST LIABILITY.

As an initial matter, the Court notes that the parties agree that standard-setting organizations

are not immune from antitrust liability.  In their arguments, the parties talk somewhat past each

other.  The Defendants' central argument is that the actions of which POP Diesel complains are

routine standard-setting activities.  Exxonmobil contends:

> The thrust of the SAC is the notion that Exxon's membership on Subcommittee P, coupled with one alleged comment by an Exxon representative, sufficiently alleges a plausible antitrust conspiracy.  But, the Supreme Court and circuit courts have repeatedly acknowledged that membership in standard setting groups and trade organizations is not sufficient to plead conspiracy.

Exxonmobil Motion at 11.  Similarly, ConocoPhillips asserts that, "[a]ccording to [POP Diesel's]

argument, a standard-setting organization is a 'walking antitrust conspiracy' . . . ."  ConocoPhillips

at 13.  ASTM contends: "The SAC includes no allegations that distinguish the conduct of the alleged

coconspirators from anyone else who has participated in Subcommittee P and who has not voted in

favor of Convisser's negative on the Draft TG Standard; POP Diesel's conspiracy theory thus proves

too much."  ASTM Motion at 13.  POP Diesel responds that standard-setting organizations are not

immune from antitrust liability and asserts that

> [m]any of defendants' arguments can be disposed of by examination of the Supreme
> Court's decision in American Society of Mechanical Engineers, Inc. v. Hydrolevel
> Corp., 456 U.S. 556 (1982), which clearly holds that standard-setting organizations
> like ASTM bear antitrust liability for the anticompetitive activities of its members
> acting with its apparent authority.

Response at 28.  ASTM replies that it does not contend that ASTM is immune from antitrust

liability, but that "POP Diesel's Opposition has made it clear that the success of its claims hinges

on this Court . . . holding that the mere participation in ASTM and the mere refusal to assent to Mr.

Convisser's technical views is enough to plausibly suggest the existence of an actionable

conspiracy."  Reply at 3.  The Defendants thus do not assert that ASTM cannot be held liable for

its members' actions, or that ASTM's participants are shielded from antitrust liability, but that POP

Diesel has alleged nothing more than that the Defendant Oil Companies participated routine

standard-setting activities.

In American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp., the Supreme Court

held that the American Society of Mechanical Engineers, Inc. ("ASME"), a nonprofit standard-

setting organization, could be held civilly liable under the antitrust laws for acts of its agents

performed with its apparent authority.  456 U.S. at 559.  Like ASTM, "ASME promulgates and

publishes over 400 separate codes and standards for areas of engineering and industry.  These codes,

while only advisory, have a powerful influence: federal regulations have incorporated many of them

by reference, as have the laws of most States . . . ."  456 U.S. at 559.  Among ASME's many sets of

standards is its Boiler and Pressure Vessel Code, which at the time of the Supreme Court's decision

was incorporated into the laws of forty-six states.  Part of the Boiler and Pressure Vessel Code

concerned "low-water fuel cutoffs," which cause boilers to stop firing if their water levels fall too

low, preventing a possible explosion.  456 U.S. at 559-60.  McDonnell & Miller, Inc. ("M&M"), had

dominated the market for low-water fuel cutoffs for decades, "[b]ut in the mid-1960's, respondent

Hydrolevel Corporation entered the low-water fuel cutoff market with a different version of this

device.  The relevant distinction . . . was that Hydrolevel's fuel cutoff, unlike M&M's, included a

time delay."  456 U.S. at 560.  In early 1971, one of M&M's important customers, Brooklyn Union

Gas Company, switched to Hydrolevel's product.  In response, M&M allegedly abused its power

within ASME to attack Hydrolevel's product and to thwart Hydrolevel's competitive challenge:

> Because of its involvement in ASME, M&M was in an advantageous position to react to Hydrolevel's challenge.  ASME's governing body had delegated the interpretation, formulation, and revision of the Boiler and Pressure Vessel Code to a Boiler and Pressure Vessel Committee.  That committee in turn had authorized subcommittees to respond to public inquiries about the interpretation of the code. An M&M vice president, John W. James, was vice chairman of the subcommittee which drafted, revised, and interpreted Section IV, the segment of the Boiler and Pressure Vessel Code governing low-water fuel cutoffs.

> After Hydrolevel obtained the Brooklyn Union Gas account, James and other M&M officials met with T. R. Hardin, the chairman of the Section IV subcommittee. The participants at the meeting planned a course of action.  They decided to send an inquiry to ASME's Boiler and Pressure Vessel Committee asking whether a fuel cutoff with a time delay would satisfy the requirements of ¶ HG–605 of Section IV. James and Hardin, as vice chairman and chairman, respectively, of the relevant subcommittee, cooperated in drafting a letter, one they thought would elicit a negative response.

> The letter was mailed over the name of Eugene Mitchell, an M&M vice president, to W. Bradford Hoyt, secretary of the Boiler and Pressure Vessel Committee and a full-time ASME employee.  Following ASME's standard routine, Hoyt referred the letter to Hardin, as chairman of the subcommittee.  Under the procedures of the Boiler and Pressure Vessel Committee, the subcommittee chairman -- Hardin -- could draft a response to a public inquiry without referring it to the entire subcommittee if he treated it as an "unofficial communication."

> As a result, Hardin, one of the very authors of the inquiry, prepared the response.  Although he retained control over the inquiry by treating the response as "unofficial," the response was signed by Hoyt, secretary of the Boiler and Pressure Vessel Committee, and it was sent out on April 29, 1971, on ASME stationery. Predictably, Hardin's prepared answer, utilized verbatim in the Hoyt letter,

-37-

> condemned fuel cutoffs that incorporated a time delay . . . .
>
> . . . .
>
> As anticipated, M&M seized upon this interpretation of Section IV to discourage customers from buying Hydrolevel's product.  It instructed its salesmen to tell potential customers that Hydrolevel's fuel cutoff failed to satisfy ASME's code.  And M&M's employees did in fact carry the message of the subcommittee's response to customers interested in buying fuel cutoffs.  Thus, M&M successfully used its position within ASME in an effort to thwart Hydrolevel's competitive challenge.

456 U.S. 561-63 (footnote and citations omitted).  Eventually, James' role in the unofficial response condemning Hydrolevel's product came to light, and Hydrolevel brought an action under sections 1 and 2 of the Sherman Act.  The case went to trial, and the parties disputed a jury instruction on the standard for allowing ASME to be held liable for James' actions.  The district court "charged the jury that ASME could be held liable only if it had ratified its agents' actions or if the agents had acted in pursuit of ASME's interests."  456 U.S. at 564.  Noting that, under general rules of agency law, principals are liable when their agents act with apparent authority and commit torts analogous to the facts in American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp., the Supreme Court held

> that the apparent authority theory is consistent with the congressional intent to encourage competition. ASME wields great power in the Nation's economy.  Its codes and standards influence the policies of numerous States and cities, and, as has been said about "so-called voluntary standards" generally, its interpretations of its guidelines "may result in economic prosperity or economic failure, for a number of businesses of all sizes throughout the country," as well as entire segments of an industry.  H.R. Rep. No. 1981, 90th Cong., 2d Sess., 75 (1968).  ASME can be said to be "in reality an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce."  Fashion Originators' Guild of America, Inc. v. FTC, 312 U.S. 457 . . . (1941).  When it cloaks its subcommittee officials with the authority of its reputation, ASME permits those agents to affect the destinies of businesses and thus gives them the power to frustrate competition in the marketplace.

456 U.S. at 570-71.  To the extent that POP Diesel contends that American Soc. of Mechanical

Engineers, Inc. v. Hydrolevel Corp. stands for the proposition that standard-setting organizations may be liable for the actions of their agents, the Defendants do not appear to disagree.  Rather, ASTM contends that "[t]he Supreme Court in Hydrolevel did not suggest, as POP Diesel does in its Opposition, that an unlawful conspiracy is automatically formed among a standard-setting organization and its members when representatives of those members join a committee or subcommittee."  Reply at 3.  ASTM further asserts that American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp. is inapposite, because "POP Diesel is not pursuing a theory of agency liability against ASTM"; rather, POP Diesel contends "that ASTM was an active participant in the conspiracy."  Response at 3-4 (citing Response at 24 ("Quite obviously, POP Diesel does allege an anticompetitive conspiracy between ASTM, the Defendant Oil Companies and the Coconspirators")).  The Court agrees with the proposition that standard-setting organizations are not immune from antitrust liability.  The proposition, however, does not save POP Diesel's SAC, because the SAC's fatal flaw is that it fails to allege a plausible antitrust conspiracy.  POP Diesel contends that "Hydrolevel makes clear that the Defendant Oil Companies act with apparent authority of ASTM merely because ASTM 'cloaks its subcommittee officials with the authority of its reputation, [and] . . . permits those agents to affect the destinies of businesses, and thus gives them the power to frustrate competition in the marketplace.'"  Response at 28 n.14 (citations omitted). While the Court does not disagree with POP Diesel's contention, POP Diesel still must allege an antitrust conspiracy to state a claim under § 1 or New Mexico's equivalent.  Because the Court concludes that POP Diesel has failed to plausibly allege an antitrust conspiracy, ASTM's cloak of authority is largely irrelevant in the analysis for this case.

### B.       POP DIESEL FAILS TO ALLEGE A PLAUSIBLE ANTITRUST CLAIM.

POP Diesel has not plausibly alleged an antitrust conspiracy.  The Defendants contend that

POP Diesel has failed to set forth factual allegations that would push its SAC across the threshold

of plausibly.  The Defendants assert that POP Diesel's antitrust claims contend in essence that

participating in a standard-setting organization amounts to participating in an anti-competitive

conspiracy.  They assert, on the contrary, that standard-setting organizations are not "walking

conspiracies." Wilk v. Am. Med. Ass'n., 895 F.2d 352, 374 (7th Cir. 1990)("But, a trade association

is not, just because it involves collective action by competitors, a 'walking conspiracy.'").

ConocoPhillips states:

> In its reply memorandum in support of its motion for a preliminary injunction,
> Plaintiff suggested that the "conspiracy" at issue was the mere consensual
> participation by ASTM's members in its processes.  According to that argument, a
> standard-setting organization is a "walking antitrust conspiracy," any decision of
> which may be challenged under Section 1 of the Sherman Act on the theory that a
> standard-setting organization's decisions are the product of "collective action"
> because its members "collectively" (through voting and similar procedures) define
> the actions taken.

ConocoPhillips Motion at 13.  See Exxonmobil's Motion at 7 ("As a preliminary matter, this Court

should reject Plaintiff's argument that the mere participation in a standard setting body is per se

unlawful.").

POP Diesel responds that it "has sufficiently alleged facts showing a group boycott and an

unreasonable restraint of trade in violation of Section 1 of the Sherman Act and New Mexico Statute

Annotated 57-1-1." Response at 27.  POP Diesel further contends that "[t]hese same allegations also

show intentional interference with prospective advantage."  Response at 27.  The heart of POP

Diesel's antitrust conspiracy theory is that the Oil Company Defendants are using their influence

to compel members of Committee D02 to vote in favor of the Draft ASTM Triglyceride Standard.

POP Diesel asserts that, "[a]s the world's largest publicly traded international oil and gas company,

ExxonMobil has the influence and market power to ensure that ASTM adopts the Draft ASTM

-40-

Triglyceride Standard in its current form."  SAC ¶ 49, at 18.[3]

The Court concludes that POP Diesel has not adequately pled factual allegations in support of its antitrust claims to make them plausible.  The Court therefore dismisses the antitrust claims over which it has subject-matter jurisdiction.  The Court also dismisses POP Diesel's New Mexico tort law claims, which are founded on the antitrust conspiracy claims.  The Court must, when evaluating a motion to dismiss under rule 12(b)(6), "ask whether there is 'plausibility in [the] complaint.'"  Christy Sports, LLC v. Deer Valley Resort Co., 555 F.3d 1188, 1191 (10th Cir. 2009)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 564).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. at 1949 (quoting Bell Atl. Corp. v. Twombly,

---

[3] POP Diesel again demands that the Court artificially ignore facts outside of the SAC that undermine its claims.  In its Response, POP Diesel contends:

> To the extent that this argument or any other argument relies upon matters outside the Complaint for the truth of such matters, the argument is barred on a motion to dismiss.  For example, ExxonMobil's argument that "the [ASTM] members that voted against [Mr. Convisser's] criticisms [of the Draft ASTM Triglyceride Standard] (which did not even include Exxon), included two members who had expressed their own criticisms of the draft standard" is an allegation obviously not set out in the Complaint.  Instead, POP Diesel[ ] alleges that, at the December, 2010, meeting of the Subcommittee, the Subcommittee membership voted 12-1, over Mr. Convisser's objections, to forward the Draft ASTM Triglyceride Standard to the full Committee D02 for its approval.  The Complaint is silent as to which Subcommittee members voted for or against the Draft ASTM Triglyceride Standard and which Subcommittee members expressed criticisms of the Draft ASTM Triglyceride Standard.  On the other hand, POP Diesel[ ] does allege that two representatives of ExxonMobil were "present and observing" at the Subcommittee's vote.

Response at 27 (citations to the record omitted).  The Court need not, and does not, rely on the alleged facts outside of the SAC to determine that POP Diesel has not plausibly alleged an antitrust conspiracy theory.  The Court notes, however, that, as with POP Diesel's admission that it has suffered no antitrust injury, these extra-complaint considerations reinforce that allowing POP Diesel to proceed to discovery would not likely lead to evidence that would allow POP Diesel to survive summary judgment.

550 U.S. at 570).  See Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir.

2007)("[A] plaintiff must 'nudge [its] claims across the line from conceivable to plausible. in order

to survive a motion to dismiss.'")(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).  To state

a plausible claim, a plaintiff must "provide the 'grounds' of his 'entitle[ment] to relief' [which]

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted).  "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129

S. Ct. at 1949.

POP Diesel does not set forth allegations of a plausible conspiracy.  The heart of POP

Diesel's antitrust claim is that the Defendant Oil Companies "have used their influence in ASTM

with the purpose and effect of excluding triglyceride diesel fuel from the Relevant Markets."

Response at 28 n.14.  In particular, POP Diesel alleges that "ExxonMobil exerted its influence as

a member of Committee D02 to support the Draft ASTM Triglyceride Standard" and that

"ConocoPhillips used its influence as the key technical contact to include anticompetitive language

in two Fit-for-Purpose Guides." Response at 30.  Because the Court lacks subject-matter jurisdiction

over POP Diesel's antitrust claims that are based on the Fit-For-Purpose Guidelines, the Court does

not consider whether being a technical contact is an antitrust violation.

POP Diesel offers little more than threadbare allegations in support of its antitrust conspiracy

claims.  See Kendall v. Visa USA, Inc., 518 F.3d 1042, 1047-48 (9th Cir. 2008)(affirming the

dismissal of a a §1 claim based on allegations that defendants "knowingly, intentionally and actively

participated in an individual capacity in the alleged scheme to fix the interchange fee or merchant

discount fee," because the plaintiff's allegation was "nothing more than a conclusory statement" and

"[t]here [we]re no facts alleged to support such a conclusion").  What factual allegations POP Diesel

provides are insufficient to make its antitrust claims plausible.  In Bell Atlantic v. Twombly, the

Supreme Court held that a recitation of the elements of a § 1 claim combined with allegations of

parallel conduct -- which was consistent with both lawful and with unlawful behavior -- was

insufficient to plead a plausible antitrust claim.  The Supreme Court stated:

> In applying these general standards to a § 1 claim, we hold that stating such a claim
> requires a complaint with enough factual matter (taken as true) to suggest that an
> agreement was made.  Asking for plausible grounds to infer an agreement does not
> impose a probability requirement at the pleading stage; it simply calls for enough
> fact to raise a reasonable expectation that discovery will reveal evidence of illegal
> agreement.  And, of course, a well-pleaded complaint may proceed even if it strikes
> a savvy judge that actual proof of those facts is improbable, and "that a recovery is
> very remote and unlikely."  In identifying facts that are suggestive enough to render
> a § 1 conspiracy plausible, we have the benefit of the prior rulings and considered
> views of leading commentators, already quoted, that lawful parallel conduct fails to
> bespeak unlawful agreement.  It makes sense to say, therefore, that an allegation of
> parallel conduct and a bare assertion of conspiracy will not suffice.  Without more,
> parallel conduct does not suggest conspiracy, and a conclusory allegation of
> agreement at some unidentified point does not supply facts adequate to show
> illegality.  Hence, when allegations of parallel conduct are set out in order to make
> a § 1 claim, they must be placed in a context that raises a suggestion of a preceding
> agreement, not merely parallel conduct that could just as well be independent action.

550 U.S. at 556-57 (citations omitted).

Like the plaintiffs in Bell Atlantic Corp. v. Twombly, POP Diesel fails to allege "enough

factual matter (taken as true) to suggest that an agreement was made."  550 U.S. at 556.  POP Diesel

alleges three sets of factual allegations in support of its antitrust conspiracy theory: (i) at the June

2010 Working Group meeting, ExxonMobil stated it would vote against the Draft ASTM

Triglyceride Standard if parts of it were changed in accordance with Conviser's objections to the

statement in Section 1.2 that "[t]h[e fuels specified herein] are not intended for use" in residential

and smaller burners, diesel internal combustion engines, and marine applications, SAC ¶ 48, at 18;

(ii) the minutes of the June 2010 meeting where ExxonMobil made this comment were procedurally

deficient and did not record ExxonMobil's comment, see SAC ¶ 52(c), at 19; and (iii) POP Diesel was not permitted "unlimited discussion and debate" on the Draft ASTM Triglyceride Standard at the December 2010 Committee D02 meeting, SAC ¶ 52(d), at 20 (alleging that, while "Committee D02 permitted unlimited discussion and debate on all of the other twenty or so ASTM Standards on the agenda," over POP Diesel's objection, the Committee "voted to submit Convisser's comments accompanying his negative vote on the Draft ASTM Triglyceride Standard to electronic balloting, rather than allow for discussion and debate at the meeting").   None of the allegations, however, alone or in combination, plausibly suggests an antitrust conspiracy.

### 1.   POP Diesel's Allegation That Exxonmobil Opposed Pop Diesel's Objections Does Not Plausibly Allege an Antitrust Violation.

Similar to the allegations of parallel conduct in Bell Atlantic Corp. v. Twombly, POP Diesel primarily relies on conclusory allegations combined with factual allegations of conduct that is equally consistent with lawful conduct, namely a member of a standard-setting organization stating a position on a draft standard in opposition to an objection.   In Greater Rockford Energy and Tech. Corp. v. Shell Oil Co., 998 F.2d 391 (7th Cir. 1993), cert. denied 510 U.S. 1111 (1994), the United States Court of Appeals for the Seventh Circuit found that "the only evidence suggesting concerted action among the defendants is their common membership in organizations such as" ASTM and the American Petroleum Institute ("API").   The Seventh Circuit held:

> The plaintiffs allege that the defendants combined in these organizations to restrain trade (1) by delaying issue of an ASTM motor fuel specification that included gasohol and (2) by lobbying governmental authorities through the API to discourage the marketing and acceptance of gasohol.   Neither of these claims, however, amounts to a § 1 violation.

998 F.2d at 396.   The Seventh Circuit stated:

> First, the failure of a private, standard-setting body to certify a product is not, by itself, a violation of § 1.   In Consolidated Metal Products, Inc. v. American

Petroleum Institute, 846 F.2d 284 (5th Cir. 1988), a manufacturer of "sucker rods" -- a steel rod used to pump oil from wells -- argued that the API's delay in certifying its innovative product was an illegal restraint of trade in violation of § 1.  The Fifth Circuit disagreed and affirmed summary judgment against the plaintiff.  It held that "a trade association that evaluates products and issues opinions, without constraining others to follow its recommendations, does not per se violate section 1, when for whatever reason, it fails to evaluate a product favorably to the manufacturer."  Id. at 292; see also Schachar v. American Academy of Ophthalmology, Inc., 870 F.2d 397, 399-400 (7th Cir. 1989).  The Fifth Circuit then found that the delay in certification did not violate § 1 under a rule-of-reason analysis.  First, the plaintiff failed to show a conspiracy, for "a trade association is not by its nature a 'walking conspiracy.'" Id. at 293-94; Wilk v. American Medical Ass'n, 895 F.2d 352, 374 (7th Cir.), cert. denied, 498 U.S. 982 . . . (1990); see also Moore v. Boating Indus. Ass'n, 819 F.2d 693, 712 (7th Cir.), cert. denied, 484 U.S. 854 . . . (1987) (membership in trade association alone not sufficient evidence of agreement to restrain trade).  Second, there was no evidence of an intent to restrain trade, the court held, noting that the API followed its normal certification procedures.  Finally, the court found no evidence of an anticompetitive effect because the certification, although influential, was not required to compete in the market.  Reliance by oil pump buyers on the certification was voluntary, and the record indicated that the plaintiff had no problem selling its product without the API's certification.

The plaintiffs' § 1 claim fails here for analogous reasons.  As we have noted, there is no evidence of concerted action.  In addition, the plaintiffs have not proffered evidence of an unlawful purpose.  The ASTM did not stray from its normal procedures.  Indeed, the plaintiffs concede as much, but argue that "the defendants did not even adopt an emergency specification for gasohol, although ASTM procedures plainly provided that emergency specifications could be adopted to fill a pressing need while a proposal went through the normal ASTM standards-writing process and ballots."  The failure to take emergency steps to specify gasohol and proceeding through the normal specification process, however, is not evidence of an unlawful purpose.  Finally, there is no evidence of an anticompetitive effect.  The record indicates that in the period 1978-1987, during which the defendants, acting through the ASTM, allegedly restrained trade by not issuing a gasohol specification, ethanol fuel sales increased continuously from 20 million gallons per year to 825 million gallons per year -- a 4000 percent increase.  It would be difficult to show an anticompetitive effect on ethanol sales in the face of this increase.

Greater Rockford Energy and Tech. Corp. v. Shell Oil Co. 998 F.2d at 396-97 (emphasis added)(citations to the record omitted).

While the Court evaluates the SAC's allegations on the Defendants' motions to dismiss, and

not on a summary judgment standard, the same legal principles apply.[4]  Taking the allegations in the SAC as true, POP Diesel's antitrust claims fail for similar reasons to the claims in <u>Greater Rockford Energy and Tech. Corp. v. Shell Oil Co.</u>  POP Diesel fails to allege facts plausibly suggesting that the Defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective." <u>Abraham v. Intermountain Health Care, Inc.</u>, 461 F.3d 1249, 1257 (10th Cir. 2006).  Like the plaintiffs in <u>Greater Rockford Energy and Tech. Corp. v. Shell Oil Co.</u>, POP Diesel relies principally upon the Oil Company Defendants' participation in ASTM as the foundation for its antitrust claims.  The only specific factual allegation that POP Diesel offers against the Defendant Oil Companies in its surviving antitrust claims, beyond their membership and participation in ASTM, is that ExxonMobil voiced its opposition to changing the Draft ASTM Triglyceride Standard based on Convisser's objections.  As POP Diesel's SAC acknowledges, however, "debate and discussion" of proposed standards is part of ASTM's procedure.  <u>See</u> SAC ¶ 52(d), at 20 (alleging that it was a "procedural irregularity" not to "allow for discussion and debate at the meeting").  It is hard to see how ExxonMobil's statement would suggest an unlawful agreement in restraint of trade.  POP Diesel appears to contend that ExxonMobil's made its position known and trusted that other members of the Working Group and Committee D02 would not go against it.  <u>See</u> SAC ¶ 52(i), at 21-22 (stating that members of Subcommittee D02 not affiliated with the Defendant Oil Companies "repeatedly stated that many of Convisser's objections had substantive merit," but nonetheless "refused to adopt and approve any of Convisser's proposed changes <u>because such adoption and approval would antagonize the Defendant Oil Companies</u>").  This allegation does

---

[4] The <u>Supreme Court in Bell Atlantic Corp. v. Twombly</u> relied on its holding in the summary judgment case <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986), which held that conscious parallelism does not establish an antitrust conspiracy.

not suggest an agreement, but unilateral conduct.  The Tenth Circuit has held, however, that "unilateral conduct, regardless of its anticompetitive effects, is not prohibited by § 1 of the Sherman Act." Abraham v. Intermountain Health Care Inc., 461 F.3d at 1256.  Moreover, it would defeat the purpose of standard-setting organizations to hold that it is unlawful for members of standard-setting organizations to state opposition to another member's opposition to a proposed standard. Allegations of ExxonMobil's opposing an POP Diesel's objection "fails to bespeak unlawful agreement.  It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice" to state a plausible § 1 antitrust claim. Bell Atlantic Corp. v. Twombly, 550 U.S. at 557.

### 2.   POP Diesel Has Not Adequately Alleged an Anti-Competitive Effect.

The Seventh Circuit also affirmed summary judgment in Greater Rockford Energy and Tech. Corp. v. Shell Oil Co., because "the court found no evidence of an anticompetitive effect because the certification, although influential, was not required to compete in the market." 998 F.2d at 391. Similarly, the standard at issue in this case is influential, but compliance is not required to compete in the relevant markets.[5]  POP Diesel alleges in the SAC that, notwithstanding the incorporation of ASTM standard into N.M.S.A. 1978, § 57-19-29A ("Unless modified by regulation of the board, the quality standards, tests and methods of conducting analyses on petroleum products manufactured, kept, stored, sold or offered for sale in New Mexico shall be those last adopted and published by [ASTM]."),[6] and notwithstanding that its product does not meet the standards "last

---

[5] While the Court does not rely on POP Diesel's admission at the preliminary injunction hearing that it is not a participant in the  burner market, it notes that this lack of participation would further support concluding that POP Diesel has not plausibly alleged an antitrust violation.

[6] POP Diesel contends that "Section 57-19-29, and, for that matter, all of Article 19 of Chapter 57, pertains to petroleum products, which of course POP Diesel[ ] does not supply."

adopted and published by [ASTM]," SAC 32, at 8-9, it "competes in the Relevant Markets against the Defendant Oil Companies, as well as other producers and sellers of diesel fuel,"[7] SAC ¶ 24, at 7.  Moreover, POP Diesel acknowledges in the SAC that burner manufacturers -- not the Defendants -- seeking insurance coverage for the use of triglyceride diesel fuel asked ASTM Committee D02 to develop a standard for triglyceride diesel fuel to be used in burners in an effort to expand the market.  See SAC ¶ 37, at 10.  Underwriters Laboratories, an insurance actuarial firm, would not rate burners using triglyceride diesel fuel, and some insurers therefore would not offer coverage unless and until ASTM first adopted a standard specification for triglyceride diesel fuel for burners.  See SAC ¶ 37, at 10-11.  Because POP Diesel is allegedly able to compete in the relevant markets without complying with ASTM standards, and the Draft ASTM Triglyceride Standard is intended to expand the burner market, POP Diesel has not adequately alleged an "anticompetitive effect because the [standard], although influential, [will] not [be] required to compete in the market." 998 F.2d at 391.

**3.      The "Procedural Irregularities POP Diesel Alleges Do Not Make its Claims Plausible.**

Unlike the alleged antitrust conspiracy in Greater Rockford Energy and Tech. Corp. v. Shell Oil Co., where "API followed its normal certification procedures," 998 F.2d at 397, POP Diesel does

---

Response at 33.  This assertion is a curious response in light of POP Diesel's reliance in its SAC on N.M.S.A. 1978, § 57-19-29A's incorporation of ASTM standards to show an anti-competitive effect. See SAC ¶ 51, at 18 ("Once it is adopted and published, numerous states will incorporate it by reference into law pursuant to existing statutes, similar to New Mexico Statutes Annotated 57-19-29(A) (1978)."). Nonetheless, the statement underscores that POP Diesel has not adequately alleged an anti-competitive effect because it has not adequately alleged how the ASTM standards will affect its business.

[7] The Court notes that there appears to be some tension between this allegations and POP Diesel's admissions in support of the preliminary injunction.

allege "procedural irregularities" in the SAC.   SAC ¶ 52, at 18.   The alleged procedural irregularities, however, are not suggestive of a conspiracy in restraint of trade and do not push POP Diesel's antitrust claims across the threshold of plausibility.   POP Diesel alleges "procedural irregularities" and omissions surrounding the meeting notes for the June 2010 meeting.   SAC ¶ 52(d), at 20.   POP Diesel alleges that, contrary to its customs and policies, no minutes of the Working Group's June 2010 meeting were circulated within sixty days of its June 2010 meeting, and, without the Working Group's or the Subcommittee's prior approval at their meetings on December 8, 2010, the Chair of the Subcommittee appended a set of purported minutes for the June 2010 Working Group meeting to the Subcommittee report to the D02 Committee on the December 9, 2010 Working Group meeting.   See SAC ¶ 52(a)-(c), at 19.   POP Diesel further alleges that the draft of the purported Working Group minutes made no mention of ExxonMobil's statement that it would vote against the Draft ASTM Triglyceride Standard if limiting language was deleted.   See SAC ¶ 52(c), at 19.   First, the tardiness of the meeting minutes does not suggest an unlawful agreement in restraint of trade.   Additionally, it is unclear how excluding ExxonMobil's statement from the minutes would plausibly suggest a conspiracy in restraint of trade, particularly when the essence of POP Diesel's antitrust theory appears to be that the Oil Company Defendants used their influence to compel other members of Committee D02 to vote in accordance with their interests. If this allegation were a plausible antitrust theory, the Court fails to see how concealing ExxonMobil's statement furthers the conspiracy.

POP Diesel's final set of factual allegations is that, unlike the other approximately twenty matters discussed at the December 2010 meeting and "[i]n contravention of the agenda," which stated "that the meeting 'will continue until all business is completed,'" POP Diesel was not permitted "unlimited discussion and debate" of its objections to the Draft ASTM Triglyceride

Standard.  SAC ¶ 52(d), at 20 (alleging that, while "Committee D02 permitted unlimited discussion and debate on all of the other twenty or so ASTM Standards on the agenda," over POP Diesel's objection, the Committee "voted to submit Conviser's comments accompanying his negative vote on the Draft ASTM Triglyceride Standard to electronic balloting, rather than allow for discussion and debate at the meeting").  These allegations, alone or in combination with POP Diesel's other factual contentions, do not plausibly allege an antitrust conspiracy.  First, it is a stretch to read the statement in the meeting agenda "that the meeting 'will continue until all business is completed'" to mean that POP Diesel would be permitted unlimited discussion and debate of the Draft ASTM Triglyceride Standard, or that POP Diesel would be permitted to have its objection discussed in whatever form it chose.  Moreover, POP Diesel points to no case, and the Court finds none, that holds that "contravention of [an] agenda" establishes a plausible antitrust conspiracy claim.  Second, POP Diesel does not state in the SAC whether the approximately twenty other items that it alleges were "permitted unlimited discussion and debate" were contested, making them suspect measuring sticks for assessing Committee D02's treatment of Conviser's objections.  SAC ¶ 52(d), at 20.  The Committee's ability to cover twenty items in one meeting suggests that the other items elicited little discussion and debate.  Finally, POP Diesel essentially contests the manner of the discussion and debate.  It acknowledges in the SAC that POP Diesel's objections were addressed at the December 2010 meeting, see SAC ¶ 52(h), at 21 ("[T]he Subcommittee presented on a large display screen written responses to each of Conviser's objections to the Draft Standard . . . ."), and that Conviser's objections will accompany the electronic ballot, see SAC ¶ 52(d), at 20 ("[Committee D02 voted to submit Conviser's comments accompanying his negative vote on the Draft ASTM Triglyceride Standard to electronic balloting . . . .").  POP Diesel thus does not contest that its objections were not heard, but that it would prefer they were heard differently.  This contention does

not plausibly support an antitrust conspiracy.

### 4.   Participating in a Standard-Setting Organization Alone Is Not an Antitrust Violation.

Beyond its allegations that Exxonmobil objected to changing the Draft ASTM Triglyceride Standard, that the meeting minutes were procedurally deficient and incomplete, and that it was not allowed unlimited comment and debate at the December 2010 meeting, POP Diesel alleges only that the Defendant Oil Companies participated in standard-setting activities.  The Defendants contend that merely participating in a standard-setting organization does not amount to an unlawful conspiracy in restraint.  The Court agrees.  An antitrust conspiracy requires "a combination or some form of concerted action between at least two legally distinct economic entities."  Capital Imaging Assocs. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 542 (2d Cir. 1993).

> Section 1 has been interpreted as prohibiting only concerted, multilateral action.  See Bell v. Fur Breeders Agric. Coop., 348 F.3d 1224, 1232 (10th Cir. 2003).  Such action occurs when "two or more entities that previously pursued their own interests separately . . . combin[e] to act as one for their common benefit" in the restraint of trade.   See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769 . . . (1984).  Underlying § 1's emphasis on concerted action is the rationale that when two formerly separate entities combine for their common benefit, their activity is "fraught with anti-competitive risk" because it "deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands."  Id. at 768-69 . . . .  For this reason, "unilateral conduct, regardless of its anti-competitive effects, is not prohibited" by § 1 of the Sherman Act.  Motive Parts Warehouse v. Facet Enters., 774 F.2d 380, 386 (10th Cir. 1985) (quoting Contractor Util. Sales v. Certain-teed Prods., 638 F.2d 1061, 1074 (7th Cir. 1981)).  Therefore, it is critical to distinguish between unilateral and concerted action in establishing a violation of § 1.

Gregory v. Fort Bridger Rendezvous Ass'n, 448 F.3d 1195, 1200 (10th Cir. 2006).  The Second Circuit has noted that "every action by a trade association is not concerted action by the association's members."  AD/SAT v. Associated Press, 181 F.3d 216, 234 (2d Cir.1999).  See also Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 510 n.13 (1988)(emphasizing that its holding

allowing an antitrust claim to go forward was "expressly limited to cases where an 'economically interested party exercises *decisionmaking* authority in formulating a product standard for a private association that comprises market participants," as opposed to "mere efforts to persuade others to exclude a competitor's product from a private code" (emphasis original)).  Thus, POP Diesel must allege more than that the Defendant Oil Companies participated in promulgating the Draft ASTM Triglyceride Standard.

### 5.    The Nature of the Conspiracy POP Diesel Alleges Is Hard to Swallow.

POP Diesel's antitrust claims are also implausible because they require broad cooperation among groups that would be unlikely bedfellows.  ASTM argues:

> Angered by its failure to convince any ASTM technical committee members of its views on the merits of the Draft TG Standard, POP Diesel has filed a baseless antitrust suit in order to bring the ASTM consensus process to a grinding halt.  POP Diesel's newly-minted conspiracy claim asks the Court to ignore the law and to suspend logic by inferring the existence of an unlawful conspiracy among ASTM and a diverse group of its members from the mere fact that ASTM may, as the result of its consensus process, publish a standard to which POP Diesel objects.  In its most recent incarnation, POP Diesel's conspiracy theory asserts that two oil companies, an organic farm owner, a biodiesel trade association, two employees of a Canadian waste oil recycling firm, and an employee of a petroleum terminaling firm have somehow found common cause in trying to drive POP Diesel out of business merely as a result of their actions participating in ASTM's Committee D02 and Subcommittee P.

ASTM's Memorandum at 2.  ASTM's "membership is composed of three categories: producers, consumers, and general interest (academic, etc.) . . . [and] [i]ts specifications are written by technically qualified committees composed of members from the three categories."  Application of Am. Soc'y for Testing & Materials, 231 F. Supp. 686, 688 (E.D. Pa. 1964).  POP Diesel alleges a far-reaching conspiracy, requiring that the Defendants conspired with numerous other entities.  See SAC ¶ 17-19, at 5-6.   The conspiracy would require the participation of parties whose interest would appear to be to advance the market for triglyceride diesel fuels, including: (i) the National

Biodiesel Board and Ralph F. Turner, Chair of the Triglyceride Burner Fuel Working Group, acting

on behalf of biodiesel interests; (ii) Barbara Parry and Steve Spence of Newalta, acting on behalf

of interests connected with recycled engine oil for burners; (iii) Marie F. Calhoon of

Transmontaigne Inc., acting on behalf of interests connected with the petroleum industry; and (iv)

other members of the Triglyceride Burner Fuel Working Group and Subcommittee P of ASTM

Committee D02.  See SAC ¶ 18, at 6.  As the Defendants note, POP Diesel has not set forth

plausible allegations suggesting why these multifaceted interests would enter into an unlawful

agreement to exclude POP Diesel from the market.

### C.   THE COURT DISMISSES POP DIESEL'S TORT CLAIM.

POP Diesel relies on its antitrust claim to support its claim for tortious interference with

prospective business advantage.  See Response at 27 ("These same allegations also show intentional

interference with prospective advantage.").  The Court dismisses POP Diesel's antitrust claims, on

which POP Diesel relies to support its tort claim.  POP Diesel's tort claim fails because POP Diesel

does not allege a contractual relationship in the burner market with which the Defendants' alleged

action interfered.  See Horizon AG-Prods. v. Precision Sys. Eng'g, Inc., No. CIV 09-1109 JB/DJS,

2010 WL 4054131 (D.N.M. Sept. 28, 2010)(Browning, J.)(dismissing the plaintiffs' tortious

interference with prospective contractual relations claim, because the plaintiff "ha[d] not alleged that

it had any continuing or customary relationships with its customers").  POP Diesel contends that the

SAC alleges continuing or customary relationships with its customers, because it states that

"Albuquerque, Las Cruces, Santa Fe, and Taos '**have pledged** to assist POP Diesel[ ] in establishing

the first state-wide network of triglyceride diesel fuel filling stations in the country."  Response at

36-37 (quoting SAC ¶ 5, at 3)(emphasis original).  Without citing any authority, POP Diesel

contends: "Quite obviously, this pledge is a prospective business contract."  Response at 37.  ASTM

replies:

> Despite POP Diesel's assertion that such allegations "quite obviously" suffice, it has not, in fact, alleged prospective contracts with any of those cities.  It also fails to cite a single case in support of the principle that an amorphous "pledge" to support a business in some unspecified way constitutes an "actual prospective contractual relation" under New Mexico law.

Reply at 10.  To the extent the interference on which POP Diesel relies will flow from the Fit-for-Purpose Guidelines, which address diesel engine fuels, and not the Draft ASTM Triglyceride Standard, which address burners, POP Diesel's claims are not ripe for the reasons discussed in Part I.A, <u>supra</u>, and the Court dismisses without prejudice.  Because POP Diesel makes no allegations of interference with its alleged activities in the burner market, the Court dismisses with prejudice POP Diesel's tortious interference with prospective business advantage to the extent the claim is founded on the Draft ASTM Triglyceride Standard.

**IT IS ORDERED** that: (i) Defendant Conocophillips' Motion to Dismiss, filed April 1, 2011 (Doc. 64); (ii) Defendant Exxonmobil Corporation's Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), filed April 1, 2011 (Doc. 66); and (iii) Defendant ASTM International's Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), or in the Alternative, to Strike Certain Allegations Pursuant to Fed. R. Civ. P. 12(f), filed April 1, 2011 (Doc. 67), are granted in part and denied in part.  The Court dismisses the claims of Plaintiff Plant Oil Powered Diesel Fuel Systems, Inc. ("POP Diesel") that are based on the Fit-For-Purpose Guidelines without prejudice, because they are unripe.  The Court dismisses POP Diesel's remaining claims with prejudice for failure to state a claim on which relief may be granted.

```
                              _____
                              UNITED STATES DISTRICT JUDGE
```

*Counsel:*

David J. Jaramillo
Maria E. Touchet
The Gaddy Jaramillo Law Firm
Albuquerque, New Mexico

-- and --

Daniel Rees Shulman
Jeremy Lloyd Johnson
Julie Boehmke
Gray Plant Mooty Mooty & Bennett, PA
Minneapolis, Minnesota

   *Attorneys for the Plaintiff*

Julian Brew
Kaye Scholer, LLP
Los Angeles, California

-- and --

David F. Cunningham
Thompson, Hickey, Cunningham, Clow, April & Dolan, P.A.
Santa Fe, New Mexico

   *Attorneys for Defendant ExxonMobil Corporation*

Andrew G. Schultz
Rodey, Dickason, Sloan, Akin & Robb, P. A.
Albuquerque, New Mexico

-- and --

D. Bruce Hoffman
David A. Higbee
Ryan Shores
Hunton & Williams LLP
Washington, DC

-- and --

Thomas G. Slater
Hunton & Williams LLP
Richmond, Virginia

*Attorneys for Defendant Chevron Corporation*

George S. Cary
Steven J. Kaiser
Cleary Gottlieb Steen & Hamilton LLP
Washington, DC

-- and --

Michael B. Campbell
Campbell Trial Law, LLC
Santa Fe, New Mexico

*Attorneys for Defendant Chevron Corporation Conocophillips*

John B. Pound
Long, Pound & Komer, P.A.
Santa Fe, New Mexico

-- and --

Thomas B. O'Brien
ASTM International
West Conshohocken, Pennsylvania

-- and --

Mark P. Edward
R. Brendan Fee
Morgan, Lewis & Bockius LLP
Philidelphia, Pennsylvania

*Attorneys for Defendant ASTM International*

Daniel Laytin
Leslie S. Garthwaite
Leslie M. Smith
Sandra Maja Fabula
Kirkland & Ellis LLP
Chicago, Illinois

-- and --

John R. Cooney
Zachary L. McCormick
Modrall Sperling Roehl Harris & Sisk PA
Albuquerque, New Mexico

*Attorneys for Defendant BP Products North America, Inc.*