IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PLANT OIL POWERED DIESEL FUEL SYSTEMS, INC.,

       Plaintiff,

vs.                                                                                      No. CIV 11-0103 JB/WPL

EXXONMOBIL CORPORATION; ROYAL DUTCH
SHELL, PLC; BP, PLC; CHEVRON CORPORATION;
CONOCOPHILLIPS; ASTM INTERNATIONAL f/k/a
AMERICAN SOCIETY FOR TESTING AND
MATERIALS; BP PRODUCTS NORTH AMERICA, INC.;
and CHEVRON USA, INC.

       Defendants.

## MEMORANDUM OPINION OR ORDER

**THIS MATTER** comes before the Court on Defendant ASTM International's Motion for

Attorney's Fees and Expenses Pursuant to the Standards Development Organization Advancement

Act, filed August 19, 2011 (Doc. 86).  The Court held a hearing on December 15, 2011.  The

principal issues are: (i) whether Defendant ASTM International, as the prevailing party, is statutorily

entitled to attorney fees; and (ii) whether its fees of $330,755.55 are reasonable.  The Court

concludes that, even though ASTM International is a substantially prevailing party, Plaintiff Plant

Oil Powered Diesel Fuel Systems, Inc.'s ("POP Diesel") claims were not wholly frivolous, without

foundation, or brought in bad faith.  The Court will, therefore, deny the Motion without addressing

the issue of reasonableness.

## FACTUAL BACKGROUND

POP Diesel develops, manufactures, and sells triglyceride diesel fuel -- fuel consisting of

vegetable oil and animal fat -- and related equipment that permits and manages the use of

triglyceride diesel fuel in residential, commercial, and industrial burners and in diesel engines.  See Second Amended Complaint Jury Demand ¶ 1, at 2, filed April 1, 2011 (Doc. 1)("Second Amended Complaint").  POP Diesel also owns and operates a state-licensed triglyceride diesel fuel processing and filling station in the State of New Mexico, which it opened in 2006 as the first such station in the United States of America.  See Second Amended Complaint ¶ 4, at 3.

Defendants ExxonMobil Corporation and ConocoPhillips Company (together "the Defendant Oil Companies"), are two of the world's largest producers and sellers of petroleum-based diesel fuel, which competes with triglyceride diesel fuel, but which, POP Diesel alleges, is inferior to triglyceride diesel fuel for use in burners and diesel engines, for reasons of cost, performance, product safety, and environmental impact.  Second Amended Complaint ¶¶ 7-9, at 3-4.  Each of the Defendant Oil Companies is a member of ASTM International, one of the largest standard-setting organizations in the world.  See Second Amended Complaint ¶¶ 8, 11-15, at 4-5.  ASTM International promulgates quality standards for many products, including fuel oils, which federal and state statutes throughout the United States, including New Mexico, have adopted by reference.  See Second Amended Complaint ¶ 13, at 4.  ASTM International's "membership is composed of three categories: producers, consumers, and general interest (academic, etc.) . . . [and] [i]ts specifications are written by technically qualified committees composed of members from the three categories."  Application of Am. Soc'y for Testing & Materials, 231 F.Supp. 686, 688 (E.D. Pa. 1964).

This case involves ASTM International's promulgation, with the Defendant Oil Companies' alleged involvement, of a proposed new standard and guidelines for biofuels that would limit the use of triglyceride diesel fuel and related products, including those of POP Diesel.  POP Diesel alleges that the Defendants conspired with numerous other entities.  See Second Amended

Complaint ¶¶ 17-19, at 5-6.  POP Diesel asserts that the co-conspirators of which it knows include certain members of ASTM's Triglyceride Burner Fuel Working Group and Subcommittee P of ASTM Committee D02, including: (i) the National Biodiesel Board and Ralph F. Turner, Chair of the Triglyceride Burner Fuel Working Group, acting on behalf of biodiesel interests; (ii) Barbara Parry and Steve Spence of Newalta, acting on behalf of interests connected with recycled engine oil for burners; (iii) Marie F. Calhoon of Transmontaigne Inc., acting on behalf of interests connected with the petroleum industry; and (iv) other members of the Triglyceride Burner Fuel Working Group and Subcommittee P of ASTM Committee D02.  See Second Amended Complaint ¶ 18, at 6.  POP Diesel contends that the co-conspirators and the Defendant Oil Companies all have an economic interest in the exclusion of triglyceride diesel fuel from the relevant markets, because

> triglyceride diesel fuel may tend to displace competing products manufactured, marketed, or promoted by the co-conspirators, including petroleum-based diesel fuel, recycled engine oil, and so-called biodiesel, a blend of 95 percent petroleum-based diesel fuel and 5 percent of a substance that starts out as triglycerides, but the molecules of which end up being physically and chemically transformed into a different substance . . . .  Specifically, the co-conspirators are primarily affiliated with and representatives of petroleum companies, including, but not limited to, the Defendant Oil Companies; corporate agricultural interests that have invested heavily in biodiesel production facilities; companies that collect and render waste triglycerides, which have also invested heavily in biodiesel production facilities; sellers of petroleum fuel oil and recycled engine oil for use in burners; manufacturers and sellers of biodiesel; and related interests that service petroleum and biodiesel producers.

Second Amended Complaint ¶ 17, at 5-6.

### 1.    The Relevant Markets.

The relevant product and geographic markets for purposes of this action are: (i) the diesel fuel market for residential, commercial, and industrial burners in the United States; and (ii) the diesel fuel market for diesel engines in the United States ("the Relevant Markets").  Second Amended Complaint ¶ 21, at 7.  POP Diesel competes in the Relevant Markets against the

Defendant Oil Companies, as well as against other producers and sellers of diesel fuel.  See Second Amended Complaint ¶ 24, at 7.

       **2.**      **The Draft ASTM Triglyceride Standard.**

ASTM's largest committee, titled D02, Petroleum Products and Lubricants ("Committee D02"), of which the Defendant Oil Companies are members, promulgates standards, specifications, classifications, test methods, and guidelines for liquid fuels in the diesel fuel industry.  Second Amended Complaint ¶¶ 8, 10, 15, at 4-5.  To date, Committee D02 has approved for mixing with petroleum-based diesel fuel a non-petroleum blend stock, commonly known as "biodiesel," that meets ASTM Standard Specifications Biodiesel Fuel Blend Stock B100 for Middle Distillate Fuels D6751.  Second Amended Complaint ¶ 33, at 9.  ASTM Standard Specifications D396 and D975 approve up to five percent biodiesel blended with petroleum-based diesel fuel for use in burners and diesel engines, respectively.  See Second Amended Complaint ¶ 33, at 9.

POP Diesel alleges that, because of the five percent cap, biodiesel represents only an incremental step in reducing net greenhouse gas emissions as compared with the near one-hundred percent use of triglyceride diesel fuel POP Diesel's equipment permits.  See Second Amended Complaint ¶ 35, at 10.  The Defendant Oil Companies do not oppose biodiesel, which poses no threat to petroleum-based diesel fuel because of the five-percent cap.  See Second Amended Complaint ¶ 35, at 10.  POP Diesel contends that supporting the five-percent cap on biodiesel in ASTM Standard Specifications D396 and D975 allows the Defendant Oil Companies to portray themselves as favoring renewable energy.  See Second Amended Complaint ¶ 35, at 10.  Biodiesel blended with petroleum fuels makes use of existing pipeline, rail, road and other infrastructure, whereas "triglyceride diesel fuel is handled, transported, and stored in equipment that is apart and segregated from the infrastructure supporting petroleum."  Second Amended Complaint ¶ 35, at 10.

Without federal tax incentives, which expired at the end of 2009, the manufacture of biodiesel is largely not cost-effective or economically or commercially feasible, and many biodiesel facilities today are sitting idle.  See Second Amended Complaint ¶ 36, at 10.

Several years ago, burner manufacturers seeking insurance coverage for the use of triglyceride diesel fuel asked ASTM Committee D02 to develop a standard for triglyceride diesel fuel to be used in burners.  See Second Amended Complaint ¶ 37, at 10.  Underwriters Laboratories, an insurance actuarial firm, would not rate burners using triglyceride diesel fuel, and some insurers therefore would not offer coverage, unless and until ASTM International first adopted a standard specification for triglyceride diesel fuel for burners.  See Second Amended Complaint ¶ 37, at 10-11.  Various subcommittees of Committee D02 refused to adopt a specification for triglyceride diesel fuel burners.  See Second Amended Complaint ¶ 39, at 10.  POP Diesel alleges that this refusal is the result of the petroleum-based diesel fuel interests that dominate these subcommittees and that these interests "oppose any standard for triglyceride diesel fuel that may lead to triglyceride diesel fuel's supplanting petroleum-based diesel fuel."  Second Amended Complaint ¶ 38, at 11.  The request was then referred to Committee D02's Subcommittee P, Recycled Petroleum Products (the "Subcommittee").  Second Amended Complaint ¶ 40, at 11.  The Subcommittee established a Triglyceride Burner Fuel Working Group (the "Working Group").  Second Amended Complaint ¶ 40, at 11.  "The Defendant Oil Companies, either directly or indirectly, are all members of or active participants in the D02 Committee, the Subcommittee, and the Working Group," and, POP Diesel alleges, each has an interest in preserving the status quo embodied in ASTM Standard Specifications D396 -- for burners -- and D975 -- for diesel engines -- with the five-percent biodiesel cap.  Second Amended Complaint  ¶ 41, at 11-12.

The Subcommittee and the Working Group have created and approved the Draft ASTM

Triglyceride Standard.  Second Amended Complaint ¶ 42, at 12.  POP Diesel asserts that the Draft ASTM Triglyceride Standard contains numerous, material misstatements of fact made with the purpose and effect of excluding sellers of triglyceride diesel fuel and related products, including POP Diesel, from the Relevant Markets.  See Second Amended Complaint ¶ 44, at 12-17.  During the June 2010 ASTM International semi-annual meeting, POP Diesel's President, Claude Convisser, voiced objections to the Draft ASTM Triglyceride Standard at the meetings of both the Working Group and the Subcommittee.  See Second Amended Complaint ¶¶ 45-47, at 17.  In regards to Mr. Convisser's comments at the Working Group meeting, ExxonMobil stated that it would vote against the Draft ASTM Triglyceride Standard if ASTM deleted the alleged misrepresentation in Section 1.2 -- that "[t]h[e fuels specified herein] are not intended for use" in residential and smaller burners, diesel internal combustion engines, and marine applications -- to which Mr. Convisser had objected. Second Amended Complaint ¶ 48, at 18.  Mr. Convisser subsequently provided the Working Group and Subcommittee with written objections to the Draft ASTM Triglyceride Standard.  See Complaint ¶ 47, at 17.  Mr. Convisser's oral and written objections described, among other things, the following alleged material misrepresentations in the Draft ASTM Triglyceride Standard:

(i)     Table 1 of the Draft ASTM Triglyceride Standard contains "Detailed Requirements for Triglyceride Burner Fuels," which refers to thirty-eight ASTM-approved test methods allegedly applicable to triglyceride diesel fuel.  Second Amended Complaint ¶ 44(a), at 12. These test methods, however, all involve tests for the properties of petroleum-based diesel fuel and have never been validated as having applicability to triglyceride diesel fuel.  These test methods thus provide invalid criteria for disqualifying triglyceride diesel fuel from fitness for use in burners.  See Second Amended Complaint ¶ 44(a), at 12-13.

(ii)    Section 1.2 of the Draft ASTM Triglyceride Standard states that "[t]he fuels specified herein

-6-

are not intended for blending with conventional [petroleum] fuel oils for this purpose."
Second Amended Complaint ¶ 44(b), at 13. POP Diesel contends that this statement is false,
because triglyceride diesel fuel and petroleum-based diesel fuel used in burners are miscible,
meaning that, when stored in a heated tank before combustion, they blend in a homogeneous
mixture. See Second Amended Complaint ¶ 44(b), at 13. POP Diesel further asserts that
there is no evidence that burners cannot operate on a blend of triglyceride diesel fuel and
petroleum-based diesel fuel, and that such use is common without harm to burner equipment.
POP Diesel's burner equipment functions, POP Diesel contends, with any blend of
triglyceride diesel fuel and petroleum-based diesel fuel. POP Diesel further contends that
ASTM will likely rely on this language when it develops future specifications for diesel
engines. See Second Amended Complaint ¶ 44(b), at 13-14.

(iii)   Section 1.2 of the Draft ASTM Triglyceride Standard also states that "[the fuels specified
herein] are not intended for use in . . . [certain specified burners], such as residential burners
or small pressure atomization burners nor are they intended for use in internal combustion
engines." Second Amended Complaint ¶ 44(c), at 14. POP Diesel asserts, on the contrary,
that triglyceride diesel fuel, properly managed, operates in all such burners and diesel
internal combustion engines. See Second Amended Complaint ¶ 44(c), at 14.

(iv)   Sections 5.3.1 and 5.3.2 of the Draft ASTM Triglyceride Standard define triglyceride burner
fuel so as to exclude triglyceride diesel fuel that originates from household, non-commercial
sources, so as to exclude its use from residential burners. See Second Amended Complaint
¶ 44(d), at 14-15. POP Diesel asserts, on the contrary, that triglyceride diesel fuel can
originate from household, non-commercial sources, and, properly managed, is suitable for
use in residential burners. See Second Amended Complaint ¶ 44(d), at 14-15.

(v)     Section 5.3.2 of the Draft ASTM Triglyceride Standard also, according to POP Diesel, falsely states that "[t]he extra equipment and maintenance required to handle this fuel . . . may preclude its use in small and/or unattended installations."  Second Amended Complaint ¶ 44(e), at 14.  POP Diesel asserts, on the contrary, that its burners do not require extra equipment or maintenance or an attendant.  See Second Amended Complaint ¶ 44(e), at 14.

(vi)    The Draft ASTM Triglyceride Standard limits to thirty the total acid number for triglyceride diesel fuel, as set forth in Table 1, and in Sections X1.2 and X1.5.1.  POP Diesel asserts, on the contrary, that when used with its equipment, triglyceride diesel fuel may have an acid number in excess of thirty, and is safe and appropriate for use in residential, commercial, and industrial burners.  See Second Amended Complaint ¶ 44(f), at 15.

(vii)   Section X1.4.4.2 of the Draft Standard states that, because "[t]he viscosity of [triglyceride diesel fuel] can change significantly with relatively small temperature differences in the range of temperatures at which the burner operates, . . . burner manufacturers and triglyceride fuel users should consider the viscosity characteristics of the range of potential triglyceride burner fuels very carefully."  Second Amended Complaint ¶ 44(g), at 15.  POP Diesel asserts, on the contrary, that higher viscosity is not a problem for burner and diesel engine equipment that pre-heats triglyceride diesel fuel to lower its viscosity, as does POP Diesel's equipment.  See Second Amended Complaint ¶ 44(g), at 15.

(viii)  Section X1.4.1 of the Draft ASTM Triglyceride Standard states with regards to the temperature at which a substance turns from solid to liquid state: "An increase in pour point can occur when triglyceride burner fuel is subjected to cyclic temperature variations that can occur in the course of storage."  Second Amended Complaint ¶ 44(h), at 16.  POP Diesel

-8-

asserts, on the contrary, that there is no evidence that such temperature variations lead to a significant change in the pour point of triglyceride diesel fuel.  See Second Amended Complaint ¶ 44(h), at 16-17.

(xi)     Section 1.4 of the Draft ASTM Triglyceride Standard states: "Nothing in this specification shall preclude observance of national or local regulations, which can be more restrictive." Second Amended Complaint ¶ 44(i), at 17.  POP Diesel contends that there is "no factual basis to suggest that governments may have cause to adopt even more restrictive standards." Second Amended Complaint ¶ 44(i), at 17.

POP Diesel further asserts that numerous irregularities, and breaches of ASTM International's policies and procedures, have marked the ASTM's Committee D02's, the Subcommittee's, and the Working Group's approval process for the Draft ASTM Triglyceride Standard.  See Second Amended Complaint ¶ 52, at 18-22.  POP Diesel alleges the following irregularities:

(i)     ASTM's Regulations Governing Technical Committees ("ASTM's Regulations") state in the relevant part of § 19.2.2.4: "Accurate minutes should be kept of all ASTM-sponsored meetings." Second Amended Complaint ¶ 52(a), at 19.  The Bylaws of Committee D02 state at § 9.3.2: "Minutes shall be circulated within 60 days following a meeting."  Second Amended Complaint ¶ 52(b), at 19.  POP Diesel alleges that no minutes were taken or circulated for an ASTM International-sponsored meeting of the Working Group in Kansas City, Missouri, in late June 2010, during which ExxonMobil stated that it would vote against the Draft ASTM Triglyceride Standard if the Working Group or Subcommittee deleted language stating triglyceride diesel fuel is not appropriate for residential and smaller burners, diesel internal combustion engines, and marine applications.  See Second Amended

Complaint ¶ 52(a), at 19.

(ii)     ASTM's Regulations further states in § 19.2.2.4 that "[t]he minutes of the preceding meeting

should be approved before the start of the following meeting."  Second Amended Complaint

¶ 52(c), at 19.  Without the Working Group's or the Subcommittee's prior approval, at their

meeting on December 8, 2010, the Chair of the Subcommittee appended a set of purported

minutes for the June 2010 Working Group meeting to the Subcommittee report to the D02

Committee on the December 9, 2010 Working Group meeting.  See Second Amended

Complaint ¶ 52(c), at 19.  The draft of the purported Working Group minutes made no

mention of ExxonMobil's statement that it would vote against the Draft ASTM Triglyceride

Standard if limiting language was deleted.  See Second Amended Complaint ¶ 52(c), at 19.

(iii)    At the December 9, 2010 meeting, the Working Group's agenda said that the meeting "will

continue until all business is completed."  Second Amended Complaint ¶ 52(d), at 20.  While

"Committee D02 permitted unlimited discussion and debate on all of the other twenty or so

ASTM Standards on the agenda," over POP Diesel's objection, the Committee "voted to

submit Mr. Convisser's comments accompanying his negative vote on the Draft ASTM

Triglyceride Standard to electronic balloting, rather than allow for discussion and debate at

the meeting."  Second Amended Complaint ¶ 52(d), at 20.

(iv)    ASTM International has not provided material to POP Diesel in response to Mr. Convisser's

request for access to the data and reports on triglyceride diesel fuel that the Subcommittee

and Working Group had considered in formulating the Draft ASTM Triglyceride Standard.

See Second Amended Complaint ¶ 52(e)-(f), at 20-21.

(v)     Contrary to the "usual and customary ASTM practice of trying to work through differences

prior to an actual committee meeting," the Working Group and Subcommittee did not

contact Mr. Convisser following his submission in September of written comments accompanying his negative vote and before the December meeting. Second Amended Complaint ¶ 52(g), at 21. Instead, the Subcommittee contacted Mr. Convisser the week before the December meeting and asked him to withdraw his negative comments, which Mr. Convisser declined to do. See Second Amended Complaint ¶ 52(g), at 21. At the December meeting, the Committee D02 "presented on a large display screen" its responses to Mr. Convisser's objections to the Draft ASTM Triglyceride Standard, but provided no hard copies. See Second Amended Complaint ¶ 52(h), at 21.

POP Diesel asserts that, "[a]s the world's largest publicly traded international oil and gas company, ExxonMobil has the influence and market power to ensure that ASTM adopts the Draft ASTM Triglyceride Standard in its current form." Second Amended Complaint ¶ 49, at 18. POP Diesel alleges that members of the Subcommittee not affiliated with the Defendant Oil Companies "repeatedly stated that many of Convisser's objections had substantive merit," but nonetheless "refused to adopt and approve any of Convisser's proposed changes because such adoption and approval would antagonize the Defendant Oil Companies." Second Amended Complaint ¶ 52(i), at 21-22. The Subcommittee voted twelve-to-one in favor of adopting the Draft ASTM Triglyceride Standard and forwarding it to Committee D02. See Second Amended Complaint ¶ 53, at 22.

### 3.    The Fit-For-Purpose Guidelines.

POP Diesel also asserts that, in response to its objections, the Defendant Oil Companies have also moved aggressively to have ASTM restrict future approval of triglyceride diesel fuels for diesel engines. See Second Amended Complaint ¶ 55, at 23. POP Diesel alleges that the Defendants have caused Committee D02 to begin the promulgation of "Fit-for-Purpose" Guidelines that limit standards for future diesel engine fuels to petroleum-based diesel fuel or biodiesel, as currently

described in ASTM Standard Specification D975.  Second Amended Complaint ¶ 55, at 23.  These Fit-for-Purpose Guidelines are anticipatory standards governing research and development of future products, in that they specify how a new and potentially as yet undeveloped product must function, and how it must fit with existing products and processes to meet ASTM International standards.  See Second Amended Complaint ¶ 56, at 23.  POP Diesel argues that these Fit-for-Purpose Guidelines are detrimental to innovation, research, and development, in that they tend to limit and channel innovation towards existing products and processes, and protect existing products and processes from future competition.  See Second Amended Complaint ¶ 56, at 23.

POP Diesel contends that, like the Draft ASTM Triglyceride Standard, the purpose and effect of the Fit-for-Purpose Guidelines will be to stifle innovation, and to exclude Pop Diesel and other sellers of alternative diesel fuels from the Relevant Markets.  See Second Amended Complaint ¶ 59, at 23.  For example, the Fit-For-Purpose Guidelines' definition of "hydrocarbon oil," a key term, will favor biodiesel, while excluding triglyceride diesel fuel.  Second Amended Complaint ¶ 59, at 23 (a), at 23.  The Fit-For-Purpose Guidelines shift the future burden of validating triglyceride diesel fuel to its producers, small firms that cannot afford the testing that it is the function of ASTM International to provide.  See Second Amended Complaint ¶ 59, at 23, at 24-25.  Like the Draft ASTM Triglyceride Standard, the Fit-For-Purpose Guidelines rely on standards and tests applicable to petroleum-based diesel fuel, with no proven applicability to triglyceride diesel fuel.  See Complaint ¶¶ 59(c)-(d), at 26-28.  POP Diesel alleges that ConocoPhillips is the technical contact for parts of the Fit-for-Purpose Guidelines, see Second Amended Complaint ¶ 59 (a), (b), at 24, and that a "former employee of ExxonMobil is actively participating in the drafting" of a related guideline, see Second Amended Complaint ¶ 59(c), at 25.  POP Diesel contends, upon information and belief, that the Defendant Oil Companies may have other Fit-for-Purpose Guidelines in some

stage of ASTM development unknown to POP Diesel that have the same purpose and effect as they attribute to the Guidelines.  See Complaint ¶ 62, at 27.

In sum, POP Diesel alleges that, in concert, the Defendant Oil Companies, and ASTM International, are in the process of promulgating the Draft ASTM Triglyceride Standard and the Fit-for-Purpose Guidelines with the purpose and effect of excluding triglyceride diesel fuel and POP Diesel's products from the Relevant Markets.  See Second Amended Complaint ¶¶ 63-64, at 30. The Defendants intend imminently to present the Draft ASTM Triglyceride Standard to the Committee D02 membership for a vote on its adoption.  See Second Amended Complaint ¶ 43, at 12.  Once the Draft ASTM Triglyceride Standard is adopted and published, numerous states will incorporate it by reference into law pursuant to existing statutes, such as N.M.S.A. 1978, § 57-19-29. See Second Amended Complaint ¶ 13, at 4.

## PROCEDURAL BACKGROUND

POP Diesel filed a Complaint against several oil companies and ASTM International on February 1, 2011, alleging that the Defendant Oil Companies and ASTM International, acting through the members of its D.O2 Committee and Subcommittee P, conspired to commit antitrust violations in violation of Section 1 of the Sherman Antitrust Act.  See Verified Complaint, filed February 1, 2011 (Doc. 1)("Complaint").  On the same day that POP Diesel filed its Complaint, it moved for a temporary restraining order ("TRO") "to enjoin the Defendants from taking any further action during the pendency of this action, in the absence of prior approval from this Court, with regard to (a) draft Standard Specification for Triglyceride Burner Fuel for use of triglyceride diesel fuel in larger-sized commercial and industrial burners."  Memorandum Opinion and Order, filed April 18, 2011 at 1 (Doc. 71)("April 18, 2011 MOO").  POP Diesel contends that the proposed standard, which stated that "'[t]h[e fuels specified herein] are not intended for use' in residential and

smaller burners, diesel internal combustion engines, and marine applications" was created in contradiction to published studies and its experience.  April 18, 2011 MOO at 3, 5, 8.  POP Diesel argued that the standard will severely limit or bar POP Diesel's use of the fuel in its relevant markets when it is adopted and then automatically applied to state statutes regulating diesel fuel, thereby preventing it from competing with the oil companies to supply diesel fuel to consumers.  See April 18, 2011 MOO at 3, 5, 8.

Five attorneys represented ASTM International:  Thomas O'Brien, its in-house counsel; John Pound, its local counsel in New Mexico; and three attorneys from Morgan, Lewis, & Bockius, LLP in Philadelphia, Pennsylvania -- Mark P. Edwards, lead counsel and partner specializing in antitrust litigation;  R. Brendan Fee, senior antitrust associate; and Sean P. Duffy, a mid-level associate from the firm's Washington, D.C. office.  See Defendant ASTM International's Memorandum of Law in Support of its Motion for Attorneys' Fees and Expenses Pursuant to the Standards Development Organization Advancement Act at 11, filed August 19, 2011 (Doc. 87)("Memorandum in Support of Attorney Fees").  Paralegal Andrea Preate-Regni also assisted Mr. Edwards.  See Memorandum in Support of Attorney Fees at 11.  The same day Mr. Pound and the Morgan Lewis attorneys entered their appearance, Mr. Pound filed a twenty-four page brief in opposition to the application for TRO that the Morgan Lewis attorneys had prepared.  See Defendant ASTM International's Brief in Opposition to Plaintiff's Motion for Preliminary Injunction, filed February 23, 2011 (Doc. 28). The Court set a hearing date to hear the application for TRO on February 24, 2011.  See Notice of Motion Hearing, filed February 24, 2011 (Doc. 24).  Defendant Chevron U.S.A., Inc. joined in ASTM International's response, see Chevron U.S.A. Inc.'s Joinder in ASTM International's Opposition to Plaintiff's Motion for Temporary Injunction, filed February 25, 2011 (Doc. 38), and Plaintiff filed a reply brief, see Plaintiff's Reply in Support of Motion for Temporary Restraining

Order/Preliminary Injunction, filed February 28, 2011 (Doc. 39).  The Court held the hearing on the motion for TRO on March 1, 2011, at which Mr. Edwards and Mr. Pound appeared on behalf of ASTM International, and Mr. Edwards argued ASTM International's opposition.  See Clerk's Minutes, filed March 1, 2011 (Doc. 48).  The hearing lasted for one hour and thirty minutes.  See Clerk's Minutes at 1.  The Court rejected some of ASTM International's arguments, but ultimately denied the motion for TRO, holding that, because POP Diesel could not show that the draft standard had been adopted, POP Diesel "has not shown imminent harm would result if the Court does not issue a preliminary injunction."  April 18, 2011 MOO at 1.

POP Diesel filed an amended complaint on February 15, 2011, adding parties and terminating others.  See First Amended Verified Complaint, filed February 15, 2011 (Doc. 15).  ASTM International filed a twenty-four page motion to dismiss the First Amended Verified Complaint on February 23, 2011.  See Defendant ASTM International's Brief in Support of Its Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), or in the Alternative, to Strike Certain Allegations Pursuant to Fed. R. Civ. P 12(f), filed February 23, 2011 (Docs. 31)("First Motion to Dismiss").  The First Motion to Dismiss contained many of the same standing and failure-to-allege-injury arguments raised in its opposition to the TRO, but ASTM International also argued that POP Diesel "failed to allege facts plausibly suggesting a conspiracy among ASTM and the Defendant Oil Companies," and set out the weaknesses in POP Diesel's conspiracy claims against ASTM International regarding competition and intent.  See First Motion to Dismiss at 10, 12, 17.  The Defendants subsequently agreed that POP Diesel could file a second amended complaint that deleted all Defendants except for ExxonMobil, ConocoPhilips, and ASTM International, and that contained additional allegations.  See Order on the Stipulated Motion Requesting Leave to File Second Amended Complaint, filed March 30, 2011 (Doc. 62);

Second Amended Complaint.  ASTM International filed a second motion to dismiss that repeated all of its arguments from the first motion and essentially added only a section regarding absence of antitrust injury.  Compare Memorandum on First Motion to Dismiss at i (outline of legal arguments) with Defendant ASTM International's Brief in Support of Its Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), or in the Alternative, to Strike Certain Allegations Pursuant to Fed. R. Civ. P. 12(f) at i, filed April 1, 2011 (Doc. 68)("Second Motion to Dismiss")(outline of legal arguments).  ASTM International then withdrew its First Motion to Dismiss.  See ASTM International's Notice of Withdrawal of its Motion to Dismiss Plaintiff's Amended Complaint, filed April 26, 2011 (Doc. 75).  POP Diesel responded to the Second Motion to Dismiss, and ASTM International filed a twelve page reply.  See Defendant ASTM International's Reply in Support of Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), or in the Alternative, to Strike Certain Allegations Pursuant to Fed. R. Civ. P 12(f), filed May 6, 2011 (Doc. 76).  No other hearings were held in this matter.

The Court issued its opinion granting the Defendants' motions to dismiss on July 21, 2011. See Memorandum Opinion and Order, filed July 21, 2011 (Doc. 84)("July 21, 2011 MOO").  In the fifty-seven page opinion, the Court rejected ASTM International's arguments that the Court lacked subject-matter jurisdiction, because POP Diesel lacked standing to bring suit, but concluded that certain of POP Diesel's claims were not ripe and dismissed its fit-for-purpose claims without prejudice.  See July 21, 2011 MOO at 20.  The Court also concluded that POP Diesel "has not set forth adequate factual allegations in support of its antitrust claims or, thereby, a claim of tortious interference with prospective advantage" even though POP Diesel had twice amended its complaint. July 21, 2011 MOO at 35.  The Court dismissed those claims with prejudice.  See July 21, 2011

MOO at 35.

POP Diesel subsequently terminated its out-of-state counsel for alleged incompetence and moved for reconsideration, contending that its former counsel had been given more facts to support the antitrust claims, but that it had failed to include them in the Second Amended Complaint and had committed grievous errors in briefing the response to the motion to dismiss, including failure to explain an agency theory of ASTM International's potential liability.  See Plaintiff's Memorandum in Support of its Motion to Reconsider Dismissal with Prejudice and for Leave to File a Third Amended Complaint at 1, 3-4, filed August 23, 2011 (Doc. 97)("Memorandum in Support of Reconsideration").

ASTM International moves, pursuant to the Standards Development Organization Advancement Act, 15 U.S.C. § 4304, for its attorneys' fees and expenses.  See  Memorandum in Support of Attorney Fees at 1.

## LAW REGARDING ATTORNEYS FEES

The statute discussing awarding attorneys fees and costs, 15 U.S.C. § 4304 provides, in relevant part:

(a) Notwithstanding sections 15 and 26 of this title, in any claim under the antitrust laws, or any State law similar to the antitrust laws, based on the conducting of a joint venture, or of a standards development activity engaged in by a standards development organization, the court shall, at the conclusion of the action --

(1) award to a substantially prevailing claimant the cost of suit attributable to such claim, including a reasonable attorney's fee, or

(2) award to a substantially prevailing party defending against any such claim the cost of suit attributable to such claim, including a reasonable attorney's fee, if the claim, or the claimant's conduct during the litigation of the claim, was frivolous, unreasonable, without foundation, or in bad faith.

15 U.S.C. § 4304.  To establish entitlement to attorneys fees, ASTM International must first establish that "the claim, or the claimant's conduct during the litigation of the claim, was frivolous, unreasonable, without foundation, or in bad faith."  15 U.S.C. § 4304(a)(2).  Because neither the parties nor the Court has found any cases interpreting § 4304, the Court looks to similar federal fee-shifting statutes.  See Burlington v. Dague, 505 U.S. 557, 561-62 (1992)(noting that when, as here, a federal fee-shifting statute instructs the courts to "'award costs of litigation (including reasonable attorney . . . fees )' to a 'prevailing or substantially prevailing party' . . . our case law construing what is a 'reasonable' fee applies uniformly to all of them.").  The Court notes that Title VII's fee-shifting provision is similar in language to § 4304.  Thus, the Court will look to cases interpreting the same language to determine how to resolve ASTM International's motion for attorney's fees.

Under 42 U.S.C. § 2000e-5(k), "a district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421 (1978).  In providing for such recovery by prevailing defendants, Congress made clear it "wanted to protect defendants from burdensome litigation having no legal or factual basis . . . [and] intended to deter the bringing of lawsuits without foundation by providing that the prevailing party . . . could obtain legal fees." Christiansburg Garment Co. v. EEOC, 434 U.S. at 420.  "[T]he term 'meritless' is to be understood as meaning groundless or without foundation, rather than simply that the plaintiff has ultimately lost his case, and . . . the term 'vexatious' in no way implies that the plaintiff's subjective bad faith is a necessary prerequisite to a fee award against him." Christiansburg Garment Co. v. EEOC, 434 U.S. at 421. The Supreme Court of the United States admonished that,

it is important that a district court resist the understandable temptation to engage in

post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.

. . . .

Hence, a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so. And, needless to say, if a plaintiff is found to have brought or continued such a claim in bad faith, there will be an even stronger basis for charging him with the attorney's fees incurred by the defense.

Christiansburg Garment Co. v. EEOC, 434 U.S. at 421-22. This standard is a "stringent" one,

Figures v. Board of Pub. Utils., 967 F.2d 357, 362 (10th Cir. 1992), and there are "rare

circumstances in which a suit is truly frivolous so as to warrant an award of attorneys' fees to the

defendant," Clajon Production Corp. v. Petera, 70 F.3d 1566, 1581 (10th Cir. 1995). Thus, the

United States Court of Appeals for the Tenth Circuit has held:

Claims that the district court dismisses for failure to state a claim do not automatically meet the standard set forth in Christiansburg and Hensley for an award of fees to the defendants. See Hughes v. Rowe, 449 U.S. 5, 15, 101 S. Ct. 173, 178, . . . (1980). Those claims dismissed on 12(b)(6) motions that receive "careful consideration," especially as evidenced by lengthy, detailed, and reasoned orders or opinions, are not "groundless" or "without foundation." Id. at 15-16, 101 S. Ct. at 178-79.

Jane L. v. Bangerter, 61 F.3d 1505, 1513 (10th Cir. 1995). The Tenth Circuit reasoned that, "[i]f

[a plaintiff's] theories were truly frivolous, the district court would have had no need to engage in

prolonged and fact-specific inquiries." Jane L. v. Bangerter, 61 F.3d at 1513 & n. 4-7. Thus, in Jane

L. v. Bangerter, the Tenth Circuit reversed the district court's award of attorney's fees to the

defendant because the district court did not state that the plaintiff's claims were frivolous in its

underlying opinion but, rather, gave the theories "more-than-cursory review," and conducted "a

lengthy application of the facts of this case" to the applicable law. Jane L. v. Bangerter, 61 F.3d at

1517.  The Tenth Circuit noted that, even though the district court concluded that one "argument

borders on the frivolous," the district court "did not conclude that the argument was frivolous,

however, and in fact gave it more than minimal consideration." Jane L. v. Bangerter, 61 F.3d at

1517.

> The standard in Christiansburg Garment is met when a party utterly fails to produce
> any evidence in support of material issues necessary to withstand summary
> judgment.  Head v. Medford, 62 F.3d 351, 355 (11th Cir. 1995); Smith v.
> Smythe-Cramer Co., 754 F.2d 180, 183 (6th Cir. 1985)("Courts have awarded
> attorneys fees to prevailing defendants where no evidence supports the plaintiff's
> position or the defects in the suit are of such magnitude that the plaintiff's ultimate
> failure is clearly apparent from the beginning or at some significant point in the
> proceedings after which the plaintiff continues to litigate.").

Twilley v. Integris Baptist Med. Cent., Inc., 16 F.App'x 923, 926 (10th Cir.

2001)(unpublished)(affirming court's award of attorneys fees to defendant because plaintiff's claims

were unfounded but she continued to litigate, and affirming court's reduction of claim for fees from

$52,796 to $20,000 in part because the district "court found that the total number of hours billed by

defendant's counsel was excessive given that the legal and factual issues were not complex and the

litigation was decided at the summary judgment stage").

## ANALYSIS

The Court has carefully evaluated POP Diesel's allegations and claims set forth in its Second

Amended Complaint, as well as Mr. Convisser's declarations, that formed the factual basis of the

Second Amended Complaint.  See Declaration of Claude Convisser at 1-30, filed February 2, 2011

(Doc. 7); Supplemental Declaration of Claude D. Convisser at 1-10, filed  February 28, 2011 (Doc.

-20-

40).  The Court concludes that POP Diesel's antitrust conspiracy claims, while insufficiently set

forth in the Second Amended Complaint and unpersuasively argued in POP Diesel's response to the

Defendants' motions to dismiss, are not wholly frivolous or utterly without foundation.  ASTM

International concedes that it is not contending that POP Diesel brought the claims in bad faith.

See Transcript of Hearing at 64:4-16[1] (December 15, 2011)(Pound)("Tr.").[2]

ASTM International gives several reasons why it believes the Court should find POP

Diesel's antitrust conspiracy claims against it to be frivolous, unreasonable, or without foundation.

Unfortunately, POP Diesel chose not to specifically address any of these reasons, presenting only

evidence of its former counsel's "bungling of its claims."  Plaintiff's Opposition to Defendant

ASTM International's Motion for Attorney's Fees and Expenses at 4 , filed September 6, 2011(Doc.

100)("Response").  POP Diesel focuses on its admission that, "due to ineffective representation by

its prior, Minnesota counsel, it did not put its strongest foot forward" in its Second Amended

---

[1]  At the December 15, 2011 hearing, ASTM International's local counsel stated,

I have stayed away from the bad faith element just as a practical matter.  Frankly
because we don't need it here . . . .  We don't have to establish bad faith or lack of
good faith under the statute, as you know.  And I believe there's no need to go into
some peculiar exercise into trying to plumb the depths of the minds of the people
who chose to file the lawsuit and to continue to prosecute it once it became even
clearer than it should have been before it was filed that the case was frivolous.  We
just don't need to go there that in light of the fact that, applying the English language
that a case that is dismissed because the Court finds the thesis implausible, by
definition, is a case that was unreasonably filed, frivolous, and is without foundation.

Transcript of Hearing at 64:4-16 (December 15, 2011)(Pound)("Tr.").  ASTM International's
counsel later emphasized: "My point that I was trying to make is that because the language of the
statute does not require us to prove bad faith there's no need to go there.  We just don't need to try
to figure out what the mental state of the decision makers was."  Tr. at 71:13-16 (Pound).  Further,
ASTM International's briefs in support of its motion for attorney's fees do not discuss bad faith.

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original,
unedited version. Any final transcript may contain slightly different page and/or line numbers.

Complaint, response briefs to the motions to dismiss, and in other respects set forth in POP Diesel's motion for reconsideration.  Response at 2.  POP Diesel contends that "a brief review of the rulings to date" shows that its claims are not frivolous, because some of them were dismissed without prejudice and because the TRO was denied without prejudice to its renewal.  Response at 2.  POP Diesel also contends that, "the fact that by ASTM's own policies and procedures, it has acted without authority to regulate triglyceride fuel and now seeks exorbitant sanctions in service to its petroleum-allied members and their goal of squashing triglyceride diesel fuel from the get-go" show that its antitrust claims were not frivolous, unreasonable, or without foundation.  Response at 2.  The bulk of POP Diesel's argument regarding frivolousness focuses on Committee D.O2's and Subcommittee P's alleged lack of authority to set standards for triglyceride fuels, because triglycerides do not fall within the definition of the committees' scope of authority.  See Response at 2-7.

The Court will address ASTM International's arguments made in support of a finding that POP Diesel's claims are frivolous, unreasonable, or without foundation.  Its points are as follows:

> First, the antitrust conspiracy that POP Diesel eventually posited, which was supposedly hatched by ASTM, two oil companies, an organic farm owner, a biodiesel trade association, two employees of a Canadian waste oil recycling firm, and an employee of a petroleum terminaling firm, was, in the Court's words, "hard to swallow." (Dkt. 84, Memorandum Opinion and Order, p. 52).  POP Diesel supplied no factual support for the proposition that those "unlikely bedfellows" would have any reason to conspire with one another with the goal of driving POP Diesel out of business, and, in turn, harming competition in the markets for diesel fuel.  (Id.)  As the Court pointed out, many of the people who POP Diesel said were complicit in the alleged conspiracy would want to "advance the market for triglyceride fuel," not shut it down.  (Id.)

> Second, POP Diesel's antitrust claims, besides being based upon a conspiracy of "unlikely bedfellows," were utterly incoherent.  The sole purported factual basis for POP Diesel's conspiracy claim was an allegation that a representative of ExxonMobil objected at a Working Group meeting to the standard at issue being modified to conform to one of POP Diesel's 12 objections.  As the Court observed,

"it would defeat the purpose of standard-setting organizations" if stating opposition to another member's objection could form the basis for a viable claim under the antitrust laws. (Dkt. 84, p. 47).  As if to further underscore the unreasonableness of its claims, POP Diesel also alleged that, as part of the conspiracy, the ExxonMobil representative's statement had been purposefully omitted from the Working Group meeting minutes, even though the principal thrust of POP Diesel's claim was that ExxonMobil was able to vanquish POP Diesel's objection to the standard simply by alerting other ASTM members to its position. (Id., p. 49).  In other words, according to POP Diesel, ExxonMobil was at once trying to improperly influence ASTM members to vote against POP Diesel's negative, while at the same time keeping its view on POP Diesel's negative a secret.

Third, notwithstanding allegations to the contrary in its complaints, POP Diesel conceded that (i) the ASTM standard at issue did not affect the markets for diesel fuel used in compression engines, and (ii) it is neither a customer nor a competitor in the market for diesel fuel used in burners. (Dkt. 84, p. 33).  Hence, POP Diesel's entire theory of antitrust injury was based on premises it admitted were false. But, instead of dropping its case, POP Diesel asked the Court simply to ignore those admissions, and to allow it to take burdensome discovery from Defendants in order to support a claim it could never prove.

Fourth, POP Diesel could not possibly have established the requisite anticompetitive effects to state an antitrust claim because the standard at issue -- again, by POP Diesel's own admission -- would never have prohibited POP Diesel from competing in the supposedly relevant markets. POP Diesel conceded that the New Mexico statute it had been saying would incorporate the ASTM standard into law and allegedly would cause anticompetitive effects, "pertains only to petroleum products, which of course POP Diesel [] does not supply." (Dkt. 84, p. 47, n. 6).  It is difficult to fathom how a plaintiff with sophisticated antitrust counsel could base a claim against ASTM on supposed anticompetitive effects flowing from a statute that, it admits, does not even apply to its business.

Memorandum in Support of Attorney Fees at 5.  The Court's July 21, 2011 MOO noted that the Second Amended Complaint's "fatal flaw is that it fails to allege a plausible antitrust conspiracy" between the Defendants, and it also noted POP Diesel's deficiency in failing to discuss the membership of the Working Group and Subcommittee P, and how it may have been aligned with the Defendant Oil Companies.  July 21, 2011 MOO at 39, 41 n.3.  In its motion to reconsider, however, POP Diesel asserts that its counsel was incompetent by making the statements in its briefing, which are set out by ASTM International in points 3 and 4 above, that were contrary to its

allegations in the Second Amended Complaint.  See Memorandum in Support of Reconsideration at 12-13.  POP Diesel also argues that, before the Second Amended Complaint was drafted, it had given its attorneys information and evidence demonstrating "that the ASTM Subcommittee D.O2.P members drew overwhelmingly from the biodiesel, petroleum, and used petroleum oil recycling industries" in appointing members of the Working Group "involved in the drafting and approval of the unreasonably restrictive ASTM Triglyceride Burner Fuel Standard," which are POP Diesel's competitors, and which support an inference that ASTM International's agents intended to skew the normal standard-setting process against competition.  Memorandum in Support of Reconsideration at 10-11.  POP Diesel also pointed to what it considered one of its counsel's most egregious errors -- its failure to mention in its response to the motion to dismiss its allegation that "the only scientific authority cited by ASTM to justify the Standard is a report whose import is to contradict specific restrictions included in the Standard," and to demonstrate how that report was in direct conflict with the proposed Triglyceride Standard.  Memorandum in Support of Reconsideration at 4; POP Diesel's Consolidated Reply to the Defendants' Opposition to its Motion to Reconsider at 8-12, filed September 20, 2011 (Doc. 102)("Consolidated Reply").  POP Diesel contends that the Working Group's promulgation of language in the Triglyceride Standard which is contrary to various portions of the 2002 Report, which was the only technical study on which the Working Group and Subcommittee P relied, is damning proof that, instead of relying on the scientific evidence in that Report to develop and promulgate reasonable standards, the Working Group and Subcommittee P was improperly influenced by, and kowtowed to, the powerful oil companies that dominate Committee D.02.  POP Diesel contends that incorporating language into the Triglyceride Standard that is contrary to that 2002 Report is proof that the Working Group heeded ExxonMobil's threat, made at a Working Group meeting, that it would vote against the Triglyceride Standard if the

Working Group deleted language that triglyceride fuels "'are not intended for use' in residential and smaller burners, diesel internal combustion engines, and marine applications." Second Amended Complaint ¶ 48, at 18.  POP Diesel contends that the Working Group's unexplained refusal to prepare a Standard that is consistent with the 2002 University of Georgia Report is proof of a conspiracy, because "there was no evidence to justify the restrictions stated in the Standard, [and] the true allegiance of members of this Subcommittee, . . . comes to the fore in depicting an antitrust conspiracy."  Consolidated Reply at 12.  Of course, POP Diesel's arguments based on counsel's error and allegedly newly discovered evidence that were raised in its motion for reconsideration were too late to remedy the Court's dismissal of its claims, and the Court recently denied its motion for reconsideration.  See Memorandum Opinion and Order at 39, filed March 22, 2012 (Doc. 114).  Nevertheless, they support the conclusion that POP Diesel's claims were not wholly frivolous, unreasonable, or without foundation.

Further, in the Second Amended Complaint, POP Diesel pointed to the Working Group's failure to include in its meeting minutes ExxonMobil's statement that it would oppose the Draft ASTM Triglyceride Standard if it deleted anticompetitive language as evidence of a conspiracy and as a procedural irregularity supporting a conspiracy claim.  See Second Amended Complaint ¶ 52(a)-(c), at 18-19.  In its briefing on the motion to dismiss, however, POP Diesel quoted this part of the Second Amended Complaint only in contending that it had alleged facts showing a conspiracy.  See Plaintiff's Combined Memorandum of Law in Opposition to Defendants' Motions to Dismiss at 10, filed April 22, 2011(Doc. 74)("Such improprieties consisted of, inter alia, failing to include in meeting minutes ExxonMobil's statement that it would oppose the Draft ASTM Triglyceride Standard if it did not include anticompetitive language.").  POP Diesel did not explain how that irregularity showed evidence of conspiracy in its thirty-seven page response to the

Defendants' contentions that not including the threat in the minutes of the meeting proved nothing

and, in fact, weighed in favor of showing that no conspiracy existed. See Defendant ExxonMobil's

Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6), at 14, filed April 1, 2011 (Doc. 66)(contending that POP Diesel

"has not alleged any kind of 'back room' activity by Exxon . . . [and that Exxon's threat was

ineffective because,] ironically, Plaintiff complains that the statement was not even included in the

minutes of that meeting, and therefore was not disseminated to other members"). Thus, the Court

did not manufacture an argument for POP Diesel in regard to the exclusion of the minutes, stating,

> it is unclear how excluding ExxonMobil's statement from the minutes would
> plausibly suggest a conspiracy in restraint of trade, particularly when the essence of
> POP Diesel's antitrust theory appears to be that the Oil Company Defendants used
> their influence to compel other members of Committee D02 to vote in accordance
> with their interests.

July 21, 2011 MOO at 49.   It seems reasonable, however, that POP Diesel could have argued that

the Working Group, all of whom were present when ExxonMobil made its threat, excluded the

threat from its minutes, because it wanted to keep the threat secret to avoid any inference that

ExxonMobil's threat actually affected its decisions not to delete the extraneous language before it

submitted the proposed standard to the full Subcommittee P.  Thus, POP Diesel's inclusion of that

allegation as evidence of an antitrust conspiracy is not as "utterly incoherent" and inconsistent as

ASTM International insists.  Memorandum in Support of Attorney Fees at 5.

The Court prepared a fifty-seven page Memorandum Opinion and Order dismissing POP

Diesel's antitrust claims, and "engage[d] in prolonged and fact-specific inquiries," Jane L. v.

Bangerter, 61 F.3d at 1513, in analyzing each allegation supporting the claims that POP Diesel's

Minnesota counsel brought to its attention in response to the Defendants' motion to dismiss, see July

21, 2011 MOO.  Thus, the Court did not give only a "cursory review" to POP Diesel's theories.

Jane L. v. Bangerter, 61 F.3d at 1517.  While the Court found that POP Diesel's undeveloped theory

of the nature of the conspiracy "hard to swallow," July 21, 2011 MOO at 52-53, it "did not conclude

that the argument was frivolous," Jane L. v. Bangerter, 61 F.3d at 1517.  POP Diesel did not "utterly

fail," Twilley v. Integris Baptist Med. Cent., Inc., 16 F.App'x at 926, to produce any evidence of

antitrust conspiracy.  It showed, for example, that ExxonMobil actively threatened to vote against

the Triglyceride Standard if the Working Group deleted the extraneous[3] language that triglyceride

---

[3]As noted in part in the Court's July 21, 2011 MOO, POP Diesel's Second Amended Complaint alleged that Gina Clapper, a member of Subcommittee P, told Mr. Conviser that the reason the Committee was going to promulgate a Triglyceride Standard was because "burner manufacturers -- not the Defendants -- seeking insurance coverage for the use of triglyceride diesel fuel asked ASTM Committee D02 to develop a standard for triglyceride diesel fuel to be used in burners in an effort to expand the market." July 21, 2011 MOO at 48 (emphasis added).  The Court held that, "[b]ecause Draft ASTM Triglyceride Standard is intended to expand the burner market, POP Diesel has not adequately alleged an 'anticompetitive effect because the [standard], although influential, [will] not [be] required to compete in the market.'" July 21, 2011 MOO at 48 (brackets original).  If the Triglyceride Standard was developed only to apply to triglyceride fuel used in commercial and industrial burners, it is difficult to understand why ExxonMobil, which does not manufacture commercial or industrial burners, would insist that the extraneous language stating that the fuel is also not intended to be used in other applications, like internal combustion engines, remain as part of the Standard unless it was trying to prevent competition for fuels in that market. POP Diesel, however, did not make that argument before final judgment was entered, and the Court is not allowed to advocate for a party and manufacture arguments on its behalf.  POP Diesel now contends that Clapper's statement to him that Turner began working on the Triglyceride Standard "on behalf of fuel oil burner manufacturers interested in gaining an initial ASTM standard for triglyceride diesel fuel so that Underwriters Laboratory would rate insurance and the burner manufacturers could thereby offer warranty coverage" is not true, and was a false pretext to create anticompetitive standards, because Turner actually was "representing the interests of the biodiesel industry," Memorandum in Support of Reconsideration at 8-9; Ralph E. Turner Biography at 2, filed August 23, 2011 (Doc. 97-5), by being the "owner's representative and technical director in construction of a 45 million gallon per year biodiesel plant," POP Diesel's Consolidated Reply at 6.  POP Diesel also sought to amend its complaint to allege that "[t]here are not any burner manufacturers who have ever attended any ASTM Subcommittee meeting considering the promulgation of a standard for triglyceride diesel fuel," "[t]here are not any such burner manufacturers who sought insurance coverage for triglyceride diesel fuel and Underwriters Laboratories certification," and "[t]here are not any such burner manufacturers who ever requested that ASTM develop such a standard."  Memorandum in Support of Reconsideration at 9.  Once again, POP Diesel is stuck with the allegations in its Second Amended Complaint upon which the Court based its decision holding that it had failed to allege an anticompetitive effect, but this

-27-

fuels also "'are not intended for use' in . . . diesel internal combustion engines," which is the market

in which POP Diesel competes with ExxonMobil, and it mentioned the 2002 University of Georgia

Report that contradicted the proposed Triglyceride Standard in several respects.   The Court

dismissed without prejudice POP Diesel's fit-for-purpose claims against ASTM International.   The

Court concludes that this is not one of those "rare circumstances in which a suit is truly frivolous

so as to warrant an award of attorneys' fees to the defendant," Clajon Production Corp. v. Petera,

70 F.3d at 1581.

**IT IS ORDERED** that Defendant ASTM International's Motion for Attorney's Fees and

Expenses Pursuant to the Standards Development Organization Advancement Act, filed August 19,

2011 (Doc. 86), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David J. Jaramillo
Maria E. Touchet
The Gaddy Jaramillo Law Firm
Albuquerque, New Mexico

*-- and --*

Claude D. Convisser
Santa Fe, New Mexico

    *Attorneys for the Plaintiff*

Julian Brew
Kaye Scholer, LLP
Los Angeles, California

_____

evidence is indicative that POP Diesel's claims were not wholly frivolous or unfounded.

*-- and --*

David F. Cunningham
Thompson, Hickey, Cunningham, Clow, April & Dolan, P.A.
Santa Fe, New Mexico

     *Attorneys for Defendant ExxonMobil Corporation*

Andrew G. Schultz
Rodey, Dickason, Sloan, Akin & Robb, P. A.
Albuquerque, New Mexico

*-- and --*

D. Bruce Hoffman
David A. Higbee
Ryan Shores
Thomas G. Slater
Hunton & Williams, LLP
Washington, DC

*-- and --*

Thomas G. Slater
Hunton & Williams LLP
Richmond, Virginia

     *Attorneys for Defendant Chevron Corporation*

George S. Cary
Steven J. Kaiser
Cleary Gottlieb Steen & Hamilton, LLP
Washington, DC

*-- and --*

Michael B. Campbell
Campbell Trial Law, LLC
Santa Fe, New Mexico

     *Attorneys for Defendant Chevron Corporation Conocophillips*

John B. Pound
Long, Pound & Komer, P.A.
Santa Fe, New Mexico

*-- and --*

Thomas B. O'Brien
ASTM International
West Conshohocken, Pennsylvania

*-- and --*

Mark P. Edwards
R. Brendan Fee
Morgan, Lewis & Bockius, LLP
Philadelphia, Pennsylvania

     *Attorneys for Defendant ASTM International*

Daniel Laytin
Leslie S. Garthwaite
Leslie M. Smith
Sandra Maja Fabula
Kirkland & Ellis LLP
Chicago, Illinois

*-- and --*

John R. Cooney
Zachary L. McCormick
Modrall Sperling Roehl Harris & Sisk PA
Albuquerque, New Mexico

     *Attorneys for Defendant BP Products North America, Inc.*